13 CV 2017

ROBERT PLUMA,

PLAINTIFF,

vs.

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE OFFICERS "JOHN
DOES 1-50"

DEFENDANTS.

INDEX NO
ECF CASE 

COMPLAINT
[JURY TRIAL
DEMANDED]

RECEIVED MAR 26 2013 S.D.N.Y.
CITY OF N.Y. LAW DEPT. OFFICE OF THE CORP. COUNSEL
'13 MAR 26 PH 2:36

Plaintiff ROBERT PLUMA, by his attorneys, STECKLOW COHEN &

THOMPSON, complaining of the defendants, respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

1.  Plaintiff ROBERT PLUMA brings this action for compensatory damages,

punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988

for violations of his civil rights, as said rights are secured by said statutes and the

Constitutions of the State of New York and the United States.

2.  The Plaintiff ROBERT PLUMA was peaceably assembled at Zuccotti

Park on the evening of December 31, 2011, intending to welcome in the New Year with

his girlfriend, other friends, and with other citizens who believed in the goals of the

Occupy Wall Street movement. An overwhelming force of New York City Police

officers was present. These officers initiated physical confrontations with other

individuals at Zuccotti Park. In so doing, multiple police officers used metal fencing as a

weapon to push members of the crowd. The same or other police officers deployed

pepper spray or tear gas. The Plaintiff was injured when he was blinded by the tear gas and fell, breaking his dominant hand in a way the required surgery and rehabiltiation.

## II. JURISDICTION

**3.** This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

**4.** Plaintiff ROBERT PLUMA further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## III. VENUE

**5.** Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## IV. JURY DEMAND

**6.** Plaintiff ROBERT PLUMA respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## COMPLIANCE WITH GEN. MUN. LAW § 50-I

**7.** A notice of claim was made and served upon the City of New York in compliance with section fifty-e of this chapter, and at least thirty days have elapsed since the service of such notice and adjustment or payment thereof has been neglected or refused, and this action or special proceeding is commenced within one year and ninety days after the happening of the events upon which the claim is based.

## V. THE PARTIES

**8.** Plaintiff ROBERT PLUMA ("the Plaintiff") is a resident of the State of New York.

**9.** Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

**10.** Defendant THE CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

**11.** Plaintiff ROBERT PLUMA will amend this complaint to name the Defendant "John Doe" POLICE OFFICERS ("the Defendant POLICE OFFICERS") as their identities can be established to a reasonable certainty.

**12.** That at all times relevant to this action, the Defendant POLICE OFFICERS either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

**13.** Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant THE CITY OF NEW YORK, and were acting under the supervision of said department and according to his official duties.

## VI. FACTS COMMON TO ALL CLAIMS

**14.**     On the evening of December 31, 2011, the Plaintiff went to Zuccotti Park with his girlfriend.

**15.**     The Plaintiff and his girlfriend chose to go to Zuccotti Park to welcome in the New Year with hopeful reflection upon the efforts of Occupy Wall Street to bring greater democracy and a fairer economic system to our country.

**16.**     Zuccotti Park is open 24 hours, and the park was open that evening.

**17.**     The police permitted people to enter the park.

**18.**     At the time the Plaintiff arrived, the police had set up metal barricades that surrounded most or all of the park.

**19.**     Entry to the park was permitted only through gaps in these barricades, which were guarded by police.

**20.**     Those entering the park were subjected to search, although such search was probably unlawful under the circumstances.

**21.**     The Plaintiff and his girlfriend observed the approach of the New Year by talking with each other and with friends.

**22.**     The Plaintiff, who is also a citizen journalist, had his camera with him, and took pictures and shot video.

**23.**     The Plaintiff and others peacefully remained in the park for some time.

**24.**     The Plaintiff filmed a single arrest from a safe and lawful distance.

**25.**     There was no warning that the militarized police were about to strike.

**26.**     Yet strike they did.

**27.**     The Plaintiff became aware of activity in his vicinity.

**28.**     The police shoved a metal barricade against members of the public.

**29.**　　The Plaintiff, acting as a citizen journalist, began to film the event.

**30.**　　The police shoved a metal barricade against members of the crowd.

**31.**　　The police deployed pepper spray.

**32.**　　The police deployed the pepper spray with the intention of creating the maximum possible confusion and suffering among the protestors they were attacking.

