Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

ROBERT PLUMA,

Index No. 13cv2017 (TPG)
ECF CASE

PLAINTIFF,

vs.

AMENDED
COMPLAINT
[JURY TRIAL
 DEMANDED]

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE SERGEANT
CARL SORECO, NEW YORK CITY POLICE
OFFICER MEGHAN O'LEARY, NEW YORK CITY
POLICE OFFICER CHRISTOPHER VEGA, NEW
NEW YORK CITY POLICE OFFICER "JOHN DOE"
SHIELD NO. 26990, NEW YORK CITY POLICE
OFFICER "JOHN DOE" SHIELD NO. 29615, NEW
YORK CITY POLICE OFFICER "JOHN DOE"
SHIELD NO. 11395, NEW YORK CITY POLICE
OFFICER "JOHN DOE" SHIELD NO. 3076, NEW
YORK CITY POLICE OFFICER " JOHN DOE SECOND
PEPPER SPRAY OFFICER", NEW YORK CITY POLICE
OFFICER "JOHN DOE INCIDENT COMMANDER"
and NEW YORK CITY POLICE OFFICERS
"JOHN DOES 1-50"

DEFENDANTS.

_____

Plaintiff ROBERT PLUMA, by his attorneys, STECKLOW COHEN &

THOMPSON, complaining of the defendants, respectfully alleges as follows:

I. PRELIMINARY STATEMENT

**1.** Plaintiff ROBERT PLUMA brings this action for compensatory damages,

punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988

for violations of his civil rights, as said rights are secured by said statutes and the

Constitutions of the State of New York and the United States.

**2.** The Plaintiff ROBERT PLUMA was peaceably assembled at Zuccotti Park on the evening of December 31, 2011, intending to welcome in the New Year with his girlfriend, and with other citizens who believed in the goals of the Occupy Wall Street movement. An overwhelming force of New York City Police officers was present. These officers initiated physical confrontations with other individuals at Zuccotti Park. The police officers needlessly escalated these confrontations into violence. In so doing, multiple police officers used metal fencing as a weapon to push the crowd. The same or other police officers deployed pepper spray across a group including civilians of which Mr. Pluma was a part. The Plaintiff was injured when he was blinded by the pepper spray, pushed and fell, breaking his dominant hand in a way that required surgery and rehabilitation.

## II. JURISDICTION

**3.** This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

**4.** Plaintiff ROBERT PLUMA further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## III. VENUE

**5.** Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## IV. JURY DEMAND

**6.** Plaintiff ROBERT PLUMA respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## COMPLIANCE WITH GEN. MUN. LAW § 50-I

**7.** A notice of claim was made and served upon the City of New York in compliance with section fifty-e of this chapter, and at least thirty days have elapsed since the service of such notice and adjustment or payment thereof has been neglected or refused, and this action or special proceeding is commenced within one year and ninety days after the happening of the events upon which the claim is based.

## V. THE PARTIES

**8.** Plaintiff ROBERT PLUMA ("the Plaintiff") is a resident of the State of New York.

**9.** Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

**10.** Defendant THE CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

**11.** That at all times hereinafter mentioned, Defendant POLICE SERGEANT CARL SORECO ("Defendant POLICE SERGEANT SORECO") was a duly sworn

police sergeant of the New York City Police Department and was acting under the supervision of said department and according to his official duties.

12.      That at all times hereinafter mentioned, Defendant POLICE OFFICER MEGHAN O'LEARY ("Defendant POLICE OFFICER O'LEARY") was a duly sworn police officer of the New York City Police Department and was acting under the supervision of said department and according to her official duties.

13.      That at all times hereinafter mentioned, Defendant POLICE OFFICER CHRISTOPHER VEGA ("Defendant POLICE OFFICER VEGA") was a duly sworn police officer of the New York City Police Department and was acting under the supervision of said department and according to his official duties.

14.      That at all times hereinafter mentioned, the Defendant POLICE OFFICERS "John Does 1-50" were duly sworn police officers of the New York City Police Department and were acting under the supervision of said department and according to their official duties. Photographs of eight of the Defendant POLICE OFFICERS "John Does 1-50" are attached hereto as **Exhibit A.**

15.      That at all times hereinafter mentioned, Defendant POLICE OFFICER "John Doe" SHIELD NO. 26990 was a duly sworn police officer of the New York City Police Department and was acting under the supervision of said department and according to his official duties. Defendant POLICE OFFICER "John Doe" SHIELD NO. 26690 can be seen on Page 8 of Plaintiff's **Exhibit A**, attached hereto.

16.      That at all times hereinafter mentioned, Defendant POLICE OFFICER "John Doe" SHIELD NO. 29615 was a duly sworn police officer of the New York City Police Department and was acting under the supervision of said department and

according to his official duties. Defendant POLICE OFFICER "John Doe" SHIELD No. 29615 can be seen on Page 9 of Plaintiff's **Exhibit A**, attached hereto.

17.     That at all times hereinafter mentioned, Defendant POLICE OFFICER "John Doe" SHIELD NO. 11395 was a duly sworn police officer of the New York City Police Department and was acting under the supervision of said department and according to his official duties.

18.     That at all times hereinafter mentioned, Defendant POLICE OFFICER "John Doe" SHIELD NO. 3076 was a duly sworn police officer of the New York City Police Department and was acting under the supervision of said department and according to his official duties.

19.     That at all times hereinafter mentioned, Defendant NEW YORK CITY POLICE OFFICER "JOHN DOE SECOND PEPPER SPRAY OFFICER" was a duly sworn police officer of the New York City Police Department and was acting under the supervision of said department and according to his official duties.

20.     That at all times hereinafter mentioned, Defendant POLICE OFFICER "JOHN DOE INCIDENT COMMANDER" was a duly sworn police officer of the New York City Police Department and was acting under the supervision of said department and according to his official duties.

21.     Plaintiff ROBERT PLUMA will amend this complaint to name Defendant POLICE OFFICER "John Doe" SHIELD NO. 26990, Defendant POLICE OFFICER "John Doe" SHIELD NO. 29615, Defendant POLICE OFFICER "John Doe" SHIELD NO. 11395, Defendant POLICE OFFICER "John Doe" SHIELD NO. 3076, Defendant POLICE OFFICER "JOHN DOE SECOND PEPPER SPRAY OFFICER", Defendant

POLICE OFFICER "JOHN DOE INCIDENT COMMANDER", and the Defendant

POLICE OFFICERS "John Does 1-50", as their identities can be established to a

reasonable certainty.

