UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
ROBERT PLUMA,

                Plaintiff,

              -against-

THE CITY OF NEW YORK, a municipal entity; NEW
YORK CITY POLICE OFFICERS "JOHN DOES 1-50",
     Defendants,
------------------------------------------------------------------x

13 CV 2017 (TPG)

Opposition to the
Defendants' Motion
to Dismiss

STECKLOW COHEN & THOMPSON
*Attorneys for Plaintiff*
217 Centre Street, 6th Floor
New York, NY 10013
Phone: (212) 566-8000
Fax: (212) 202-4952

# TABLE OF CONTENTS

I.   Preliminary Statement ...................................................................................................4

II.  Statement of Facts......................................................................................................5

    A.   The Events of December 31, 2011 and the Plaintiff's Injury ...................................5

    B.   Police Policies and Practices Concerning the Use of Pepper Spray ........................6

    C.   Other Relevant Policies and Practices of the NYPD ............................................10

III. Argument....................................................................................................................11

    A.   The Defendants Violated the Plaintiff's Fourth Amendment Rights....................11

    B.   The Defendants Violated the Plaintiff's First Amendment Rights .......................18

    C.   The Plaintiff States a Claim Under Monell.........................................................19

    D.   Leave to Amend Should be Granted....................................................................20

IV.  Conclusion................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. Conn. 2004) ................16, 26

*Anthony v. City of New York*, 339 F.3d 129 (2d Cir. N.Y. 2003)......................................19

*Atkinson v. City of Mt. View*, 709 F.3d 1201 (8th Cir. Mo. 2013)........................14, 23, 24

*Barsamian v. City of Kingsburg*, 597 F. Supp. 2d 1054 (E.D. Cal. 2009) .................14, 23

*Bettencourt v. Arruda*, 2012 U.S. Dist. LEXIS 156753 (D. Mass. Nov. 1, 2012)............10

*Brendlin v. California*, 551 U.S. 249 (2007)....................................................11, 12, 13, 24

*Cal. v. Hodari D.*, 499 U.S. 621, 626 (1991) ....................................................10, 14, 24, 25

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)....... ...................................10, 11, 13

*Cowan v. Breen*, 352 F.3d 756 (2d Cir. Conn. 2003)............................................10, 20, 22

*Fisher v. City of Memphis*, 234 F.3d 312 (6th Cir. 2000) ....................................10, 20, 22

*Foman v. Davis*, 371 U.S. 178 (1962):...................................................................................19

*Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. Conn. 2013)..................................19

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. Cal. 2012)....................................12, 13, 17

*State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843 (2d Cir. 1981)...............................19

*United States v. Brignoni Ponce*, 422 U.S. 873 (1975)................................................14, 23

*Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003) ..........................................10, 20, 22, 24

*Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. Cal. 2011) ........................10, 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
ROBERT PLUMA.

                    Plaintiff.                          13 CV 2017 (TPG)

                    -against-                     Opposition to the
                                                  Defendants' Motion
THE CITY OF NEW YORK, a municipal entity; NEW      to Dismiss
YORK CITY POLICE OFFICERS "JOHN DOES 1-50".
    Defendants.
--------------------------------------------------------------------x

        Plaintiff, Robert Pluma, by his attorneys, Stecklow, Cohen & Thompson, hereby submits

this opposition to the defendants' motion to dismiss pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure, and in support of the plaintiff's cross-motion to amend the Complaint pursuant to

Rule 15 of the Federal Rules of Civil Procedure:

## I.    Preliminary Statement

        1.      When the defendants filed this belated motion to dismiss, the plaintiff offered to

compromise with the defendants in order to avoid the need to burden the Court's time with this

decision. The plaintiff offered to consent to bifurcation of the *Monell* claim in exchange for

withdrawal of the remaining portions of the motion and consent by the defendants to the

amendment of the Complaint to name certain officers who have been identified as participants in

the police assault on the plaintiff, Police Officer Christopher Vega, Sergeant Carl Soreco, and

Police Officer Meghan O'Leary. The defendants rejected that offer and proposed no alternative.

        2.      Accordingly, the plaintiff opposes the defendants' motion on all branches --

although the plaintiff would consent to bifurcation of the *Monell* claim if the Court deemed it

advisable -- and moves for leave to amend the Complaint. A proposed amended Complaint is

annexed hereto as Exhibit C. The proposed amendment: 1) names the individuals identified

above, 2) amplifies the allegations concerning the event itself, and 3) amends the *Monell* claim to

4

show the nexus between the NYPD's polices regarding the use of pepper spray and the plaintiff's injuries.