**33.**　　The police deployed the pepper spray in such a way as to strike those present holding cameras, including the Plaintiff.

**34.**　　The police spayed tear gas on the Plaintiff, simply a bystander and citizen journalist witnessing the event.

**35.**　　The Plaintiff was blinded and unable to breathe, and fell.

**36.**　　The Plaintiff landed with most of his weight on his left hand.

**37.**　　This impact caused spiral fractures that required surgery.

**38.**　　The Plaintiff's left hand is his dominant hand.  It is the one that he uses to write.

**39.**　　The Plaintiff was not arrested by the police.

**40.**　　At no point did any officer attempt to arrest the Plaintiff, or give any indication that the police believed the Plaintiff had behaved in any way that was unlawful.

**41.**　　The Plaintiff had done nothing wrong or unlawful.

**42.**　　The Plaintiff was, however, attacked by the police.  As a result of the attack, the Plaintiff was on the ground, temporarily blind, his eyes, nose and mouth burning, and his hand in searing pain.

**43.**　　The Plaintiff was helped to a safer distance from the police aggressors.

**44.**     He vomited from the pepper spray.

**45.**     The Plaintiff unsuccessfully sought medical help at the scene.

**46.**     Unable to find help, the Plaintiff and his girlfriend went to the hospital.

**47.**     The Plaintiff was found to have multiple spiral fractures of his left hand requiring surgery.

**48.**     The Plaintiff underwent surgery several days later.

**49.**     The Plaintiff underwent months of physical therapy.

**50.**     During his recovery, the Plaintiff was unable to perform basic tasks like tying his own shoelaces.

**51.**     The Plaintiff, who worked with computers, could not type effectively.

**52.**     When the Plaintiff attempted to perform the daily tasks of life that required two hands, he felt severe pain and discomfort.

**53.**     When the Plaintiff attempted to perform the daily tasks of life that required the strength and precision of his dominant hand, he suffered not only pain and discomfort, but also frustration and anger.

**54.**     The Plaintiff suffered fear and anxiety that his main hand, with its spiral fracture, would never get back to normal.

**55.**     When the Plaintiff lost his job, it was hard for him to do the things necessary to find a job, with his broken dominant hand.

**56.**     To this day, while the function of the Plaintiff's hand has returned to a large extent, the Plaintiff still feels discomfort and limited movement.

## FIRST CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

**57.** Plaintiff ROBERT PLUMA repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**58.** All of the aforementioned acts of Defendant THE CITY OF NEW YORK, and the Defendant POLICE OFFICERS, their agents, servants and employees, were carried out under the color of state law.

**59.** All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States of America, in violation of 42 U.S.C. § 1983.

**60.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

**61.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

**62.** The individual Defendants and Defendant THE CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or

rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

63.     As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT PLUMA was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, and loss of wages.

64.     As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money, and punitive damages, to be determined at trial.

SECOND CLAIM FOR RELIEF

EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

65.     Plaintiff ROBERT PLUMA repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

66.     Plaintiff was subjected to excessive and unjustified force in violation of his rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

67.     As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT PLUMA was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, and loss of wages.

68.     As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money, and punitive damages, to be determined at trial.

<u>THIRD CLAIM FOR RELIEF</u>

<u>FAILURE TO INTERVENE UNDER 42 U.S.C. §1983</u>

**69.** Plaintiff ROBERT PLUMA repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**70.** The Defendants had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights.

**71.** The individual Defendants failed to intervene on Plaintiff 's behalf to prevent the violation of his constitutional rights despite having had a realistic opportunity to do so.

**72.** The individual Defendants failed to intervene on Plaintiff 's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

**73.** As a result of the aforementioned conduct of the individual Defendants, Plaintiff's constitutional rights were violated.

**74.** As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT PLUMA was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, and loss of wages.

**75.** As a result of Defendants' impermissible conduct, Plaintiff's demands judgment against Defendants in a sum of money, and punitive damages, to be determined at trial.