**22.** Defendant POLICE SERGEANT SORECO, Defendant POLICE

OFFICER O'LEARY, Defendant POLICE OFFICER VEGA, Defendant POLICE

OFFICER "John Doe" SHIELD NO 26990, Defendant POLICE OFFICER "John Doe"

SHIELD NO 29615, Defendant POLICE OFFICER "John Doe" SHIELD NO. 11395,

Defendant POLICE OFFICER "John Doe" SHIELD NO. 3076, Defendant POLICE

OFFICER "JOHN DOE SECOND PEPPER SPRAY OFFICER", Defendant POLICE

OFFICER "JOHN DOE INCIDENT COMMANDER", and the Defendant POLICE

OFFICERS "John Does 1-50" will be collectively referred to as the Defendant POLICE

OFFICERS.

**23.** That at all times relevant to this action, the Defendant POLICE

OFFICERS either personally or through their employees, were acting under color of state

law and/or in compliance with the official rules, regulations, laws, statutes, customs,

usages and/or practices of the State or City of New York.

**24.** Each and all of the acts of the Defendant POLICE OFFICERS alleged

herein were done by said defendants while acting within the scope and in furtherance of

their employment by Defendant THE CITY OF NEW YORK, and were acting under the

supervision of said department and according to their official duties.

VI. FACTS COMMON TO ALL CLAIMS

**25.** On the evening of December 31, 2011, the Plaintiff went to Zuccotti Park

with his girlfriend.

**26.**     The Plaintiff and his girlfriend chose to go to Zuccotti Park to welcome in the New Year with hopeful reflection upon the efforts of Occupy Wall Street to bring greater democracy and a fairer economic system to our country.

**27.**     Zuccotti Park is open 24 hours, and the park was open that evening.

**28.**     At the time the Plaintiff arrived, the police had set up metal barricades that surrounded most or all of the park.

**29.**     Entry to the park was permitted only through gaps in these barricades, which were guarded by police.

**30.**     There was an overwhelming police presence at the park; however, the police permitted people to enter the park.

**31.**     Those entering the park were subjected to search, although such search was probably unlawful under the circumstances.

**32.**     The Plaintiff and his girlfriend entered the park and prepared to observe the approaching New Year.

**33.**     The Plaintiff and others peacefully remained in the park for some time.

**34.**     The Plaintiff became aware of activity in his vicinity.

**35.**     The Plaintiff, acting as a citizen journalist, began to film the event.

**36.**     The police used a metal barricade as a battering ram against a group of civilians within Zuccotti Park, of which the Plaintiff was a part.

**37.**     Specifically, they lifted the metal barricade off the ground to above waist height, and pushed the metal into the group, pushing the group of people backwards.

**38.**     The purpose of the using the metal barricade as battering ram on the group of people was to push the group of people, including the Plaintiff, backwards and to knock them down.

**39.**     Using the metal barricades, the police did in fact push the group of people backwards and knock some of them down.  One of those knocked down was the Plaintiff.

**40.**     While the metal barricade was pushing into this group of people, two police officers discharged pepper spray across the group of people.

**41.**     The two officers that did this were Defendant POLICE OFFICER VEGA and JOHN DOE SECOND PEPPER SPRAY OFFICER."

**42.**     The police officers targeted the group of people as a whole.

**43.**     The pepper spray struck the group of people as a whole.

**44.**     The plaintiff, who was in the group of people, was struck by the pepper spray.

**45.**     As a result of being struck by the pepper spray and as a result of the use of the metal barricade as a battering ram, the plaintiff was blinded, incapacitated, pushed back and knocked down.

**46.**     The plaintiff sustained the spiral fracture to his hand when he fell.

**47.**     As a result of being blinded, incapacitated, pushed back and knocked down, the plaintiff's liberty of movement was restricted. The plaintiff was unable to walk without help.  He was moved a few feet away, where he lay on the ground and vomited from the effects of the police assault.

**48.** The plaintiff remained at the scene for a significant period of time before the incapacitating effects of the assault ameliorated sufficiently for the plaintiff to move on his own.

**49.** The Plaintiff unsuccessfully sought medical help at the scene.

**50.** Unable to find help, the Plaintiff and his girlfriend went to the hospital.

**51.** The Plaintiff was found to have multiple spiral fractures of his left hand requiring surgery.

**52.** The Plaintiff underwent surgery several days later.

**53.** The Plaintiff underwent months of physical therapy.

**54.** During his recovery, the Plaintiff was unable to perform basic tasks like tying his own shoelaces.

**55.** The Plaintiff, who worked with computers, could not type effectively.

**56.** When the Plaintiff attempted to perform the daily tasks of life that required two hands, he felt severe pain and discomfort.

**57.** When the Plaintiff attempted to perform the daily tasks of life that required the strength and precision of his dominant hand, he suffered not only pain and discomfort, but also frustration and anger.

**58.** The Plaintiff suffered fear and anxiety that his main hand, with its spiral fracture, would never get back to normal.

**59.** As a result of his injury, the Plaintiff ceased to participate in Occupy Wall Street events.

**60.** When the Plaintiff lost his job, it was hard for him to do the things necessary to find a job, with his broken dominant hand.

**61.** To this day, while the function of the Plaintiff's hand has returned to a large extent, the Plaintiff still feels discomfort and limited movement.

THE DEFENDANTS FAILED TO ADEQUATELY SUPERVISE
DEFENDANT P.O. VEGA

**62.** On December 31, 2011, Defendant POLICE OFFICER VEGA was on duty at Zuccotti Park.

**63.** On December 31, 2011, Defendant POLICE OFFICER "JOHN DOE INCIDENT COMMANDER" was the member of the NYPD who was the highest unformed ranking police supervisor assuming command.

**64.** As the Incident Commander of the Occupy Wall Street event at Zuccotti Park on December 31, 2011 through January 1, 2012, Defendant POLICE OFFICER "JOHN DOE INCIDENT COMMANDER" was responsible for the overall management of the policing activities concerning the event.

**65.** As described within Section 213-11 of the NYPD Patrol Guide, *Policing Special Events/Crowd Control,* as the Incident Commander of the OWS event at Zuccotti Park on December 31, 2011 through January 1, 2012, Defendant POLICE OFFICER "JOHN DOE INCIDENT COMMANDER" was responsible for the command, control and coordination of all incident operations.