## II. Statement of Facts

### A. The Events of December 31, 2011 and the Plaintiff's Injury

3. The plaintiff was part of a large number of people associated with Occupy Wall Street inside Zuccotti Park on the night of December 31, 2011. He was there with his girlfriend for the purpose of celebrating New Year's Eve and showing support for Occupy Wall Street. The NYPD controlled entry to and exit from the park. The plaintiff was permitted to enter the park, which is open 24 hours, by the police.

4. In the minutes before the plaintiff's injury occurred, he was located on the southern side of the park, amongst a group of people there. The police had arranged a line of metal barricades to close the southern side of the park from entry and exit. Some of the civilians and some of the police on this southern border of the park began to argue across this line of barricades. The plaintiff did not participate in these arguments, but observed them.

5. The arguments escalated, and a group of approximately seven NYPD officers, including Police Officer Vega, lifted a single metal barricade unit -- weighing approximately 50 pounds -- and used it as a battering ram to push into the group of people. The officers lifted the barricade until the base of the barricade was approximately waist-high, and pushed against all the civilians on the other side of the barricade. The group as a whole, including the plaintiff, were pushed backwards. At the same time, P.O. Vega and another officer sprayed their pepper spray canisters over and onto the group. As explained below, the canisters have a range of approximately 15 feet. These officers tried to, and did, hit as many members of the group as the spray could reach. The officers hit the plaintiff, who was part of the group. When the plaintiff was hit by the pepper spray, it had the effect on him that it is designed to have: he was rendered unable to see or breathe normally. He was disoriented and incapacitated. While this happened,

5

the officers continued to push the metal barricade into the crowd, pushing the crowd, including the plaintiff. The plaintiff fell and suffered a severe spiral fracture of his hand.

6.      When the plaintiff fell, he was defenseless: unable to see or breathe, and in searing pain. Other people helped him move a few feet away so that he would not be trampled. He stayed on the ground, and vomited. The plaintiff stayed on the ground until the effects of the pepper spray wore off enough for him to be able to move from where he was to seek help.

7.      The plaintiff was not formally arrested, and was never charged with a crime. He suffered a spiral fracture of his dominant hand that required surgery and the implantation of permanent mental screws.

**B.      Police Policies and Practices Concerning the Use of Pepper Spray**

8.      The New York City Civilian Complaint Review Board issued a report in 2000 that described the NYPD's use of pepper spray, and identified instances of the misuse of pepper spray by NYPD officers, and recommended training to prevent such occurrences in the future. *See* REPORT OF THE PEPPER SPRAY COMMITTEE OF THE CIVILIAN COMPLAINT REVIEW BOARD, Hon. Charles M. Greinsky, *et al.*, New York City Civilian Complaint Review Board 2000 (hereinafter, the "CCRB Report"), Ex. A.

9.      According to the CCRB Report: "The NYPD began to use pepper spray, formally known as oleoresin capsicum (OC) spray, in a limited capacity in February 1991, when its use was restricted to the Emergency Services Unit. Use of pepper spray, which replaced mace, was expanded to the entire department in October 1994." *See* CCRB Report, p. 3, Ex. A. The purpose for which pepper spray is deployed by the NYPD is described as follows:

> The spray is designed for use as less-than-lethal force, adequate for incapacitating dangerous or violently resisting suspects. Intended results of the use of pepper spray are inflammation and swelling of the mucous membranes of the eye, nose, and throat and involuntary closure of the eyes. *See* CCRB Report, pp. 3-4, Ex. A.

10.     The CCRB Report also summarizes the policy in the NYPD Patrol Guide

(hereinafter, "the Patrol Guide"), found in procedure PG 212-95, regarding when pepper spray

should be used by members of the service:

> Patrol Guide 212-95 lists five situations in which an officer may use pepper spray.
> Pepper spray may be used when a police officer "reasonably believes" that it is necessary
> to: 1) protect himself, or another from unlawful use of force (e.g., assault); 2) effect an
> arrest, or establish physical control of a subject resisting arrest; 3) establish physical
> control of a subject attempting to flee from arrest or custody; 4) establish physical control
> of an emotionally disturbed person (EDP); and 5) control a dangerous animal by
> deterring an attack, to prevent injury to persons or animals present. *See* CCRB Report,
> pp. 4-5, Ex. A.

11.     At the time of the events at issue in this case, Patrol Guide PG 212-95 had not

changed from what was summarized in the CCRB Report. *See* Patrol Guide PG 212-95, Item 1,

Ex. B.

12.     The CCRB Report describes the kind of pepper spray the NYPD uses:

> [The pepper spray] features a 10% solution of oleoresin capsicum, carried in a solution
> principally composed of water, antifreeze, and denatured alcohol. The canisters ... have
> an effective range of 3 to 15 feet. *See* CCRB Report, p. 4, Ex. A.