## FOURTH CLAIM FOR RELIEF

## RETALIATION FOR FIRST AMENDMENT PROTECTED EXPRESSION UNDER 42 U.S.C. § 1983

**76.** Plaintiff ROBERT PLUMA repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**77.** At or around the time that the Plaintiff came into contact with the Defendants, the Plaintiff had recently been and/or was currently engaging in protected speech or conduct, including but not limited to participating in a peaceful assembly, journalism in order to lawfully exercise their First Amendment protected rights.

**78.** The Defendants took adverse action against the Plaintiff in retaliation for lawfully exercising his First Amendment protected rights to free speech, expression, and association.

**79.** The actions of the Defendant POLICE OFFICERS heretofore described, were designed to and did cause bodily harm, pain and suffering in direct retaliation for Plaintiff's exercise of his civil and constitutional rights of free speech, free expression and expressive association as guaranteed by the First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

**80.** As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT PLUMA was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, and loss of wages.

**81.**     As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against the Defendants in amounts to be determined at trial.

FIFTH CLAIM FOR RELIEF

STATE LAW —— ASSAULT

**82.**     Plaintiff ROBERT PLUMA repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**83.**     The Defendants engaged in physical conduct placing the Plaintiff in imminent apprehension of harmful contact.

**84.**     As a result of the Defendants' conduct, the Plaintiff sustained serious physical, mental and emotional injuries, as well as other out of pocket damages.

**85.**     As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against the Defendants in amounts to be determined at trial.

SIXTH CLAIM FOR RELIEF

STATE LAW —— BATTERY

**86.**     Plaintiff ROBERT PLUMA repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**87.**     The Defendants, without privilege or consent, intentionally made bodily contact with the Plaintiff which was offensive in nature.

**88.**     As a result of the Defendants' conduct, the Plaintiff sustained serious physical, mental and emotional injuries, as well as other out of pocket damages.

**89.**     As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against the Defendants in amounts to be determined at trial.

<u>SEVENTH CLAIM FOR RELIEF</u>

<u>STATE LAW —— NEGLIGENCE</u>

**90.**     Plaintiff ROBERT PLUMA repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**91.**     The Defendants employed physical force against third parties in the vicinity of the Plaintiff.

**92.**     The Defendants released gaseous toxins in the vicinity of the Plaintiff.

**93.**     The Defendants owed a duty of care not to engage in these activities in the vicinity of the Plaintiff; or, in the alternative, the Defendants had a duty to do so in a manner that would not injure the Plaintiff.

**94.**     In breach of these duties, the Defendants employed physical force against third parties and released gaseous toxins in a manner that physically injured the Plaintiff.

**95.**     As a result of the Defendants' conduct, the Plaintiff sustained serious physical, mental and emotional injuries, as well as other out of pocket damages.

**96.**     As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against the Defendants in amounts to be determined at trial.

<u>EIGHTH CLAIM FOR RELIEF</u>

<u>STATE LAW —— RESPONDEAT SUPERIOR</u>

**97.**     Plaintiff ROBERT PLUMA repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**98.** The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers, officials, and agents of the City of New York.

**99.** As a result, the Plaintiff sustained serious physical, mental and emotional injuries, as well as other out of pocket damages.

**100.** The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers and officials in the course of their employment by Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

**101.** As a result, the Defendant THE CITY OF NEW YORK is liable to the Plaintiff for the injuries and other damages caused by its police officers, officials, and agents on a theory of respondeat superior.

**102.** As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against the Defendants in amounts to be determined at trial.

NINTH CLAIM OF RELIEF

STATE LAW ——— NEGLIGENT HIRING, RETENTION<br>TRAINING AND SUPERVISION

**103.** Plaintiff ROBERT PLUMA repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**104.** Defendant The City of New York hired, trained, and supervised the Defendant POLICE OFFICERS who caused the injuries to the Plaintiff.

**105.** Defendant THE CITY OF NEW YORK hired the Defendant POLICE OFFICERS without regard to their propensity to use excessive or reckless force, or to unlawfully violate the constitutional rights of citizens.

**106.** Defendant THE CITY OF NEW YORK retained the Defendant POLICE OFFICERS despite knowledge of their use of excessive or reckless force, or repeated violations of citizens' constitutional rights.

**107.** Defendant THE CITY OF NEW YORK failed to train the Defendant POLICE OFFICERS not to use excessive or reckless force, or to unlawfully violate the constitutional rights of citizens.