**66.** Defendant POLICE OFFICER "JOHN DOE INCIDENT COMMANDER" was the member of the NYPD who was ultimately responsible for the supervision of Defendant P.O. Christopher Vega.

**67.** Defendant POLICE OFFICER VEGA lifted one of the metal barricades that the police had lined the park with and swung the barricade at a nearby demonstrator.

10

**68.** Photographs depicting the actions undertaken by Defendant POLICE OFFICER VEGA as described in the preceding paragraph are attached hereto as **Exhibit B.**

**69.** At some point before Defendant POLICE OFFICER VEGA swung the metal barricade at the demonstrator, Defendant POLICE OFFICER VEGA allegedly suffered a slight cut to his hand while carrying out his policing duties.

**70.** Upon information and belief, Defendant POLICE OFFICER VEGA blamed one or more of the OWS demonstrators for the injury.

**71.** Upon information and belief, the injury influenced Defendant POLICE OFFICER VEGA's mental and emotional state, causing him to become violent and aggressive.

**72.** Following the alleged injury, Defendant POLICE OFFICER VEGA is angry because he has suffered a slight cut and blames a demonstrator.

**73.** Defendant POLICE OFFICE VEGA carried out his aggression and violence against the demonstrators by lifting a metal barricade to hit one of the demonstrators in the face.

**74.** Upon information and belief, Defendant POLICE OFFICER "JOHN DOE INCIDENT COMMANDER", and the Defendant POLICE OFFICERS "John Does 1-50" with supervisory authority over Defendant POLICE OFFICER VEGA observed or should have observed that Defendant POLICE OFFICER VEGA was acting in an overly-aggressive and needlessly-violent manner.

**75.** Upon observing Defendant POLICE OFFICER VEGA's conduct, Defendant POLICE OFFICER "JOHN DOE INCIDENT COMMANDER" and/or the

Defendant POLICE OFFICERS "John Does 1-50" with supervisory authority over Defendant POLICE OFFICER VEGA should have removed Defendant POLICE OFFICER VEGA from his current policing activities.

76. Defendant POLICE OFFICER VEGA should not have been permitted to continue to have contact with the public.

77. Defendant POLICE OFFICER "JOHN DOE INCIDENT COMMANDER", and the Defendant POLICE OFFICERS "John Does 1-50" with supervisory authority over Defendant POLICE OFFICER VEGA should have known that Defendant POLICE OFFICER VEGA had a propensity to engage in unjustified physical confrontations with civilians.

78. The Defendant POLICE OFFICERS "John Does 1-50's" with supervisory authority over Defendant POLICE OFFICER VEGA and Defendant POLICE OFFICER "JOHN DOE INCIDENT COMMANDER's" failure to remove Defendant POLICE OFFICER VEGA from his current policing activities constituted negligent supervision.

79. Upon information and belief, Defendant THE CITY OF NEW YORK failed to train Defendant POLICE OFFICER VEGA to not use unnecessary force against civilians while policing a demonstration.

80. Defendant THE CITY OF NEW YORK failed sufficiently to train Defendant POLICE OFFICER VEGA to exercise self-control and self-restraint while policing a demonstration.

81. Had the Defendant POLICE OFFICERS "John Does 1-50" and Defendant POLICE OFFICER "JOHN DOE INCIDENT COMMANDER" properly supervised Defendant POLICE OFFICER VEGA, Defendant POLICE OFFICER VEGA would have

been prevented from engaging in the negligent, reckless, and needlessly violent and aggressive conduct that resulted in the Plaintiff's injury, as described herein.

<u>FIRST CLAIM FOR RELIEF</u>

<u>DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983</u>

**82.** Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**83.** All of the aforementioned acts of Defendant THE CITY OF NEW YORK, and the Defendant POLICE OFFICERS, their agents, servants and employees, were carried out under the color of state law.

**84.** All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States of America, in violation of 42 U.S.C. § 1983.

**85.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

**86.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

**87.** The individual Defendants and Defendant THE CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**88.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

**89.** As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

SECOND CLAIM FOR RELIEF

EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

**90.** Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**91.** Plaintiff was subjected to excessive and unjustified force in violation of his rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

**92.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

**93.** As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

THIRD CLAIM FOR RELIEF

FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

**94.** Plaintiff repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**95.** The Defendants had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights.

**96.** Defendant POLICE SERGEANT SORECO, Defendant POLICE OFFICER O'LEARY, Defendant POLICE OFFICER "John Doe" SHIELD NO. 26990, Defendant POLICE OFFICER "John Doe" SHIELD NO. 29615, Defendant POLICE OFFICER "John Doe" SHIELD NO. 11395, Defendant POLICE OFFICER "John Doe" SHIELD NO. 3076, Defendant POLICE OFFICER "JOHN DOE SECOND PEPPER SPRAY OFFICER", Defendant POLICE OFFICER "JOHN DOE INCIDENT COMMANDER", and the Defendant POLICE OFFICERS "John Does 1-50" were present when Plaintiff was injured, and chose not to intervene during any of the events leading up to Plaintiff's injury, despite having realistic opportunities to do so.

**97.** The Defendant POLICE OFFICERS chose not to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights despite having had realistic opportunities to do so.

**98.** The Defendant POLICE OFFICERS chose not to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights despite having substantially

15

contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

99.    As a result of the aforementioned conduct of the Defendant POLICE OFFICERS, Plaintiff's constitutional rights were violated.

100.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

101.    As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

FOURTH CLAIM FOR RELIEF

RETALIATION FOR FIRST AMENDMENT PROTECTED EXPRESSION UNDER 42 U.S.C. § 1983

102.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

103.    At or around the time that the Plaintiff came into contact with the Defendants, the Plaintiff had recently been and/or was currently engaging in protected speech or conduct, including but not limited to participating in a peaceful assembly, journalism in order to lawfully exercise their First Amendment protected rights.

104.    The Defendants took adverse action against the Plaintiff in retaliation for lawfully exercising his First Amendment protected rights to free speech, expression, and association.

105.     The actions of the Defendant POLICE OFFICERS heretofore described, were designed to and did cause bodily harm, pain and suffering in direct retaliation for Plaintiff's exercise of his civil and constitutional rights of free speech, free expression and expressive association as guaranteed by the First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

106.     As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

107.     As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

<u>FIFTH CLAIM FOR RELIEF</u>

<u>STATE LAW —— ASSAULT</u>

108.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

109.     The Defendants engaged in physical conduct placing the Plaintiff in imminent apprehension of harmful contact.

110.     As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

111.     As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

## SIXTH CLAIM FOR RELIEF

## STATE LAW —— BATTERY

**112.** Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**113.** The Defendants, without privilege or consent, intentionally made bodily contact with the Plaintiff which was offensive in nature.