13.     The CCRB Report found that in 15.6%, of the cases that received full

investigations, the CCRB found that inappropriate pepper spray use occurred. *See* CCRB Report,

p. 10, Ex. A. The CCRB Report explained:

> Of the 22 substantiated cases, officers in three cases cited a civilian's refusal to heed the
> officer's command as grounds for pepper-spraying them. In three cases, officers used
> pepper spray on a large crowd or a group of people. In another three cases, officers
> claimed that the civilians were engaged in disorderly conduct. In seven cases, officers
> offered the civilian's threatening behavior or physical aggression as the rationale for
> using pepper spray. In another case, the officer pepper-sprayed a civilian for cursing. In
> four other cases, officers cited resisting arrest as the rationale for using pepper spray. In
> the final case, the officer had no apparent reason for using pepper spray since the civilian
> was already subdued.[1]

---

[1]     CCRB Report pp. 14-15.

14.     The CCRB Report recommends that the NYPD stress the proper procedures for pepper spray use during training sessions and allow ample time for officers to practice the use of pepper spray.[2] Upon information and belief, no such training reform has ever occurred.

15.     Upon information and belief, NYPD policy allows the use of pepper spray on crowds under some circumstances. Patrol Guide PG 212-95 instructs: "Avoid discharging pepper spray indiscriminately over a large area for disorder control." *See* Patrol Guide PG 212-95, p. 2, Ex. B. This is **not** a prohibition of the use of pepper spray on groups of people. Where the Patrol Guide instructs that an action is totally forbidden, it uses mandatory language: "Do not..." For example, Patrol Guide PG 212-95 states: "Do not use pepper spray on subjects who passively resist." *See* Patrol Guide 212-95, p. 2, Ex. B (emphasis in original). Thus, use of pepper spray on "large areas" and groups is to be avoided, but is not forbidden. The Patrol Guide provides no guidance, however, as to when pepper spray can be used on a group and when it should be "avoided." The Patrol Guide indicates that some, but not all, members of service are given training in the use of pepper spray for disorder control. *See* Patrol Guide 212-95, p. 2, Ex. B. All members of service, however, can be expected to be involved in disorder control situations many times in their career.

16.     Upon information and belief, NYPD policies either permit spraying crowds of demonstrators with pepper spray, or provide such insufficient guidance on whether or when the use of pepper spray is permissible that even senior members of service are prone to commit serious violations of Constitutional rights while purportedly attempting to follow the NYPD policy. On September 24, 2011, Deputy Inspector Anthony Bologna pepper sprayed a group of protestors who were waiting compliantly within a plastic-mesh barricade pen where they had been confined by police officers. The Wall Street Journal reported: "On September 24, 2011, Mr. Bologna pepper sprayed a group of protesters who were held behind netting by police officers in

---

[2]     CCRB Report, p. 17

8

Union Square." *See* "NYPD Complaint Board Can Interview Deputy Inspector: Judge," by Sean Gardiner, THE WALL STREET JOURNAL, Nov. 27, 2013.[3]

17.    In the immediate aftermath of the event, the Police Department's "chief spokesman," Paul J. Browne, said that Deputy Inspector Bologna had used the pepper spray "'appropriately.'" *See* "Videos Show Police Using Pepper Spray at Protest on the Financial System" by Joseph Goldstein, THE NEW YORK TIMES, September 25, 2011.[4] Deputy Inspector Bologna believed that his actions complied with NYPD policy and training: "Mr. Bologna's attorney, Louis La Pietra, ... said that 'his actions were consistent with NYPD training and policy.'" *See* "NYPD Complaint Board Can Interview Deputy Inspector: Judge," by Sean Gardiner, THE WALL STREET JOURNAL, Nov. 27, 2013.[5]

18.    When public reaction to the video of the incident proved politically damaging, the NYPD distanced itself from Deputy Inspector Bologna. In late October 2011, Deputy Inspector Bologna was transferred to Staten Island. *See* "NYPD inspector who peppersprayed Wall Street protester transferred to Staten Island," by Rocco Parascandola and Bob Kapstatter, THE NEW YORK DAILY NEWS, October 26, 2011.[6] The NYPD disciplined Deputy Inspector Bologna with the loss of ten vacation days. According to press reports, the NYPD found that his actions violated "guidelines." *See* "Union leader: NYPD is making Staten Island inspector a 'scapegoat,'" by Frank Donnelly, Staten Island Live, February 15, 2012.[7] There is no indication that, prior to the events of this case on December 31, 2011, the NYPD took any steps as a result of the Bologna incident to amend or clarify its policies on the use of pepper spray against groups

---

[3]    Available at: http://blogs.wsj.com/metropolis/2013/11/27/nypd-complaint-board-can-interview-deputy-inspector-judge/
[4]    Available at: http://www.nytimes.com/2011/09/26/nyregion/videos-show-police-using-pepper-spray-at-protest.html
[5]    Available at: http://blogs.wsj.com/metropolis/2013/11/27/nypd-complaint-board-can-interview-deputy-inspector-judge/
[6]    Available at: http://www.nydailynews.com/new-york/nypd-inspector-pepper-sprayed-wall-street-protester-transferred-staten-island-article-1.968320
[7]    Available at:
http://www.silive.com/news/index.ssf/2012/02/union_leader_nypd_is_making_st.html

of protestors, or to ensure that police officers assigned to the ongoing Occupy Walls Street protests had adequate training on existing policies.