**108.** Defendant The City of New York failed to supervise the Defendant POLICE OFFICERS to ensure that they did not to use excessive or reckless force, or to unlawfully violate the constitutional rights of citizens.

**109.** As a result, the Plaintiff sustained serious physical, mental and emotional injuries, as well as other out of pocket damages.

**110.** As a result of the foregoing, Plaintiff is entitled to compensatory damages and punitive damages against the Defendants in amounts to be determined at trial.

<u>TENTH CLAIM FOR RELIEF</u>

<u>VIOLATION OF THE PLAINTIFF'S RIGHTS UNDER THE CONSTITUTION OF THE STATE OF NEW YORK</u>

**111.** Plaintiff ROBERT PLUMA repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**112.** As a result of the aforesaid conduct of Defendant THE CITY OF NEW YORK and the Defendant POLICE OFFICERS, the Plaintiff was deprived of rights guaranteed to him by the New York State Constitution, including though not limited to:

A. The right of the people to freely speak their sentiments on all subjects as described in Article I §8 of the New York State Constitution.

B. The right of the people to peaceably assemble to petition the government, or any department thereof as described in Article I §9 Subsection 1 of the New York State Constitution.

C. The right of the people to be free from excessive force under Article I §12 of the New York State Constitution.

**113.** The acts complained of were carried out by the Defendant POLICE OFFICERS in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the NYPD.

**114.** The Defendant POLICE OFFICERS and Defendant THE CITY OF NEW YORK, collectively and individually, while acting under color of state law violated the Plaintiff's constitutional rights by engaging in conduct proscribed by the New York State Constitution.

**115.** As a result of Defendants' impermissible conduct, the Plaintiff was injured and harmed. Accordingly, the Plaintiff demands judgment against Defendants in a sum of money, and punitive damages, to be determined at trial.

ELEVENTH CLAIM FOR RELIEF

MONELL LIABILITY AGAINST DEFENDANT THE CITY OF NEW YORK

**116.** Plaintiff ROBERT PLUMA repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**117.** The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

**118.** The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

**119.** The general approach of the NYPD to the Occupy Wall Street protests fits a paradigm named by scholars "the escalated force approach," which includes the following: limited concern for the protesters' speech and assembly rights; limited tolerance for community disruption; limited communication between police and demonstrators; extensive use of arrests to manage demonstrators; extensive use of force to control demonstrators; and surveillance of protesters, including infiltration and the use of informants.[1] All of the forgoing tactics have been reported being implemented by the NYPD on multiple occasions in policing Occupy-related events, including the illegal mass arrests described herein.

**120.** Particular policies and customs implemented by Defendant THE CITY OF NEW YORK which proximately caused violation of the Plaintiff's Constitutional rights are these:

---

[1] *See Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street,* The Global Justice Clinic (NYU School of Law) and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice (Fordham Law School) (2012).

A.      Defendant THE CITY OF NEW YORK has a policy and practice of

targeting participants in Occupy Wall Street activities for wrongful arrest

without cause, and the application of excessive force against them;

B.      Defendant THE CITY OF NEW YORK e City of New York has a policy

and practice of arresting individuals selected at random from within groups

engaging in peaceful protest, for the purpose of frightening and deterring

the remainder of those protesting;

C.      The City of New York has a policy and practice of unlawful use of "trap

and detain"/"trap and arrest" tactics, creating unjustified risk of injury;

D.       The foregoing policies were designed and implemented at the highest

command levels of the NYPD.

**A.      The City of New York has a policy and practice of targeting participants in
Occupy Wall Street activities for arrest without cause and subjecting them to
excessive force**

**121.**      According to *The New York Times*, as of June 18, 2012, over 2,500

participants in Occupy Wall Street activities had been arrested in Manhattan alone.  Upon

information and belief, the vast majority of the cases were dismissed or otherwise

resolved without criminal penalty.

**122.**      In other words, over the period of less than a year, Defendant THE CITY

OF NEW YORK caused hundreds or thousands of protestors – who had committed no

crime -- to be arrested.