**114.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

**115.** As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

## SEVENTH CLAIM FOR RELIEF

## STATE LAW —— NEGLIGENCE

**116.** Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**117.** The Defendants employed physical force against third parties in the vicinity of the Plaintiff.

**118.** The Defendants released gaseous toxins in the vicinity of the Plaintiff.

**119.** The Defendants owed a duty of care not to engage in these activities in the vicinity of the Plaintiff; or, in the alternative, the Defendants had a duty to do so in a manner that would not injure the Plaintiff.

**120.** In breach of these duties, the Defendants employed physical force against third parties and released gaseous toxins in a manner that physically injured the Plaintiff.

**121.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

**122.** As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

EIGHTH CLAIM FOR RELIEF

STATE LAW —— RESPONDEAT SUPERIOR

**123.** Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**124.** The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers, officials, and agents of the City of New York.

**125.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

**126.** The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers and officials in the course of their employment by Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

**127.** As a result, the Defendant THE CITY OF NEW YORK is liable to the Plaintiff for the injuries and other damages caused by its police officers, officials, and agents on a theory of *respondeat superior*.

**128.** As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

NINTH CLAIM OF RELIEF

STATE LAW —— NEGLIGENT HIRING, RETENTION<br>TRAINING AND SUPERVISION

**129.** Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**130.** Defendant The City of New York hired, trained, and supervised the Defendant POLICE OFFICERS who caused the injuries to the Plaintiff.

**131.** Defendant THE CITY OF NEW YORK hired the Defendant POLICE OFFICERS without regard to their propensity to use excessive or reckless force, or to unlawfully violate the constitutional rights of citizens.

**132.** Defendant THE CITY OF NEW YORK retained the Defendant POLICE OFFICERS despite knowledge of their use of excessive or reckless force, or repeated violations of citizens' constitutional rights.

**133.** Defendant THE CITY OF NEW YORK failed to train the Defendant POLICE OFFICERS not to use excessive or reckless force, or to unlawfully violate the constitutional rights of citizens.

**134.** Defendant The City of New York failed to supervise the Defendant POLICE OFFICERS to ensure that they did not to use excessive or reckless force, or to unlawfully violate the constitutional rights of citizens.

**135.** As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT PLUMA was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

**136.** As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

<u>TENTH CLAIM FOR RELIEF</u>

<u>VIOLATION OF THE PLAINTIFF'S RIGHTS UNDER THE CONSTITUTION OF THE STATE OF NEW YORK</u>

**137.** Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**138.** As a result of the aforesaid conduct of Defendant THE CITY OF NEW YORK and the Defendant POLICE OFFICERS, the Plaintiff was deprived of rights guaranteed to him by the New York State Constitution, including though not limited to:

A. The right of the people to freely speak their sentiments on all subjects as described in Article I §8 of the New York State Constitution.

B. The right of the people to peaceably assemble to petition the government, or any department thereof as described in Article I §9 Subsection 1 of the New York State Constitution.

C. The right of the people to be free from excessive force under Article I §12 of the New York State Constitution.

**139.** The acts complained of were carried out by the Defendant POLICE OFFICERS in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the NYPD.

**140.** The Defendant POLICE OFFICERS and Defendant THE CITY OF NEW YORK, collectively and individually, while acting under color of state law violated the Plaintiff's constitutional rights by engaging in conduct proscribed by the New York State Constitution.

**141.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

**142.** As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

ELEVENTH CLAIM FOR RELIEF

MONELL LIABILITY AGAINST DEFENDANT THE CITY OF NEW YORK

**143.** Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**144.** The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

**145.** The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers and officials pursuant to the

customs, policies, usages, practices, procedures, and rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

146.    The general approach of the NYPD to the Occupy Wall Street protests fits a paradigm named by scholars "the escalated force approach," which includes the following: limited concern for the protesters' speech and assembly rights; limited tolerance for community disruption; limited communication between police and demonstrators; extensive use of arrests to manage demonstrators; extensive use of force to control demonstrators; and surveillance of protesters, including infiltration and the use of informants.[1] All of the forgoing tactics have been reported being implemented by the NYPD on multiple occasions in policing Occupy-related events, including the illegal mass arrests described herein.

147.    Particular policies and customs implemented by Defendant THE CITY OF NEW YORK which proximately caused violation of the Plaintiff's Constitutional rights are these:

A.    Defendant THE CITY OF NEW YORK has a policy and practice of using pepper spray against groups of people without probable cause for the use of pepper spray against individuals within the group. Defendant THE CITY OF NEW YORK fails to train all members of the NYPD in the proper manner to use pepper spray. This failure to train extends to both use of pepper spray against both groups and individuals. Defendant THE CITY

---

[1]    *See Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street,* The Global Justice Clinic (NYU School of Law) and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice (Fordham Law School) (2012).

OF NEW YORK had substantial advanced notice that its policy and training were inadequate, resulting from formal reports by the Civilian Complaint Review Board detailing agency-wide deficiencies in policy and training.

B. Defendant THE CITY OF NEW YORK has a policy and practice of targeting participants in Occupy Wall Street activities for wrongful arrest without cause, and the application of excessive force against them;

C. Defendant THE CITY OF NEW YORK has a policy and practice of unlawful use of "trap and detain"/"trap and arrest" tactics, creating unjustified risk of injury;

D. Defendant THE CITY OF NEW YORK has a policy and practice of utilizing unsafe methods of crowd control at Occupy Wall Street Events.

E. The foregoing policies were designed and implemented at the highest command levels of the NYPD.

**A. The City of New York has a policy and practice of targeting participants in Occupy Wall Street activities for arrest without cause and subjecting them to excessive force**

148. Defendant THE CITY OF NEW YORK has a policy and practice of using pepper spray against groups of people without probable cause for the use of pepper spray against individuals within the group.

149. Defendant THE CITY OF NEW YORK fails to train all members of the NYPD in the proper manner to use pepper spray. This failure to train extends to both use of pepper spray against both groups and individuals.