19.     In this case, the Plaintiff was struck by pepper spray as a result of officers using the long range of the spray devices to spray an entire group of people, of which the Plaintiff was a part. As intended, the Plaintiff suffered involuntary closure of the eyes, resulting in temporary blindness, and was rendered incapacitated. The Plaintiff was temporarily immobilized. The force that incapacitated and blinded the Plaintiff is the same force that caused his injury.

## C.     Other Relevant Policies and Practices of the NYPD

20.     In this case, the plaintiff's injuries were caused part by the decision by the police officers to use a crowd control barricade as a device to push the group of people that the plaintiff was a part of. As the complaint explains, the NYPD frequently employed barricade of various types to move, trap and/or arrest protestors involved in Occupy Wall Street demonstrations. The use of barricades to push large groups of people -- whether for arrest or simply to restrict their movement -- is a policy implemented in tandem with the trap and arrest policy. As the proposed Amended Complaint alleges:

> The NYPD's trap and arrest policy is accompanied by a "trap and push" policy, in which police use moving barricades to push groups of people for the purpose of arresting them or restricting their movement. The police used this "trap and push" technique on several occasions during the NYPD's response to Occupy Wall Street. The technique was used on September 24, 2011 in Union Square and in nearby side streets. In that case, the police used plastic net barricades to push groups of protestors into areas where they could then be arrested. The same technique was used in front of 60 Centre Street on November 11, 2011. A metal barricade was used to push and move protestors on November 17, 2011 in the Wall Street area.

21.     Finally, the Complaint details the fact that the NYPD -- over the course of the entire Occupy Wall Street movement -- met the largely peaceful protests of that movement with a widespread campaign of baseless arrests and escalation of force where no force was needed. The events of this case are an example of a situation in which the NYPD chose to escalate force, and violated the plaintiff's rights by doing so.

## III. Argument

### A. The Defendants Violated the Plaintiff's Fourth Amendment Rights

22.     "[A] Fourth Amendment seizure occurs 'when there is a governmental termination of freedom of movement through means intentionally applied.'" *Cowan v. Breen*, 352 F.3d 756, 763-764 (2d Cir. Conn. 2003) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)). The defendant appears to argue that a Fourth Amendment excessive force claim can only arise during an investigatory stop or an arrest, but this is not the rule set forth by Second Circuit or Supreme Court precedent. In Cowan, for example, the Second Circuit made clear that the intent required on the part of the officer is simply the intent to apply force. The intent to bring about the result of limiting freedom of movement is not an element of the Constitutional tort. Thus, the Second Circuit explained: "Whether [police officer] Breen shot [decedent] Cooper because he felt he was in danger or because he wanted to stop her from getting away, his decision to fire at her was intentional, not accidental." *Id.* (citing *Vaughan v. Cox*, 343 F.3d 1323, 1328 (11th Cir. 2003); *Fisher v. City of Memphis*, 234 F.3d 312, 317-19 (6th Cir. 2000)). Because the force was applied intentionally, the Second Circuit held, it was a Fourth Amendment violation regardless of motive. Thus, whether or not force is applied to stop or arrest the subject, the Fourth Amendment applies if the application of force is intentional and its result is a restriction of movement.

23.     Indeed, the Supreme Court has explained: "The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, **even when it is ultimately unsuccessful** [i.e. regardless of whether a stop or arrest occurs]." *Cal. v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis added). Cases have found that the application of pepper spray upon a person is "application of physical force to restrain movement" within the meaning of Hodari. *See, e.g., Bettencourt v. Arruda*, 2012 U.S. Dist. LEXIS 156753, 19-20 (D. Mass. Nov. 1, 2012) (collecting cases). The Ninth Circuit held that pepper spray is a "form[] of force capable of inflicting serious pain and causing serious injury.... regarded as 'intermediate

force' that, while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests." *Young v. County of Los Angeles*, 655 F.3d 1156, 1161-1162 (9th Cir. Cal. 2011).