**123.**      Upon information and belief, the NYPD's response to the Occupy

movement follows mass arrest policies that were established at the time of the 2004

Republican convention, during which over 1,800 people were arrested, with more than 90 percent of the arrest cases being dismissed or ending with not-guilty verdicts.

124.    Upon information and belief, the police have been documented to have filed false criminal charges against others – not parties to this action -- who were arrested during the January 1, 2012 Occupy Wall Street march which is the subject of this action.

125.    In this regard, the City of New York treats liberal or left-oriented political assemblies more harshly than equivalent non-political events or events with a conservative or right-wing orientation.

126.    Upon information and belief, in one such arrest Alexander Arbuckle was arrested on charges that he was standing in the street blocking traffic.  The arresting officer, Officer Elisheba Vera, swore to this version of events on the witness stand at trial.  However, photo and video evidence – including video taken by the NYPD's video unit – demonstrated that Arbuckle was on the sidewalk when he was arrested.  As the magazine *The Nation* reported: "As it turns out, Officer Elisheba Vera lied to the court." Arbuckle was found not guilty.

127.    Upon information and belief, Damien Treffs was a legal observer accompanying the January 1, 2012 march.  He was violently arrested without warning. The District Attorneys office declined to prosecute the case because probable cause was lacking for the arrest.

128.    Upon information and belief, police officers committed perjury in order to press charges against another protestor, Jessica Hall, who was arrested for blocking street traffic on November 17, 2011.  As *The Nation* reported, the truth exposed at her trial was quite different:  "During trial, Sergeant Michael Soldo told the court that he arrested Hall

because she was blocking traffic. But Soldo later admitted under cross-examination, and the NYPD's own video confirmed, that it was the NYPD metal barricades that prevented vehicles from passing."

129. Upon information and belief, police lied to support the arrest of a protestor arrested at an Occupy-related protest on Sept. 19, 2011, The protestor was arrested for – according to NYPD spokesman Paul Browne – leaping over a police crowd-control barrier. Video of the incident, however, showed that the arresting officers reached across the barrier and forcibly dragged the individual over it.

130. Upon information and belief, several civil cases arising out of the arrests of protestors have also alleged perjured criminal complaints lodged against protestors prior to the Occupy movement, including:

♦ Long v. City of New York, 09 Civ. 9216 (AKH) (S.D.N.Y.) (officer purposefully swears out false complaint against protestor; perjury is discovered by means of video of the arrest taken by another protestor);

♦ Callaghan v. City of New York, 07 Civ. 9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and mass retaliatory arrests of bicyclists, not based upon individualized suspicion, engaged in expressive conduct, to wit, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);

♦ Dunlop v. City of New York, 06 Civ. 0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police

destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

♦ MacNamara v. City of New York, 04 Civ. 9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people, not based upon individualized suspicion).

131.    Upon information and belief, other cases have documented other forms of police misconduct directed against protestors, and tolerated or encouraged by the NYPD.

♦ Lin v. City of New York, 09 Civ. 1936 (PGG) (S.D.N.Y.) (officers arrest en masse participants in a Critical Mass group bicycle ride, without individualized suspicion, including arresting a person lawfully photographing an arrest of a bicyclist in Times Square and a bystander after refusing an unlawful order to produce identification);

♦ Corbin v. City of New York, 12-cv-02305 (PAC) (S.D.N.Y.) (police captain personally engaged in extended surveillance of small group of lawful protestors, eventually directing unlawful arrests of perceived leaders of group).

**B**.    **The City of New York has a policy and practice of arresting individuals selected at random from within groups engaging in peaceful protest, for the purpose of frightening and deterring the remainder of those protesting.**

132.    Upon information and belief, Defendant THE CITY OF NEW YORK has implemented a policy pursuant to which individuals are selected at random for arrest from within a group of protestors, in order to create fear in other protestors that they too will be subject to arrest.  One feature of random arrests is that the police arrest certain

individuals who are engaging in lawful activity, and who are engaging in no legally significant activity that is different from that of other individuals present at the same time and place. Upon information and belief, the purpose of this tactic is to deter protestors from engaging in protest. The tactic is effective because it creates confusion as to what conduct the police consider lawful, and what conduct will subject the individual to arrest.