**150.** Defendant THE CITY OF NEW YORK had substantial advanced notice that its policy and training were inadequate, resulting from formal reports by the Civilian Complaint Review Board detailing agency-wide deficiencies in policy and training.

**151.** The New York City Civilian Complaint Review Board issued a report in 2000 that described the NYPD's use of pepper spray, and identified instances of the misuse of pepper spray by NYPD officers, and recommended training to prevent such occurrences in the future. *See* REPORT OF THE PEPPER SPRAY COMMITTEE OF THE CIVILIAN COMPLAINT REVIEW BOARD, Hon. Charles M. Greinsky, *et al.,* New York City Civilian Complaint Review Board 2000 (hereinafter, the "CCRB Report"), Ex. A.

**152.** According to the CCRB Report: "The NYPD began to use pepper spray, formally known as oleoresin capsicum (OC) spray, in a limited capacity in February 1991, when its use was restricted to the Emergency Services Unit. Use of pepper spray, which replaced mace, was expanded to the entire department in October 1994." *See* CCRB Report, p. 3, Ex. A. The purpose for which pepper spray is deployed by the NYPD is described as follows:

> The spray is designed for use as less-than-lethal force, adequate for incapacitating dangerous or violently resisting suspects. Intended results of the use of pepper spray are inflammation and swelling of the mucous membranes of the eye, nose, and throat and involuntary closure of the eyes. *See* CCRB Report, pp. 3-4, Ex. A.

**153.** The CCRB Report also summarizes the policy in the NYPD Patrol Guide (hereinafter, "the Patrol Guide"), found in procedure PG 212-95, regarding when pepper spray should be used by members of the service:

> Patrol Guide 212-95 lists five situations in which an officer may use pepper spray. Pepper spray may be used when a police officer "reasonably believes" that it is necessary to: 1) protect himself, or another from unlawful use of force (e.g., assault); 2) effect an arrest, or establish physical control of a subject resisting arrest; 3) establish physical control of a subject attempting to flee from arrest or custody; 4) establish physical control of an emotionally disturbed person (EDP); and 5) control a dangerous animal by

deterring an attack, to prevent injury to persons or animals present.  *See* CCRB Report, pp. 4-5, Ex. A.

**154.**     At the time of the events at issue in this case, Patrol Guide PG 212-95 had

not changed from what was summarized in the CCRB Report.  *See* Patrol Guide PG 212-

95, Item 1, Ex. B.

**155.**     The CCRB Report describes the kind of pepper spray the NYPD uses:

In January 1997, the NYPD switched to a brand made by Mace Security International (MSI) of Bennington, Vermont. This brand also features a 10% solution of oleoresin capsicum, carried in a solution principally composed of water, antifreeze, and denatured alcohol. The canisters ... have an effective range of 3 to 15 feet.  *See* CCRB Report, p. 4, Ex. A.

**156.**     The CCRB Report found that in 15.6%, of the cases that received full

investigations, the CCRB found that inappropriate pepper spray use occurred.  *See* CCRB

Report, p. 10, Ex. A. The CCRB Report explained:

Of the 22 substantiated cases, officers in three cases cited a civilian's refusal to heed the officer's command as grounds for pepper-spraying them. In three cases, officers used pepper spray on a large crowd or a group of people. In another three cases, officers claimed that the civilians were engaged in disorderly conduct. In seven cases, officers offered the civilian's threatening behavior or physical aggression as the rationale for using pepper spray. In another case, the officer pepper-sprayed a civilian for cursing. In four other cases, officers cited resisting arrest as the rationale for using pepper spray. In the final case, the officer had no apparent reason for using pepper spray since the civilian was already subdued.[2]

CCRB Commissioners and staff had the opportunity to fire canisters of inert pepper spray at the Police Academy and experienced first-hand the difficulty of aiming the spray accurately. Since officers are instructed to use their less-dominant hand for firing the canisters, it is crucial that officers are trained on a regular basis to practice their aiming. The CCRB recommends that the NYPD stress the proper procedures for pepper spray use during training sessions and allow ample time for officers to practice the use of pepper spray.[3]

**157.**     As stated above, according to the CCRB Report and the Patrol Guide,

pepper spray is used to -- *inter alia* -- "incapacitate" the subject, "establish physical

control of a subject," stop a subject "attempting to flee" from the police.  *See* CCRB

---

[2]     CCRB Report pp. 14-15.
[3]     CCRB Report, p. 17

Report, pp. 3-4, Ex. A; Patrol Guide 212-95, Ex. B.   Once of the "intended results" on a subject is "involuntary closure of the eyes."  *See* CCRB Report, p. 4, Ex. A.

158.    The "effective range" of the canisters is 15 feet.  *See* CCRB Report, p. 4, Ex. A.  Thus, the spray that NYPD officers are equipped with is capable of being sprayed over a large crowd, as occurred in this case.  When deployed over a crowd, the people in the crowd could be expected to sufferer the "intended results" of the use of pepper spray, including: "involuntary closure of the eyes," resulting in temporary blindness, being rendered incapacitated, and unable to flee.

159.    Upon information and belief, NYPD policy allows the use of pepper spray on crowds under some circumstances.  Patrol Guide PG 212-95 instructs: "Avoid discharging pepper spray indiscriminately over a large area for disorder control."  *See* Patrol Guide PG 212-95, p. 2, Ex. B.  This is **not** a prohibition of the use of pepper spray on groups of people.  Where the Patrol Guide instructs that an action is totally forbidden, it uses mandatory language: "Do not..."   For example, Patrol Guide PG 212-95 states: "Do <u>not</u> use pepper spray on subjects who passively resist."  *See* Patrol Guide 212-95, p. 2, Ex. B (emphasis in original).  Thus, use of pepper spray on "large areas" and groups is to be avoided, but is not forbidden.  The Patrol Guide provides no guidance, however, as to when pepper spray can be used on a group and when it should be "avoided."  The Patrol Guide indicates that some, but not all, members of service are given training in the use of pepper spray for disorder control.  *See* Patrol Guide 212-95, p. 2, Ex. B.  All members of service, however, can be expected to be involved in disorder control situations many times in their career.