24.     As explained above, according to the CCRB Report and the Patrol Guide, pepper spray is used to -- *inter alia* -- "incapacitate" the subject, "establish physical control of a subject," stop a subject "attempting to flee" from the police. *See* CCRB Report, pp. 3-4, Ex. A; Patrol Guide 212-95, Ex. B. One of the "intended results" on a subject is "involuntary closure of the eyes." *See* CCRB Report, p. 4, Ex. A. "Pepper spray is designed to cause intense pain, and inflicts a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx, as well as disorientation, anxiety, and panic." *Young*, 655 F.3d at 1162 (quotations omitted).

25.     In this case, the Plaintiff was struck by pepper spray as a result of officers using the long range of the spray devices to spray an entire group of people, of which the Plaintiff was a part. As intended, the Plaintiff suffered involuntary closure of the eyes, resulting in temporary blindness, and was rendered incapacitated. He was disabled from leaving the scene for a significant period of time. As a result of being struck by the pepper spray, and as a result of the force applied against the Plaintiff by the officers using the metal barricade as a battering ram, the Plaintiff fell and was injured.

26.     While it is true that a person **accidentally** injured by, for example, a stray bullet fired by a police officer is not "seized" because force was not **intentionally applied** to that person, such cases are different from the case here. The Supreme Court has held that where the police intentionally apply force upon more than one person, it does not matter that the officers subjectively intended to restrict the movement of only one. In the 2007 case of Brendlin v. California, the Supreme Court explained its precedent as follows:

> California defends the State Supreme Court's ruling ... by citing our cases holding that seizure requires a purposeful, deliberate act of detention. But Chesternut, [Mich. v. Chesternut, 486 U.S. 567, 576 (1988)], answers that argument. ... [T]he criterion of

willful restriction on freedom of movement is no invitation to look to subjective intent when determining who is seized. Our most recent cases are in accord on this point. In Lewis, [County of Sacramento v. Lewis, 523 U.S. 833 (1998)], we considered whether a seizure occurred when an officer accidentally ran over a passenger who had fallen off a motorcycle during a high-speed chase, and in holding that no seizure took place, we stressed that the officer stopped Lewis's movement by accidentally crashing into him, not "through means intentionally applied." Lewis, 523 U.S. at 844. We did not even consider, let alone emphasize, the possibility that the officer had meant to detain the driver only and not the passenger. Nor is Brower [Brower v. County of Inyo, 489 U.S. 593, 596 (1989)] to the contrary, where it was dispositive that "Brower was meant to be stopped by the physical obstacle of the roadblock--and that he was so stopped." Brower, 489 U.S. at 599. California reads this language to suggest that for a specific occupant of the car to be seized he must be the motivating target of an officer's show of authority, as if the thrust of our observation were that Brower, and not someone else, was "meant to be stopped." But our point was not that Brower alone was the target but that officers detained him "through means intentionally applied"; if the car had had another occupant, it would have made sense to hold that he too had been seized when the car collided with the roadblock. *Brendlin v. California*, 551 U.S. 249, 260-261 (2007).

27.     Here, the police intended to, and did, pepper spray a group of people of whom the plaintiff was a part. The police intended to, and did, apply the force of a metal barricade used as a battering ram against a group of people of whom the plaintiff was a part. The force employed by the officers was employed against the entire group -- it was thus, from a Fourth Amendment standpoint, applied against the plaintiff. Whether the police subjectively intended to target the plaintiff in particular is Constitutionally irrelevant, because objectively they intentionally sprayed the entire group which included the plaintiff.

28.     One Court of Appeals, citing Brendlin, has found a Fourth Amendment violation in precisely the circumstances at issue here. The court was asked to determine whether police who applied force upon a group of protestors had "seized" a particular protestor who was injured by a "pepper spray projectile" fired by the officers. The Court of Appeals found that the injured protestor had been subjected to "physical force [which] terminate[d] or restrain[ed] his freedom of movement through means intentionally applied." *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. Cal. 2012) (quoting *Brendlin*, 551 U.S. at 254). The court held:

> In this case, the U.C. Davis police officers took aim and intentionally fired in the direction of a group of which Nelson was a member. Nelson was hit in the eye by a projectile filled with pepper spray and, after being struck, was rendered immobile until he was removed by an unknown individual. Nelson was both an object of intentional

governmental force and his freedom of movement was limited as a result. Under these facts, Nelson was unquestionably seized under the Fourth Amendment. *Nelson*, 685 F.3d at 875-876.