133. Upon information and belief, this tactic actually achieves the desired result of deterring other individuals from lawful participation in Occupy-related activities. Arresting even a relatively small proportion of those lawfully engaging in a protest is an effective deterrent. If the NYPD regularly arrested every 100th person entering Macy's, people would very quickly stop going to Macy's. Months and thousands of arrests after the Occupy Wall Street movement began, these abusive tactics have substantially impacted the size and frequency of events.

134. Upon information and belief, as early as the third day of the Occupy Wall Street protests, NYPD officers were already observed to have been selecting individual protestors at random from a larger group and targeting those people for arrest. At a protest on Sept. 19, 2011, journalists reported police penetrating a group of protestors to select a single individual for arrest. The individual was later falsely reported to have leapt over a barricade by NYPD spokesman Paul Browne.

135. Upon information and belief, two days later, one witness reported two random arrests at an Occupy-related protest at the corner of Broadway and Liberty streets on September 21, 2011.

136. Upon information and belief, a reporter for the *Chronicle of Higher Education* documented the random arrest tactic being employed in the vicinity of Union

Square on September 24, 2011: "In the same way that ocean trawlers capture indiscriminately, officers penned hundreds of peacefully marching Occupy Wall Street protesters together with bystanders, pedestrians, reporters, and neighborhood residents. Witnesses called police targeting of detainees 'random.'" The same reporter wrote: "Many detainees were simply on their way from the nearby farmer's market or the Strand bookstore—or en route to one of the five subway lines intersecting in the area."

137. Upon information and belief, a reporter for *The New York Times* reported that arrests of Occupy-affiliated protestors in the vicinity of the Brooklyn Bridge on October 1, 2011 appeared to be "random and aggressive." ABC News similarly reported "random" arrests taking place. The following day, Mayor Michael R. Bloomberg ratified these tactics stating, "The police did exactly what they were supposed to do."

138. Upon information and belief, on January 1, 2012, actress Ellen Barkin reported that she witnessed police forcibly arrest a woman near Union Square, who was simply walking in the vicinity of Occupy-affiliated protestors.

139. Upon information and belief, one journalist described such random arrests occurring at Zuccotti Park on the night of February 28, 2012 in which several Occupy-affiliated citizens present in the park were arrested for no discernable reason, while others, equally innocent, were not. The journalist recorded the police taunting these people.

140. Upon information and belief, *The New York Times* reported that protestors engaged in peaceful and lawful protest were being randomly selected for arrest at an Occupy-related protest on March 17, 2012.

**141.**     Upon information and belief, a New York Times reporter described the police randomly selecting individual non-violent for arrest at an Occupy-related protest in the financial district that occurred on September 15, 2012.

**142.**     Upon information and belief, a reporter for *Gothamist.com* also reported random arrests during an Occupy-related march from Washington Square to Zuccotti Park on September 15, 2012, and identified such random arrests as a recognizable tactic consistently employed by the NYPD at Occupy-related protests: "NYPD officers in white shirts [were] throwing people into the sidewalk, and … police were singling protesters out, seemingly at random, to be arrested. The tactic is a hallmark of the NYPD's policing of Occupy Wall Street demonstrations, both large and small."

**143.**     Upon information and belief, a journalist for *The Atlantic*, reporting on a protest on September 17, 2012, made the same observation: "At times, police seemed to outnumber protesters, and some arrests during the protest seemed random: An officer would point out an individual in the crowd, and then a group [of officers] would rush in and grab the target."  A journalist who was himself arrested while covering this event reported: "NYPD was randomly grabbing people 3-5 at a time throughout the march."

**C.**     **The City of New York has a policy and practice of unlawful trap and detain/trap and arrest tactics, creating unjustified risk of injury**

**144.**     Defendant THE CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of engaging in mass group arrests of protesters without particularized probable cause for the arrest of any individual within the mass of those arrested, using unlawful trap-and-arrest policing tactics.

**145.** Not only are these trap and arrest tactics unlawful, they create circumstances in which innocent members of the public are placed at unjustified risk of physical harm.

**146.** In one notorious example, on October 1, 2011, members of the NYPD led a group of approximately 600-700 onto the eastbound lane of the Brooklyn Bridge, and then blocked this group from crossing the bridge or returning to leave the roadway. The police created a risky situation in which panic and stampede were strong possibilities, in a narrow space 135 feet above water. That no-one was injured was a near-miracle, due entirely to the peacefulness, calm, and discipline of the protestors being trapped and arrested.