160.     Upon information and belief, NYPD policies either permit spraying crowds of demonstrators with pepper spray, or provide such insufficient guidance on whether or when the use of pepper spray is permissible that even senior members of service are prone to commit serious violations of Constitutional rights while purportedly attempting to follow the NYPD policy.  On September 24, 2011, Deputy Inspector Anthony Bologna pepper sprayed a group of protestors who were waiting compliantly within a plastic-mesh barricade pen where they had been confined by police officers. The Wall Street Journal reported: "On September 24, 2011, Mr. Bologna pepper sprayed a group of protesters who were held behind netting by police officers in Union Square." *See* "NYPD Complaint Board Can Interview Deputy Inspector: Judge," by Sean Gardiner, THE WALL STREET JOURNAL, Nov. 27, 2013.[4]

161.     In the immediate aftermath of the event, the Police Department's "chief spokesman," Paul J. Browne, said that Deputy Inspector Bologna had used the pepper spray "'appropriately.'"  *See* "Videos Show Police Using Pepper Spray at Protest on the Financial System" by Joseph Goldstein, THE NEW YORK TIMES, September 25, 2011.[5] Deputy Inspector Bologna believed that his actions complied with NYPD policy and training: "Mr. Bologna's attorney, Louis La Pietra, ... said that 'his actions were consistent with NYPD training and policy.'"  *See* "NYPD Complaint Board Can

---

[4]     Available at: http://blogs.wsj.com/metropolis/2013/11/27/nypd-complaint-board-can-interview-deputy-inspector-judge/

[5]     Available at: http://www.nytimes.com/2011/09/26/nyregion/videos-show-police-using-pepper-spray-at-protest.html

Interview Deputy Inspector: Judge," by Sean Gardiner, THE WALL STREET JOURNAL, Nov. 27, 2013.[6]

162. When public reaction to the video of the incident proved politically damaging, the NYPD distanced itself from Deputy Inspector Bologna. In late October 2011, Deputy Inspector Bologna was transferred to Staten Island. *See* "NYPD inspector who peppersprayed Wall Street protester transferred to Staten Island," by Rocco Parascandola and Bob Kapstatter, THE NEW YORK DAILY NEWS, October 26, 2011.[7] The NYPD disciplined Deputy Inspector Bologna with the loss of ten vacation days. According to press reports, the NYPD found that his actions violated "guidelines." *See* "Union leader: NYPD is making Staten Island inspector a 'scapegoat,'" by Frank Donnelly, Staten Island Live, February 15, 2012.[8] There is no indication that, prior to the events of this case on December 31, 2011, the NYPD took any steps as a result of the Bologna incident to amend or clarify its policies on the use of pepper spray against groups of protestors, or to ensure that police officers assigned to the ongoing Occupy Walls Street protests had adequate training on existing policies.

163. In this case, the Plaintiff was struck by pepper spray as a result of officers using the long range of the spray devices to spray an entire group of people, of which the Plaintiff was a part.

164. As intended, the Plaintiff suffered involuntary closure of the eyes, resulting in temporary blindness, and was rendered incapacitated. As a result of this, and

---

[6] Available at: http://blogs.wsj.com/metropolis/2013/11/27/nypd-complaint-board-can-interview-deputy-inspector-judge/

[7] Available at: http://www.nydailynews.com/new-york/nypd-inspector-pepper-sprayed-wall-street-protester-transferred-staten-island-article-1.968320

[8] Available at: http://www.silive.com/news/index.ssf/2012/02/union_leader_nypd_is_making_st.html

the force applied against the Plaintiff by the officers using the metal barricade as a battering ram against the group that the Plaintiff was part of, the Plaintiff was injured.

**B.**     **The City of New York has a policy and practice of targeting participants in Occupy Wall Street activities for arrest without cause and subjecting them to excessive force**

165.     According to *The New York Times*, as of June 18, 2012, over 2,500 participants in Occupy Wall Street activities had been arrested in Manhattan alone. Upon information and belief, the vast majority of the cases were dismissed or otherwise resolved without criminal penalty.

166.     In other words, over the period of less than a year, Defendant THE CITY OF NEW YORK caused hundreds or thousands of protestors – who had committed no crime -- to be arrested.

167.     Upon information and belief, the NYPD's response to the Occupy movement follows mass arrest policies that were established at the time of the 2004 Republican convention, during which over 1,800 people were arrested, with more than 90 percent of the arrest cases being dismissed or ending with not-guilty verdicts.

168.     Upon information and belief, the police have been documented to have filed false criminal charges against others – not parties to this action -- who were arrested during the January 1, 2012 Occupy Wall Street event at Zuccotti park.

169.     In this regard, the City of New York treats liberal or left-oriented political assemblies more harshly than equivalent non-political events or events with a conservative or right-wing orientation.

170.     Upon information and belief, in one such arrest Alexander Arbuckle was arrested on charges that he was standing in the street blocking traffic. The arresting

officer, Officer Elisheba Vera, swore to this version of events on the witness stand at trial. However, photo and video evidence – including video taken by the NYPD's video unit – demonstrated that Arbuckle was on the sidewalk when he was arrested. As the magazine *The Nation* reported: "As it turns out, Officer Elisheba Vera lied to the court." Arbuckle was found not guilty.

171. Upon information and belief, Damien Treffs was a legal observer accompanying a January 1, 2012 Occupy Wall Street march. He was violently arrested without warning. The District Attorneys office declined to prosecute the case because probable cause was lacking for the arrest.

172. Upon information and belief, police officers committed perjury in order to press charges against another protestor, Jessica Hall, who was arrested for blocking street traffic on November 17, 2011. As *The Nation* reported, the truth exposed at her trial was quite different: "During trial, Sergeant Michael Soldo told the court that he arrested Hall because she was blocking traffic. But Soldo later admitted under cross-examination, and the NYPD's own video confirmed, that it was the NYPD metal barricades that prevented vehicles from passing."

173. Upon information and belief, police lied to support the arrest of a protestor arrested at an Occupy-related protest on Sept. 19, 2011, The protestor was arrested for – according to NYPD spokesman Paul Browne – leaping over a police crowd-control barrier. Video of the incident, however, showed that the arresting officers reached across the barrier and forcibly dragged the individual over it.

174. Upon information and belief, several civil cases arising out of the arrests of protestors have also alleged perjured criminal complaints lodged against protestors prior to the Occupy movement, including:

♦ Long v. City of New York, 09 Civ. 9216 (AKH) (S.D.N.Y.) (officer purposefully swears out false complaint against protestor; perjury is discovered by means of video of the arrest taken by another protestor);

♦ Callaghan v. City of New York, 07 Civ. 9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and mass retaliatory arrests of bicyclists, not based upon individualized suspicion, engaged in expressive conduct, to wit, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);

♦ Dunlop v. City of New York, 06 Civ. 0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

♦ MacNamara v. City of New York, 04 Civ. 9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people, not based upon individualized suspicion).