29.     The Court of Appeals considered and rejected arguments similar to those raised

by the defendants here, citing binding Supreme Court precedents:

> The officers argue that Nelson was not individually targeted by officers, and therefore his shooting was unintentional and incapable of causing a Fourth Amendment violation. This argument misapprehends the distinction between intentional and unintentional conduct that the Supreme Court has repeatedly held as determinative of the Fourth Amendment analysis. To constitute a seizure, the governmental conduct must be purposeful, and cannot be an unintentional act which merely has the effect of restraining the liberty of the plaintiff. Compare Cnty. of Sacramento v. Lewis, 523 U.S. 833, 843-44 (1998) (no seizure occurred when police car unintentionally ran over a passenger who fell from a fleeing motorcycle during chase) and United States v. Al Nasser, 555 F.3d 722 (9th Cir. 2009) (no seizure occurred when police signaled to driver to continue driving and he misinterpreted signal and stopped), with Brower v. Cnty. of Inyo, 489 U.S. 593, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989) (seizure occurred when fleeing driver hit road block intentionally erected by the police), and Brendlin v. California, 551 U.S. 249 (seizure of passenger occurs when car stopped by police for the purpose of detaining the driver).
>
> The intentionality requirement is satisfied when the "termination of freedom of movement [occurs] through means intentionally applied." Brower, 489 U.S at 597 (emphasis in original). In the Court's opinion in Brower, such willful conduct is contrasted with the unknowing and unintentional act of accidentally pinning a fleeing felon to a wall with a police car when the brakes of an unoccupied police vehicle failed. For an act to be unintentional, the governmental conduct must lack the element of volition; an absence of concern regarding the ultimate recipient of the government's use of force does not negate volition. As Brendlin stated, "'an unintended person . . . [may be] the object of the detention,' so long as the detention is 'willful' and not merely the consequence of 'an unknowing act.'" Id. at 254 (quoting Brower, 489 U.S. at 596) (alterations in original). Regardless of whether Nelson was the specific object of governmental force, he and his fellow students were the undifferentiated objects of shots intentionally fired by the officers in the direction of that group. Although the officers may have intended that the projectiles explode over the students' heads or against a wall, the officers' conduct resulted in Nelson being hit by a projectile that they intentionally fired towards a group of which he was a member. Their conduct was intentional, it was aimed towards Nelson and his group, and it resulted in the application of physical force to Nelson's person as well as the termination of his movement. Nelson was therefore intentionally seized under the Fourth Amendment. *Nelson*, 685 F.3d at 876-877.

30.     As in Nelson, the defendants' "conduct was intentional, it was aimed towards [the

plaintiff] and his group, and it resulted in the application of physical force to [the plaintiff]'s

person as well as the termination of his movement." *Id.* at 877. This is a Fourth Amendment

violation.

14

31.    The fact that the plaintiff was not subsequently arrested, and that he later was able to leave, makes no difference to the Constitutional calculus. The phrase "termination of freedom of movement" does not imply termination of movement that results in arrest, is permanent, or is even of long duration. Thus, "A blow by a police officer that immobilizes the recipient easily meets [the Fourth Amendment] definition of a seizure. The fact that the restraint on the individual's freedom of movement is brief makes no difference." *Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. Ill. 2006). In contrast to cases involving seizure by display of authority (which require submission by the plaintiff), where force is **actually used**: "The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, **even when it is ultimately unsuccessful**." *Hodari D.*, 499 U.S. at 626 (1991) (emphasis added). *Accord Atkinson v. City of Mt. View*, 709 F.3d 1201, 1208 (8th Cir. Mo. 2013) ("This restraint need not actually 'succeed in stopping or holding [the person] even for an instant.") (quoting *Hodari D.*, 499 U.S. at 625). *Accord Barsamian v. City of Kingsburg*, 597 F. Supp. 2d 1054, 1066 (E.D. Cal. 2009) ("Even if brief, an officer's application of physical force upon a person can be regarded as a seizure."). *See also United States v. Brignoni Ponce*, 422 U.S. 873, 878 (1975) ("The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."). *See also Dejesus v. Village of Pelham Manor*, 282 F. Supp. 2d 162, 170 (S.D.N.Y. 2003) ("seizures can occur even when a person does not attempt to leave").

32.    In its present form, the Complaint alleges: "The police deployed the pepper spray in such a way as to strike those present holding cameras, including the Plaintiff." (Complaint ¶ 33). The Complaint alleges that: "The police shoved a metal barricade against members of the public," i.e., the group of civilians in Zuccotti Park that the Plaintiff was part of. The Complaint states that, as a result, "The Plaintiff was blinded and unable to breathe, and fell." (Complaint ¶ 35). "The Plaintiff landed with most of his weight on his left hand, and [t]his impact caused spiral fractures that required surgery." (Complaint ¶¶ 36-37).

33.     The proposed Amended Complaint contains the following more detailed

allegations:

- While the metal barricade was pushing into this group of people, two police officers discharged pepper spray across the group of people.

- The two officers that did this were Defendant POLICE OFFICER VEGA and JOHN DOE SECOND PEPPER SPRAY OFFICER."

- The police officers targeted the group of people as a whole.

- The pepper spray struck the group of people as a whole.