**147.** The NYPD's trap-and-arrest policing tactic involves the use of police lines against targeted protests in order to trap protesters and others, in the absence of warnings or orders calculated to reach those subject to arrest. As a generalized trap without warning, the tactic captures persons indiscriminately and without regard to the existence of particularized probable cause to arrest.

**148.** Trap and arrest tactics require the confinement of the people targeted in a space by means of barriers.

**149.** The size of the space is then decreased to pen in and control the people trapped.

**150.** The NYPD's trap-and-arrest tactics rely on the application of physical force or restraint indiscriminately to large groups of people.

**151.** The NYPD apply this force using netting, metal barriers, police vehicles, police officers' bodies, and other instruments to restrain and/or push groups of people at the chosen site of the mass arrest.

**152.** The existence of the aforementioned policy, practice and/or custom is demonstrated by the fact that it has been applied on several other recent occasions.

**153.** Upon information and belief, near Union Square on September 24, 2011, mass arrest tactics were implemented using lines of police and/or orange plastic netting to trap and arrest protestors and anyone else that happened to be in the vicinity. One reporter for the *Chronicle of Higher Education* who witnessed the scene compared the trap and arrest process to "ocean trawlers" capturing people "indiscriminately." A reporter for public television reported that some of those arrested were "bystanders who were snatched up while snapping souvenir photos." One of those arrested was a worker at a University Place café who stepped outside to see what was happening. The newspaper The Villager reported: "More than 80 people were arrested, including passersby and members of the press." The same report noted: "As in their previous marches, the demonstrators were peaceful."

**154.** The use of trap-and-arrest tactics resulted in injuries. Several of those already corralled within plastic netting were pepper-sprayed by NYPD Deputy Inspector Anthony Bologna. There was no justification for the deployment of this pepper spray. There was no apparent effort by this senior officer to direct the spray at any particular person.

**155.** NYPD Commissioner Raymond Kelly later told the press that he was in the area at this time and observed the police activity occurring there. Upon information

and belief, Commissioner Kelly's presence at this police activity indicated that he approved and condoned the police activity taking place, including performing mass arrests using the trap and arrest tactic.

**156.** On October 1, 2011, an Occupy-related protest, accompanied by police, began to cross the Brooklyn Bridge from the Manhattan side by means of the pedestrian walkway. As the pedestrian walkway filled with people, the police blocked the main entrance ramp to the eastbound lane of the bridge. After blocking this ramp to both human and vehicular traffic for some time, the police stopped doing so, and the group of officers that blocked the ramp walked up onto the bridge span itself. The marchers followed, believing that the police action indicated that the eastbound lane was now available for their use. When the line of officers reached the approximate halfway point of the bridge span, they stopped and directed the marchers not to continue. The marchers obeyed this directive. The police did not permit those on the bridge to leave or otherwise disperse and arrested approximately 700 of the marchers who had followed them onto the bridge. The following day, Mayor Michael R. Bloomberg ratified these tactics stating, "The police did exactly what they were supposed to do."

**157.** On Nov. 15, 2011, NYPD officers converged on Zuccotti Park at 1AM and arrested those present *en masse*, including several credentialed journalists who were attempting to cover the story.

**158.** On November 30, 2011, a group of approximately 100 protestors were detained on a sidewalk inside barricades for two hours, without being permitted to leave. While this mass arrest resulted in no-one being taken into custody for further processing, the protestors were not free to leave, and were under arrest while they were detained.

**159.** Mass arrests of protestors have been the consistent practice of Defendant THE CITY OF NEW YORK and of the NYPD for many years.

**160.** On April 7, 2003, the NYPD conducted a mass arrest of demonstrators who were standing on a midtown sidewalk during a protest against the invasion of Iraq. Without warning, notice or cause, police surrounded the protesters as well as passers-by who happened to be walking on the same sidewalk. Without giving a directive or providing opportunity to disperse or comply with any directive the police indiscriminately arrested everyone trapped within the police line cordon. Kunstler v. City of New York, Civil Action No. 03-CV-02819-RWS, Southern District of New York (filed February 11, 2004, terminated August 22, 2008).