175. Upon information and belief, other cases have documented other forms of police misconduct directed against protestors, and tolerated or encouraged by the NYPD.

♦ <u>Lin v. City of New York</u>, 09 Civ. 1936 (PGG) (S.D.N.Y.) (officers arrest en masse participants in a Critical Mass group bicycle ride, without individualized suspicion, including arresting a person lawfully photographing an arrest of a bicyclist in Times Square and a bystander after refusing an unlawful order to produce identification);

♦ <u>Corbin v. City of New York</u>, 12-cv-02305 (PAC) (S.D.N.Y.) (police captain personally engaged in extended surveillance of small group of lawful protestors, eventually directing unlawful arrests of perceived leaders of group).

C.    **The City of New York has a policy and practice of unlawful trap and detain/trap and arrest tactics, creating unjustified risk of injury**

**176.**    Defendant THE CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of engaging in mass group arrests of protesters without particularized probable cause for the arrest of any individual within the mass of those arrested, using unlawful trap-and-arrest policing tactics.

**177.**    Not only are these trap and arrest tactics unlawful, they create circumstances in which innocent members of the public are placed at unjustified risk of physical harm.

**178.**    In one notorious example, on October 1, 2011, members of the NYPD led a group of approximately 600-700 onto the eastbound lane of the Brooklyn Bridge, and then blocked this group from crossing the bridge or returning to leave the roadway.  The police created a risky situation in which panic and stampede were strong possibilities, in a narrow space 135 feet above water.  That no-one was injured was a near-miracle, due

entirely to the peacefulness, calm, and discipline of the protestors being trapped and arrested.

179.     The NYPD's trap and arrest policy is accompanied by a "trap and push" policy, in which police use moving barricades to push groups of people for the purpose of arresting them or restricting their movement.  The police used this "trap and push" technique on several occasions during the NYPD's response to Occupy Wall Street.  The technique was used on September 24, 2011 in Union Square and in nearby side streets.  In that case, the police used plastic net barricades to push groups of protestors into areas where they could then be arrested.  The same technique was used in front of 60 Centre Street on November 11, 2011.  A metal barricade was used to push and move protestors on November 17, 2011 in the Wall Street area.

180.     The NYPD's trap-and-arrest policing tactic involves the use of police lines against targeted protests in order to trap protesters and others, in the absence of warnings or orders calculated to reach those subject to arrest. As a generalized trap without warning, the tactic captures persons indiscriminately and without regard to the existence of particularized probable cause to arrest.

181.     Trap and arrest tactics require the confinement of the people targeted in a space by means of barriers.

182.     The size of the space is then decreased to pen in and control the people trapped.

183.     The NYPD's trap-and-arrest tactics rely on the application of physical force or restraint indiscriminately to large groups of people.

**184.** The NYPD apply this force using netting, metal barriers, police vehicles, police officers' bodies, and other instruments to restrain and/or push groups of people at the chosen site of the mass arrest.

**185.** The existence of the aforementioned policy, practice and/or custom is demonstrated by the fact that it has been applied on several other recent occasions.

**186.** Upon information and belief, near Union Square on September 24, 2011, mass arrest tactics were implemented using lines of police and/or orange plastic netting to trap and arrest protestors and anyone else that happened to be in the vicinity. One reporter for the *Chronicle of Higher Education* who witnessed the scene compared the trap and arrest process to "ocean trawlers" capturing people "indiscriminately." A reporter for public television reported that some of those arrested were "bystanders who were snatched up while snapping souvenir photos." One of those arrested was a worker at a University Place café who stepped outside to see what was happening. The newspaper The Villager reported: "More than 80 people were arrested, including passersby and members of the press." The same report noted: "As in their previous marches, the demonstrators were peaceful."

**187.** The use of trap-and-arrest tactics resulted in injuries. Several of those already corralled within plastic netting were pepper-sprayed by NYPD Deputy Inspector Anthony Bologna. There was no justification for the deployment of this pepper spray. There was no apparent effort by this senior officer to direct the spray at any particular person.

**188.** NYPD Commissioner Raymond Kelly later told the press that he was in the area at this time and observed the police activity occurring there. Upon information

and belief, Commissioner Kelly's presence at this police activity indicated that he approved and condoned the police activity taking place, including performing mass arrests using the trap and arrest tactic.

189.    On October 1, 2011, an Occupy-related protest, accompanied by police, began to cross the Brooklyn Bridge from the Manhattan side by means of the pedestrian walkway.  As the pedestrian walkway filled with people, the police blocked the main entrance ramp to the eastbound lane of the bridge.  After blocking this ramp to both human and vehicular traffic for some time, the police stopped doing so, and the group of officers that blocked the ramp walked up onto the bridge span itself.  The marchers followed, believing that the police action indicated that the eastbound lane was now available for their use.  When the line of officers reached the approximate halfway point of the bridge span, they stopped and directed the marchers not to continue.  The marchers obeyed this directive.  The police did not permit those on the bridge to leave or otherwise disperse and arrested approximately 700 of the marchers who had followed them onto the bridge.  The following day, Mayor Michael R. Bloomberg ratified these tactics stating, "The police did exactly what they were supposed to do."

190.    The decision to trap 700 people on a narrow span 135 feet above the East River was incredibly reckless.

191.    Injuries were avoided only by virtue of the highly compliant comportment of the Occupy Wall Street protestors.

192.    On Nov. 15, 2011, NYPD officers converged on Zuccotti Park at 1AM and arrested those present *en masse*, including several credentialed journalists who were attempting to cover the story.

**193.** On November 30, 2011, a group of approximately 100 protestors were detained on a sidewalk inside barricades for two hours, without being permitted to leave. While this mass arrest resulted in no-one being taken into custody for further processing, the protestors were not free to leave, and were under arrest while they were detained.

**194.** Mass arrests of protestors have been the consistent practice of Defendant THE CITY OF NEW YORK and of the NYPD for many years.

**195.** On April 7, 2003, the NYPD conducted a mass arrest of demonstrators who were standing on a midtown sidewalk during a protest against the invasion of Iraq. Without warning, notice or cause, police surrounded the protesters as well as passers-by who happened to be walking on the same sidewalk. Without giving a directive or providing opportunity to disperse or comply with any directive the police indiscriminately arrested everyone trapped within the police line cordon. Kunstler v. City of New York, Civil Action No. 03-CV-02819-RWS, Southern District of New York (filed February 11, 2004, terminated August 22, 2008).