- The plaintiff, who was in the group of people, was struck by the pepper spray. (Proposed Amended Complaint ¶¶ 40-44).

34.     The proposed Amended Complaint also provides further detail concerning the

second type of application of force intentionally applied against the group by the officers, when

they used the metal barricade as a battering ram to strike and push back the crowd:

- The police used a metal barricade as a battering ram against a group of civilians within Zuccotti Park, of which the Plaintiff was a part.

- Specifically, they lifted the metal barricade off the ground to above waist height, and pushed the metal into the group, pushing the group of people backwards.

- The purpose of the using the metal barricade as a battering ram on the group of people was to push the group of people, including the Plaintiff, backwards and to knock them down.

- Using the metal barricades, the police did in fact push the group of people backwards and knock some of them down. One of those knocked down was the Plaintiff. (Proposed Amended Complaint ¶¶ 36-39).

35.     The proposed Amended Complaint makes more explicit the fact, obvious from

the circumstances alleged, that when the plaintiff was pepper-sprayed so that he could not see or

breathe, and fell, suffering a severe hand fracture, his freedom of movement was limited:

- As a result of being struck by the pepper spray and as a result of the use of the metal barricade as a battering ram, the plaintiff was blinded, incapacitated, pushed back and knocked down.

- As a result of being blinded, incapacitated, pushed back and knocked down, the plaintiff's liberty of movement was restricted. The plaintiff was unable to walk without help. He was moved a few feet away, where he lay on the ground and vomited from the effects of the police assault.

- The plaintiff remained at the scene for a significant period of time before the incapacitating effects of the assault ameliorated sufficiently for the plaintiff to move on his own. (Proposed Amended Complaint ¶ 45, 47-48).

36.     The defendants cite the use of the word "bystander" in the Complaint, and cite cases in which police negligently struck "bystanders," and ask the Court to focus on the word "bystander" without regard to its meaning in this case and its meaning in the negligence cases cited by the defendants. (See Def. Memo., p. 15). This is not a Fourth Amendment "bystander" case, because the plaintiff was **not accidentally struck** by the pepper spray or the force of the metal barricade. A hypothetical illustrates why the use of the word "bystander" in the Complaint does not make this case, *ipso facto*, a negligence case that falls outside the Fourth Amendment. Imagine that in a crowded bar, two men get into a fight. The other customers stand back and try to stay out of the way. The other customers are **bystanders to the fight**. The police arrive, and one of the officers takes a machine gun, and fires, sweeping the hail of bullets across the entire bar, killing everyone. The customers were **not bystanders to the machine gun fire** -- they were victims of force intentionally applied to them. In this case, the plaintiff was a bystander to the conflict between the police and some of the other protestors that preceded the officers' use of pepper spray and their use of a metal barricade as a battering ram against the group. He was not a bystander to the use of force, because the pepper spray and the battering ram were directed at the entire group, of which he was a part.

37.     Finally, an entirely separate and perhaps simpler line of argument independently supports the plaintiff's Fourth Amendment claim. The Second Circuit has held that an allegation that "officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances" is itself sufficient to state a cause of action for a Fourth Amendment excessive force claim. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124 (2d Cir. Conn. 2004). *See also Phelan v. Sullivan*, 541 Fed. Appx. 21, 25 (2d Cir. N.Y. 2013) (same). The Complaint states: "The police deployed the pepper spray with the intention of creating the maximum

17

possible confusion and suffering among the protestors they were attacking." (Complaint ¶ 32). In keeping with the rule of Amnesty Am., this allegation states a Fourth Amendment claim.

38.     These facts pled were sufficient under Rule 8 to state a claim.[8] Were this Court to find that the allegations of the Complaint are insufficiently detailed, then the plaintiff respectfully requests that the Court grant leave to amend the Complaint to provide further detail concerning the facts as they actually occurred, which "unquestionably" state a claim for a Fourth Amendment violation. *Nelson*, 685 F.3d at 876.

## B.     The Defendants Violated the Plaintiff's First Amendment Rights

39.     The defendants argue that the Complaint fails to state a claim for a violation of the plaintiff's First Amendment rights. There can be no question that the plaintiff was engaged in First Amendment activity when he assembled with like-minded people in Zuccotti Park on December 31, 2011 to support Occupy Wall Street. The entire complaint explains that the NYPD targeted Occupy Wall Street demonstrations for unwarranted applications of force, including but not limited to the unwarranted use of pepper spray and a metal barricade battering ram in this case. The Complaint does not **expressly** state that as a result of the police attack and his injury, the plaintiff suffered a chilling effect of his speech. However, there was unquestionably a chilling effect that took hold when the plaintiff fell to the ground choking on pepper spray, and broke his hand. The plaintiff stopped engaging in expressive conduct immediately, and instead began trying to breathe, see, and stand up again. This is all that is required to state a claim. In fact, following the attack by police, the plaintiff did cease participation in Occupy Wall Street