**161.** Similarly, during the 2004 Republican National Convention in New York City. According to *The New York Times*, multiple instances of mass arrests occurred. 1,806 persons were arrested in connection with RNC protests, and according to the *Daily News*, "[c]harges were ultimately dropped against 90 percent of them."

**162.** Police Commissioner Kelly has explicitly ratified and defended the mass false arrests of the NYPD, even in response to a Civilian Complaint Review Board letter which sharply criticized police conduct in connection with two specific RNC mass arrests and which specifically recommended additional training for officers. Despite these complaints, Police Commissioner Kelly ratified the arrests stating, "[T]he implication that the N.Y.P.D. failed during the R.N.C. turns truth on its head." Police Commissioner Kelly further stated: "The policing of the R.N.C. was one of the Police Department's finest hours."

163.     Upon information and belief, The New York Times reported that Police Commissioner Raymond Kelly stated (in relation to the 2004 Republican Convention protests) that the police are not obligated to give warnings before arrests.  Then and now, the practice of the NYPD is that officers may arrest peaceful marchers or protestors at any time.  The NYPD engages in such arrests even where – as in the present case – the police have accompanied a march and directed the course and direction of the march.  Apart from the present case, on both September 24, 2011 and October 1, 2011, NYPD officers arrested tens or hundreds of people for marching under the direction of NYPD officers.

**D.     The forgoing policies were designed and implemented at the highest command levels of the NYPD**

164.     Upon information and belief, the foregoing tactics are known and approved by decision-makers at the highest levels of the NYPD.  A report on police response to the Occupy movement was compiled by a joint project of *New York University Law School's Global Justice Clinic* and the *Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice*.  The report documented 130 specific incidents of police misconduct, including several of those mentioned above.  In a letter to the authors, NYPD Assistant Deputy Commissioner Thomas Doepfner, writing on behalf of the NYPD concerning the report, stated:  "It is our view, however, that the police actions that have been taken in connection with Occupy Wall Street activities have been lawful."

165.     Upon information and belief, Police Commissioner Raymond Kelly personally supervised the arrests that took place near Union Square on September 24, 2011.

166.     Upon information and belief, Police response to Occupy-related activity is coordinated at the highest levels on the NYPD.  NYPD executives above the level of precinct commanders controlled the policing of Occupy-related events, using borough task forces to do the job.

167.     Both Raymond Kelly and Mayor Bloomberg have explicitly praised and ratified the tactics, including mass arrests without particularized probable cause, engaged in by the NYPD.

168.     The tactics of mass arrests without particularized probable cause, random arrests, perjury for the purposes of supporting arrests and/or criminal complaints are so widespread and of such long duration, and so many thousands of individual officers and citizens have been implicated or affected, that Defendant THE CITY OF NEW YORK must be presumed to be aware of them and to have condoned or promulgated those practices.

<u>THE UNCONSTITUTIONAL POLICES AND PRACTICES RESULTED IN PLAINTIFF'S INJURY</u>

169.     The Defendant POLICE OFFICERS implemented and applied force, including pepper spray, without individualized probable cause that such force was necessary or justified, and, as result, injured he Plaintiff.

170.     Upon information and belief, the Defendant POLICE OFFICERS were implementing the foregoing unlawful trap and arrest tactic at the time their use of force caused the Plaintiff's injuries.

171.     Upon information and belief, the Defendant POLICE OFFICERS were implementing the foregoing unlawful policy of using excessive force against protestors, including the indiscriminate release of pepper spray, and, as a result, injured the Plaintiff.

**172.** As a result of the above constitutionally impermissible conduct, Plaintiff suffered violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, physical injury, and lost wages.

**173.** Accordingly, the Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Empanel a jury.

[d] Award attorney's fees and costs.

[e] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:     New York, New York
           March 26, 2013

Respectfully submitted,

David A. Thompson [dt3991]
STECKLOW COHEN & THOMPSON
10 SPRING STREET – SUITE 1
New York, New York 10012
[212] 566-8000
[212] 202-4952/FAX
DTHOMPSON@WYLIELAW.COM
ATTORNEYS FOR PLAINTIFF