**196.** Similarly, during the 2004 Republican National Convention in New York City. According to *The New York Times*, multiple instances of mass arrests occurred. 1,806 persons were arrested in connection with RNC protests, and according to the *Daily News*, "[c]harges were ultimately dropped against 90 percent of them."

**197.** Police Commissioner Kelly has explicitly ratified and defended the mass false arrests of the NYPD, even in response to a Civilian Complaint Review Board letter which sharply criticized police conduct in connection with two specific RNC mass arrests and which specifically recommended additional training for officers. Despite these complaints, Police Commissioner Kelly ratified the arrests stating, "[T]he implication

that the N.Y.P.D. failed during the R.N.C. turns truth on its head." Police Commissioner Kelly further stated: "The policing of the R.N.C. was one of the Police Department's finest hours."

198.    Upon information and belief, The New York Times reported that Police Commissioner Raymond Kelly stated (in relation to the 2004 Republican Convention protests) that the police are not obligated to give warnings before arrests.  Then and now, the practice of the NYPD is that officers may arrest peaceful marchers or protestors at any time.  The NYPD engages in such arrests even where – as in the present case – the police have accompanied a march and directed the course and direction of the march. Apart from the present case, on both September 24, 2011 and October 1, 2011, NYPD officers arrested tens or hundreds of people for marching under the direction of NYPD officers.

199.    THE CITY OF NEW YORK has a policy and practice of utilizing unsafe methods of crowd control at Occupy Wall Street Events.

**D.    The City of New York has a policy and practice of utilizing unsafe methods of crowd control at Occupy Wall Street events**

200.    Upon information and belief, Defendant THE CITY OF NEW YORK has implemented a policy pursuant to which the NYPD utilizes unsafe methods of crowd control at Occupy Wall Street events.

201.    Such unsafe methods for crowd control were undertaken during the September 24, 2011 Occupy Wall Street event near and around Union Square, as described herein.

**202.** On that occasion, members of the NYPD unsafely used orange netting to trap, enclose, and confine OWS demonstrators, and to carry out mass arrests, without determining individualized probable cause.

**203.** Such unsafe methods for crowd control were undertaken during the October 1, 2011 Occupy Wall Street event at the Brooklyn Bridge, as described herein.

**204.** On that occasion, members of the NYPD led approximately 600-700 onto the eastbound lane of the Brooklyn Bridge.

**205.** The NYPD then blocked this group from crossing the bridge or returning to leave the roadway.

**206.** The police created a risky situation in which panic and stampede were strong possibilities, in a narrow space 135 feet above water. That no-one was injured was a near-miracle, due entirely to the peacefulness, calm, and discipline of the protestors being trapped and arrested.

**207.** On January 1, 2012, the OWS event in which the Plaintiff was injured, the NYPD repeatedly lifted metal barricades off of the ground and used the barricades as battering rams against the OWS demonstrators.

**208.** The metal barricades that the NYPD used were eight feet by seven inches long and three feet seven inches high.

**209.** The frame of the barricades were made of inch-and-half steel tube.

**210.** The vertical crosspieces that make up the fence portion of the barricade were made up of five-eights inch steel tube.

**211.** These barricades can easily cause injury when used as a battering ram.

**212.**     The members of the NYPD who used the barricades as battering rams and/or weapons, or prevented their colleagues from doing so, were well aware of the risks of injury that their conduct created.

**213.**     Nonetheless, the NYPD carried out this conduct, with deliberate indifference to the safety of the OWS demonstrators who were attending the event, and excessing their First Amendment protected rights.

**E.**     **The forgoing policies were designed and implemented at the highest command levels of the NYPD**

**214.**     Upon information and belief, the foregoing tactics are known and approved by decision-makers at the highest levels of the NYPD.  A report on police response to the Occupy movement was compiled by a joint project of *New York University Law School's Global Justice Clinic* and the *Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice*.  The report documented 130 specific incidents of police misconduct, including several of those mentioned above.  In a letter to the authors, NYPD Assistant Deputy Commissioner Thomas Doepfner, writing on behalf of the NYPD concerning the report, stated:  "It is our view, however, that the police actions that have been taken in connection with Occupy Wall Street activities have been lawful."

**215.**     Upon information and belief, Police Commissioner Raymond Kelly personally supervised the arrests that took place near Union Square on September 24, 2011.

**216.**     Upon information and belief, Police response to Occupy-related activity is coordinated at the highest levels on the NYPD.  NYPD executives above the level of

precinct commanders controlled the policing of Occupy-related events, using borough task forces to do the job.

217.     Both Raymond Kelly and Mayor Bloomberg have explicitly praised and ratified the tactics, including mass arrests without particularized probable cause, engaged in by the NYPD.

218.     The tactics of mass arrests without particularized probable cause, random arrests, perjury for the purposes of supporting arrests and/or criminal complaints are so widespread and of such long duration, and so many thousands of individual officers and citizens have been implicated or affected, that Defendant THE CITY OF NEW YORK must be presumed to be aware of them and to have condoned or promulgated those practices.

## THE UNCONSTITUTIONAL POLICES AND PRACTICES RESULTED IN PLAINTIFF'S INJURY

219.     The Defendant POLICE OFFICERS implemented and applied force, including pepper spray, without individualized probable cause that such force was necessary or justified, and, as result, injured the Plaintiff.

220.     Upon information and belief, the Defendant POLICE OFFICERS were implementing the foregoing unlawful trap and arrest tactic at the time their use of force caused the Plaintiff's injuries.

221.     Upon information and belief, the Defendant POLICE OFFICERS were implementing the foregoing unlawful policy of using excessive force against protestors, including the indiscriminate release of pepper spray, and, as a result, injured the Plaintiff.

222.     As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT PLUMA was caused to suffer personal injuries, violation of his civil rights,

emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

**223.** As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Empanel a jury.

[d] Award attorney's fees and costs.

[e] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:     New York, New York
           August 6, 2014

Respectfully submitted,

David A. Thompson [dt3991]
STECKLOW COHEN & THOMPSON
217 Centre Street, 6th Floor
New York, New York 10013
Phone:      (212) 566-8000
Fax:        (212) 202-4952
DTHOMPSON@WYLIELAW.COM
ATTORNEYS FOR PLAINTIFF