---

[8]     The fact that the Complaint, as it stands, is sufficient to state a claim is further evidenced by the fact that no motion to dismiss was filed by the defendants until after a recent decision by Magistrate Judge Pitman on June 19, 2011 in an unrelated case being litigated by my office and Mr. Andrew Lucas (the attorney that filed the present motion), in which Magistrate Judge Pitman found that the City of New York had filed to comply with its discovery obligations, and which assessed attorneys fees against the City for the motion practice surrounding that dispute. *See* Wiles v. City of New York, 13-cv--2898 Within two weeks, and on the date the plaintiff's fee application was filed in that case, this motion was filed.

events for a significant period of time, and this fact is alleged in the proposed Amended Complaint. *See* Proposed Amended Complaint ¶ 59.

### C. The Plaintiff States a Claim Under Monell

40. As stated previously, the plaintiff consents to bifurcate the Monell claim in the interests of judicial efficiency, if the Court deems this advisable. This does not mean, however, the plaintiff agrees that no valid Monell claim has been pled. Moreover, the proposed Amended Complaint pleads a Monell claim that is unquestionably 'plausible', and which had very precise nexus with the facts of this case. The NYPD has a policy that allows police officers to use pepper spray on groups of people. The policy is unclear and inevitably leads NYPD officers to use pepper spray inappropriately. The NYPD generally fails to train its officers in the use of pepper spray. The NYPD expressly trains only a few officers in the use of pepper spray in public "disorder" situations. *See* Proposed Amended Complaint ¶¶148-164. The plaintiff was injured when police officers used pepper spray in a public "disorder" situation.

41. The plaintiff's existing Complaint states, in essence, that the NYPD consistently chose to escalate force against Occupy Wall Street protests in ways that amount to a practice, if not a policy. The Complaint states that the NYPD adopted a policy of using police power to discourage protest by Occupy Wall Street-affiliated protestors, including use of excessive force, and other unconstitutional practices such as random arrests. The Complaint pleads that the NYPD used trap and arrest tactics, which involve pushing mobile barriers against groups of people, to suppress Occupy Wall Street dissent. The Complaint does not plead that the NYPD had a policy and practice of simultaneously spraying crowds with pepper spray while hitting *them* with metal barricades, but a Monell pleading need not plead such a laser-focused policy or practice in order to state a claim. Otherwise, the Monell cause of action would be wholly illusory, which the Supreme Court cannot have intended.

42. If this Court were to find the existing Monell claim to be inadequately precise, then the plaintiff respectfully requests that -- whether or not the Monell claim is bifurcated -- the

plaintiff be permitted to amend the claim to include the allegations relating to the NYPD's long-standing failure to make appropriate use of pepper spray.

### D. Leave to Amend Should be Granted

43.     "Rule 15(a) provides that leave to amend 'shall be freely given when justice so requires,' and we have interpreted this instruction in favor of allowing the amendment absent a showing by the non-moving party of bad faith or undue prejudice." *Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. N.Y. 2003) (citing *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)) (affirming grant of leave to amend pleading at summary judgment). "When a party requests leave to amend his complaint, permission generally should be freely granted." *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. Conn. 2013) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962); Fed. R. Civ. P. 15(a)(2)).

44.     In the present case, the plaintiff seeks to add individual officer plaintiffs well within the 3-year statute of limitations. This portion of the proposed amendment should be non-controversial. In addition, the plaintiff seeks to amend the factual allegations of the Complaint to show the direct connection between the defendants' acts and the violation of the plaintiff's Constitutional rights. Finally, the proposed amendment amends the *Monell* claim to address the NYPD's practice of improper use of pepper spray, and its policy of failing to amend that improper practice through training and revision of the Patrol Guide to categorically exclude the use of pepper spray on crowds.

## IV.  Conclusion

45.     For the foregoing reasons, the defendants' motion should be denied in its entirety, and the plaintiff respectfully requests to be permitted to file and serve the proposed Amended Complaint.

DATED:     New York. NY
            August 6. 2014

By: _____

David A. Thompson. Esq.
STECKLOW COHEN &
THOMPSON
*Attorneys for Plaintiff*
217 Centre Street. 6th Floor
New York, NY 10013
Phone: (212) 566-8000
Fax: (212) 202-4952

DATED:     New York, NY
           August 6, 2014

By: _____

David A. Thompson, Esq.
STECKLOW COHEN &
THOMPSON
*Attorneys for Plaintiff*
217 Centre Street, 6th Floor
New York, NY 10013
Phone: (212) 566-8000
Fax: (212) 202-4952

21