UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FILED
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/31/15

------------------------------x
                              :
ROBERT PLUMA,                 :
                              :
            Plaintiff,        :    13 Civ. 2017 (LAP)
                              :
                              :    MEMORANDUM & ORDER
     -against-                :
                              :
THE CITY OF NEW YORK, a municipal :
entity; NEW YORK CITY POLICE  :
OFFICERS "JOHN DOES 1-50",    :
                              :
            Defendants.       :
------------------------------x

LORETTA A. PRESKA, U.S.D.J.:

     Plaintiff has filed a complaint bringing claims under 42

U.S.C. § 1983 against the City of New York and a number of

unidentified individual police officers for injuries he

sustained while attending an Occupy Wall Street event.  After

filing its answer, Defendant New York City (the "City") filed a

motion to dismiss pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure.  In opposing that motion, Plaintiff requested

leave to amend his complaint.  For the reasons below,

Defendant's motion to dismiss is granted in part and denied in

part, and Plaintiff's request to amend is granted in part and

denied in part.

I.   BACKGROUND

     The Complaint [dkt. no. 1] raises the following well-

pleaded factual allegations, which the Court takes as true.  See

1

_Goldstein v. Pataki_, 516 F.3d 50, 56 (2d Cir. 2008). On the evening of December 31, 2011, Plaintiff and his girlfriend attended an Occupy Wall Street gathering in Zuccotti Park. (See Compl. ¶¶ 14-15.) By the time Plaintiff arrived, the police had set up metal barricades around most of the park, permitting entry only through gaps that officers guarded. (_Id._ ¶¶ 18-19.) After entering the park, Plaintiff, who is a self-described "citizen journalist," used his camera to take photos and video of the event. (_Id._ ¶ 22.) At some point, Plaintiff saw police officers pushing a metal barricade against a group of people inside the park. (_Id._ ¶¶ 27-28.) Plaintiff responded by filming the commotion, at which point the officers who were pushing the barricade against the crowd deployed pepper spray, which hit Plaintiff and rendered him unable to breathe or see. (_Id._ ¶¶ 29-31, 35.) After being sprayed, Plaintiff fell to the ground, landing hard on his left hand. (_Id._ ¶¶ 35-37.) Plaintiff was not arrested but was helped away from the tumult, where he vomited before leaving the park to seek medical attention. (_Id._ ¶¶ 39, 43, 44, 46.) At a hospital that same night, Plaintiff learned that he suffered multiple spiral fractures in his dominant hand, which ultimately required surgery and months of physical therapy. (_Id._ ¶¶ 38, 47-49.)

Based on these allegations, Plaintiff brings § 1983 claims against the individual officers involved for violating his

rights under the First, Fourth, Fifth, and Fourteenth Amendments, based on theories of excessive force, failure to intervene, and retaliation for protected speech. (See Compl. First through Fourth Claims.) Additionally, Plaintiff seeks to hold the City liable under § 1983 based on three theories, all of which he claims were "designed and implemented at the highest command levels of the NYPD" and caused Plaintiff's injuries. (Id. ¶ 120; see also id. Eleventh Claim) First, Plaintiff claims that the City "has a policy and practice of targeting participants in Occupy Wall Street activities for arrest without cause and the application of excessive force against them." (Id. ¶ 120.) Second, he suggests that the City "has a policy and practice of arresting individuals selected at random from within groups engaging in peaceful protest, for the purpose of frightening and deterring the remainder of those protesting." (Id.) Third, he alleges that the City "has a policy and practice of unlawful use of 'trap and detain'/'trap and arrest' tactics, creating unjustified risk of injury." (Id.)[1]

Plaintiff subsequently sought leave to amend his Complaint to raise additional theories of municipal liability, claiming that the City also "has a policy and practice of using pepper spray against groups of people without probable cause for the

---

[1] Plaintiff also raises a number of state law claims that are not at issue in this motion. (Compl. Fifth through Tenth Claims.)

3

use of pepper spray against individuals within the group," "fails to train all members of the NYPD in the proper manner to use pepper spray," and "has a policy and practice of utilizing unsafe methods of crowd control at Occupy Wall Street events." (Aff. in Opp. to Def. Mot. to Dismiss [dkt. no. 12] dated Aug. 6, 2014 ("Def. Aff.") Ex. C ¶ 147.) The proposed amended complaint also names two previously unidentified defendants, offers more allegations regarding the alleged failure to supervise particular officers, and articulates additional facts in support of Plaintiff's Fourth Amendment excessive force claim. (See id. Ex. C.) In supplementing Plaintiff's Fourth Amendment claim, the proposed amended complaint clarifies that the police lifted the barricade up to push it against a group of which Plaintiff was a part, notes that two officers "discharged pepper spray across the group of people," apparently targeting and striking the group "as a whole," and explains that Plaintiff's movement "was restricted" after being pepper sprayed and knocked down. (Id. Ex. C ¶¶ 37, 40-48.)

After filing its Answer, Defendant City moved for judgment on the pleadings under Rule 12(c), arguing that Plaintiff has failed to state a claim on his Fourth Amendment, First Amendment, and municipal liability theories. The City also opposes Plaintiff's request to amend the Complaint on the grounds that his proposed amendments would be futile.

4

II. STANDARD OF REVIEW

Rule 12(c) permits parties to "move for judgment on the pleadings" after an answer has been filed. FED. R. CIV. P. 12(c). "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). In considering such a motion, courts must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor. Goldstein, 516 F.3d at 56 (quoting Chambers v. Time Warner Inc., 282 F.3d 147, 152 (2d Cir. 2002)) (internal quotation mark omitted); Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009). A complaint will only survive a motion to dismiss, however, if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 1949 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This "plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully" and requires a "context-specific" consideration of the complaint's factual allegations based upon the court's "judicial experience and common sense." Id. at 1949-50. In this analysis, complaints that merely offer "labels and conclusions," "naked assertion[s]" devoid of "further factual enhancement," or "a formulaic recitation of the elements

of a cause of action will not" survive. _Twombly_, 550 U.S. at 555, 557.

When deciding a motion to dismiss, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." _ATSI Comms., Inc. v. Shaar Fund, Ltd._, 493 F.3d 87, 98 (2d Cir. 2007). Here, the City asks the Court to consider a transcript of Plaintiff's 50-h deposition and a publicly available video depicting scenes from Zuccotti Park on December 31, 2011. (_See_ Decl. of Andrew Lucas in Support of Def. Motion to Dismiss [dkt. no. 6] dated June 26, 2014.) Because neither was referenced in the Complaint or apparently relied upon in bringing this suit, the Court declines to consider either in deciding the present motion. _See_ _ATSI Comms., Inc._, 493 F.3d at 98; _DiFolco v. MSNBC Cable L.L.C._, 622 F.3d 104, 111 (2d Cir. 2010); _Prevost v. City of New York_, 13 Civ. 3760, 2014 WL 6907560, at *2 (S.D.N.Y. Dec. 9, 2014) ("District courts in this circuit regularly decline to consider 50-h Transcripts submitted in support of or in opposition to a motion to dismiss, even if neither party objects."). Meanwhile, Plaintiff asks the Court to consider two NYPD documents that he incorporates by reference into his proposed amended complaint. To the extent the Court herein evaluates the proposed amended

complaint, it will consider those documents as incorporated by reference and relied upon in Plaintiff's new pleading.  See ATSI Comms., Inc., 493 F.3d at 98.

While considering Plaintiff's motion to amend his complaint, the Court notes that "[a]lthough Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (quoting FED. R. CIV. P. 15(a)).  In reaching this determination, "[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  Id.; see also Foman v. Davis, 371 U.S. 178, 182 (1962).  Here, Defendant challenges Plaintiff's request on the ground that his proposed amendments would be futile.  The Court accordingly considers the proposed amended complaint in its analysis herein to determine which proposed amendments would be futile and which would survive a motion to dismiss.  See Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001).

III. DISCUSSION

A.    Fourth Amendment Claim

Plaintiff first alleges that the officers' actions at Zuccotti Park constituted excessive force in violation of the

Fourth Amendment.  As a preliminary matter, "[v]iolation of the
Fourth Amendment requires an intentional acquisition of physical
control."  Brower v. Cnty. of Inyo, 489 U.S. 593, 596 (1989).
Thus, "the first step in any Fourth Amendment claim (or, as in
this case, any section 1983 claim predicated on the Fourth
Amendment) is to determine whether there has been a
constitutionally cognizable seizure."  Medeiros v. O'Connell,
150 F.3d 164, 167 (2d Cir. 1998).  Such a seizure occurs "only
when there is a governmental termination of freedom of movement
through means intentionally applied."  Brower, 489 U.S. at 597
(emphasis omitted).  This test accordingly requires Plaintiff to
demonstrate both that his movement was restricted and that he
was the intentional object of government restriction.  The
former contemplates action that "restrains the freedom of a
person to walk away," Tennessee v. Garner, 471 U.S. 1, 7 (1985),
either "by means of physical force or show of authority."
Brendlin v. California, 551 U.S. 249, 254 (2007) (quoting
Florida v. Bostick, 501 U.S. 429, 434 (1991)) (internal
quotation marks omitted).  The latter meanwhile requires that
the governmental agent intended both to take the action that
caused restraint and to target Plaintiff specifically.  See
Medeiros, 150 F.3d at 168-69.

     Here, the Complaint alleges sufficient facts to raise the
reasonable inference that the deployment of pepper spray

8

constituted physical force that temporarily restrained Plaintiff. The original Complaint makes clear that upon being struck with the pepper spray, Plaintiff "was blinded and unable to breathe, and fell," which constituted a real, if brief, restriction of his movement. (Compl. ¶ 35.) The proposed amended complaint bolsters this inference by clarifying that Plaintiff was knocked down, "unable to walk without help," and incapacitated to the point of laying on the ground and vomiting "for a significant period of time." (Def. Aff. Ex. C ¶¶ 45, 47, 48.)

In disputing this point, the City focuses on Plaintiff's subsequent ability to leave the park on his own without being arrested. But an excessive force claim may still arise out of a temporary restraint that does not result in arrest. See California v. Hodari D., 499 U.S. 621, 626 (1991); United States v. Langer, 958 F.2d 522, 524 (2d Cir. 1992). The Court of Appeals for the Second Circuit has recognized that pepper spray "constitutes a significant degree of force" with "a variety of incapacitating and painful effects," which supports the notion that its infliction alone may constitute a restraint. Tracy v. Freshwater, 623 F.3d 90, 98 (2d Cir. 2010). Indeed, several courts outside this Circuit have acknowledged more specifically that the implementation of pepper spray absent an arrest constitutes a restraint cognizable under the Fourth Amendment.

9

See, e.g., McCracken v. Freed, 243 Fed. Appx. 702, 708 (3d Cir. 2007) ("[Plaintiff] was seized by the TRT when the team members threw the pepper spray canisters into the house."); Nelson v. City of Davis, 685 F.3d 867, 875-76 (9th Cir. 2012) (finding Fourth Amendment violation where Plaintiff "was hit in the eye by a projectile filled with pepper spray and, after being struck, was rendered immobile until he was removed by an unknown individual"); Yelverton v. Vargo, 386 F. Supp. 2d 1224 (M.D. Ala. 2005) ("[Defendant's] pepper spraying of [Plaintiff] constituted a seizure even though it did not stop him."); Logan v. City of Pullman, 392 F. Supp. 2d 1246, 1260 (E.D. Wash. 2005); Bernal v. Johnson, 13 Civ. 6726, 2014 WL 4976212, at *4 (N.D. Ill. Sept. 25, 2014); Bettencourt v. Arruda, 10 Civ. 11487, 2012 WL 5398475, at *7 (D. Mass. Nov. 1, 2012). Defendant City points to no case finding the effects of pepper spray insufficiently debilitating to satisfy the restraint prong of a Fourth Amendment seizure. Rather, the trend among federal courts and common sense support the conclusion that the blinding and disorienting effects of pepper spray temporarily incapacitated Plaintiff such that he was unable to walk away "for a significant period of time." (Def. Aff. Ex. C ¶ 48.)

Turning to the intent requirement, Defendant City does not dispute that the Complaint sufficiently alleges that the officers intended to deploy their pepper spray. Instead it

10

disputes whether the officers intended to hit Plaintiff, as opposed to others in the vicinity, with that spray. The Complaint, however, offers sufficient factual allegations to raise the reasonable inference that the police officers intentionally targeted a group of people, which included Plaintiff. Specifically, the Complaint alleges that "[t]he police deployed the pepper spray in such a way as to strike those present holding cameras, including the Plaintiff," and then did in fact hit Plaintiff. (Compl. ¶ 33.) The proposed amended complaint offers more details to support this inference by clarifying that Plaintiff was in fact a part of the group that the officers sprayed. In particular, the new allegations indicate that the police pushed the metal barricade into a "group of people, including the Plaintiff," that "two police officers discharged pepper spray across [that same] group of people," and that "[t]he pepper spray struck the group of people as a whole," including Plaintiff. (Def. Aff. Ex. C ¶¶ 38, 40, 43, 44.)

The City contends that because the Complaint characterizes Plaintiff as "a bystander and citizen journalist witnessing the event," he conceded to being separate from the group that the officers intended to seize. (Compl. ¶ 34.) In support of this argument, the City points to Mederios, in which the Court of Appeals for the Second Circuit held that a hostage who was hit

11

by a bullet that an officer shot at his abductor was not seized because the officer lacked a specific intent to hit the hostage. See Mederios, 150 F.3d at 168-69. The City also analogizes to a District Court case holding that a tenant who was hit by pepper spray that police deployed in her building while executing a warrant to arrest her landlord was not seized because "the officers did not know that she was in the house" and "did not intend to gas her." Malay v. City of Syracuse, 08 Civ. 599, 2011 WL 4595201, at *9 (N.D.N.Y. Sept. 30, 2011) (emphasis in original). Both of these cases stand for the proposition that a plaintiff must be the specifically intended and known target of police force in order to be seized under the Fourth Amendment.

Applying this rule and drawing all inferences in Plaintiff's favor, as the Court must at this stage, the present allegations raise a reasonable inference that Plaintiff was indeed one of several individuals that the officers specifically and intentionally targeted when deploying pepper spray over a group. The Complaint's description of Plaintiff as a bystander at the event appears to reflect his status as a journalist rather than a protester, but it does not allege that he was physically separate from the group that the officers targeted. (Complaint ¶ 34.) Indeed, the proposed amended complaint clarifies that Plaintiff was in fact physically part of the group of people that the police pushed with the barricade and

then hit with pepper spray.  (See Def. Aff. Ex. C ¶ 38-44.)
Given these allegations, Plaintiff is distinct from a hostage
whom the police were attempting to rescue or a hidden bystander
of whom the police were unaware.  Rather, the Complaint raises
allegations sufficient to infer that the police were aware that
Plaintiff was within a group that they were attempting to subdue
and that they did in fact subdue by intentionally deploying
pepper spray over the entire group.

Because it appears that the Second Circuit has not
previously considered specifically whether the deployment of
pepper spray over an entire group constitutes a seizure of each
affected group member, this Court looks to more analogous cases
outside this Circuit to confirm its conclusion.  Of particular
note, the Ninth Circuit has held that an individual was seized
when he was hit by a pellet containing pepper spray that
officers shot intending to disperse a crowd of which he was a
part.  The Court found that the officers had sufficient intent
to constitute a seizure because the individual was "hit by a
projectile that they intentionally fired towards a group of
which he was a member."  Nelson, 685 F.3d at 877.  Although the
disproportionate effect on that individual was unintended, "he
and his fellow students were the undifferentiated objects of
shots intentionally fired by the officers" which were "aimed
towards [the plaintiff] and his group."  Id.  Even more

elucidating is a District Court case regarding the deployment of pepper spray aimed at a group of individuals on the first floor of a house that disseminated throughout the house to incapacitate a separate group on the second floor. Logan, 392 F. Supp. 2d at 1260. The court held that because the officer intended only to subdue the group on the first floor, that group was seized, but because no members of the second group "were the deliberate and indented object" of the pepper spray, they were not seized under the Fourth Amendment. Id.

These cases clarify that the status of a plaintiff as a bystander or a hostage in and of itself does not determine whether he has been seized. Rather, that determination hinges on whether a plaintiff was a specific object of the government agent's restrictive action, a requirement that may be satisfied when officers target a crowd of which a plaintiff is a part. This rule is perfectly compatible with the Second Circuit's holding in Mederios, as it requires that defendants have a specific intent to target the entire group of which a plaintiff is a part and still finds no seizure if a plaintiff, like the second group in Logan, is standing away from and observing the targeted group but happens to be affected by the force deployed, or like the hostage in Mederios, is someone the police are trying to protect. Here, because the Complaint asserts that the officers targeted an entire group that included Plaintiff, it

offers sufficient factual allegations plausibly to infer that
Plaintiff was one of the intended objects of the officers'
deployment of force.  Accordingly, Plaintiff has successfully
alleged that he was seized for purposes of the Fourth Amendment.[2]

That determination does not end the inquiry, however, as a
seizure only violates the Fourth Amendment where it is
"objectively unreasonable."  Cowan v. Breen, 352 F.3d 756, 762
(2d Cir. 2003).  This test "is not capable of precise definition
or mechanical application," and "its proper application requires
careful attention to the facts and circumstances of each
particular case . . . ."  Graham v. Connor, 490 U.S. 386, 396
(1989) (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979))
(internal quotation mark omitted).  In the excessive force
context, courts apply this reasonableness standard by
considering "the severity of the crime at issue, whether the
suspect poses an immediate threat to the safety of the officers
or others, and whether he is actively resisting arrest or
attempting to evade arrest by flight."  Id.  This assessment

---

[2] Because the Court finds that the Complaint sufficiently alleges a seizure
cognizable under the Fourth Amendment, it need not consider Plaintiff's
Fourteenth Amendment substantive due process claim.  Excessive force claims
may only be considered under a single constitutional provision, depending on
the context of the alleged violation.  See United States v. Lanier, 520 U.S.
259, 272 n.7 (1997).  Where the claim arises in the context of a seizure, it
is governed by the Fourth Amendment alone.  See Cnty. of Sacramento v. Lewis,
523 U.S. 833, 843 (1998).  Had the Court determined that Plaintiff failed to
allege a seizure, however, then Plaintiff's excessive force claim would be
analyzed as a substantive due process claim under the Fourteenth Amendment,
which Plaintiff raised in his first cause of action but which Defendant did
not specifically challenge in his motion.

must be made objectively "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and must recognize "that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97.

Considering this standard here, the Complaint alleges sufficient facts to raise a plausible excessive force claim. Drawing all inferences in Plaintiff's favor, the Complaint describes a scene in which the officers deployed pepper spray on a group of peaceful protesters and journalists without provocation, causing Plaintiff's injuries. The Complaint alleges that the members of the group, and particularly Plaintiff, committed no crimes, posed no threat to the officers, and did not disregard instructions from the officers or evade arrest. (See Compl. ¶¶ 22-42.) Because these allegations raise a reasonable inference "that the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances," Plaintiff's excessive force cause of action states a claim upon which relief can be granted. Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 124 (2d Cir. 2004). As

such, Defendant's motion is denied with respect to Plaintiff's Fourth Amendment claim.[3]

B.    First Amendment Claim

"To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. Cnty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013). The City insists that in order to withstand a motion to dismiss, Plaintiff must further allege that his protected speech was somehow chilled. Yet the Court of Appeals recently clarified that "[c]hilled speech is not the sine qua non of a First Amendment claim"; rather, Plaintiff may show "either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." Id. (emphasis in original).

Here, although Plaintiff pleads little by way of chilling, he clearly alleges a concrete injury caused by the officers' pushing and deploying pepper spray, which satisfies the requirement recently articulated by the Court of Appeals. See id. (citing cases). The remaining two prongs, however, appear less clearly established by either the Complaint or the proposed

---

[3] Defendant's motion did not raise a qualified immunity defense, and the Court accordingly does not consider here whether the Defendant officers may be shielded from liability on that ground.

amended complaint. As an initial matter, it is not entirely
clear what protected speech Plaintiff engaged in during his time
at Zuccotti Park. Plaintiff's briefing suggests that he
"assembled with like-minded people," but he points to nothing in
the Complaint – and the Court sees nothing in either version –
actually alleging that Plaintiff went to the park in order to
engage in protest activity or assemble as a member of the Occupy
Wall Street movement. (Opp. to Def. Motion to Dismiss [dkt. no.
15] dated Aug. 12, 2014 at 18.) The Complaint notes that he
went to the Park "with hopeful reflection upon the efforts of
Occupy Wall Street," but it does not specify that he sought to
express any particular idea upon arriving at Zuccotti Park.
(Compl. ¶ 15.) See Lebowitz v. City of New York, 12 Civ. 8982,
2014 WL 772349, at *4 (S.D.N.Y. Feb. 25, 2014); Jones v.
Schneiderman, 974 F. Supp. 2d 322, 333 (S.D.N.Y. 2013) ("For
conduct to be entitled to constitutional protection, it must be
'sufficiently imbued with the elements of communication,' which
requires, 'at the very least, an intent to convey a
particularized message along with a great likelihood that the
message will be understood by those viewing it.'" (quoting Texas
v. Johnson, 491 U.S. 397, 404 (1989); Zalewska v. Cnty. of
Sullivan, N.Y., 316 F.3d 314, 319 (2d Cir. 2003))). Rather, the
Complaint clarifies that Plaintiff acted as "a citizen
journalist" filming an arrest and other police activity. (Compl.

¶¶ 22, 29.)  The only potentially expressive actions that
Plaintiff took leading up to his injury thus involved filming an
arrest and filming the commotion with the barricade.  (See id.
¶¶ 21-24; 27-34.)  Although some Courts of Appeals have held
that the First Amendment protects the right to film the police,
neither the Supreme Court nor the Second Circuit has addressed
"the right to photograph and record the police."  Mesa v. City
of New York, 09 Civ. 10464, 2013 WL 31002, at *25 (S.D.N.Y. Jan.
3, 2013); see also Lawson v. Hilderbrand, 13 Civ. 206, 2015 WL
753708, at *13 (D. Conn. Feb. 23, 2015); Ortiz v. City of New
York, 11 Civ. 7919, 2013 WL 5339156, at *4 (S.D.N.Y. Sept. 24,
2013).  It consequently remains unclear whether Plaintiff's
filming was protected by the First Amendment.[4]

　　　Even granting that Plaintiff engaged in protected activity,
however, the Complaint does not allege a causal connection
between that activity and the deployment of pepper spray.  On
its face, the Complaint fails to allege any motivation related
to specific protected speech behind the officers' decision to
push the barricade and deploy pepper spray.  Rather, Plaintiff's
briefing relied on the Complaint's subsequent allegations that
the NYPD has a practice of applying excessive force against

---

[4] As already noted above, the present motion does not raise a qualified
immunity defense, and as such the lack of clearly established law on this
point does not conclude the Court's analysis.

Occupy Wall Street demonstrators as implicitly supplying the alleged motivation.

Assuming these allegations raise an inference that the officers were retaliating against Occupy Wall Street speech, Plaintiff still does not allege that he engaged in that particular expressive conduct.  The Complaint makes clear that the commotion began near Plaintiff when he was doing nothing other than "peacefully remain[ing] in the park," at which point he began to film the police, who shortly thereafter pepper sprayed him and others near him.  (Compl. ¶ 23.)  Yet the only allegations about the officers' motivation for pushing the barricade and deploying pepper spray relates to Occupy Wall Street protest activity, not attempts to film the police.  See Dorsett, 732 F.3d at 160.  Although the Complaint alleges that "[t]he police deployed the pepper spray in such a way as to strike those present holding cameras, including the Plaintiff," that statement does not suggest that the officers' were substantially motivated by a desire to retaliate against Plaintiff's journalistic activities.  (Compl. ¶ 33.)  See Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001).  Rather, the only specific allegation of motive is "the intention of creating the maximum possible confusion and suffering among the protesters," which again focuses only on protest activity in which Plaintiff has not alleged he participated.  (Compl. ¶ 34.)

Given that Plaintiff was admittedly "a bystander and citizen journalist witnessing the event," rather than a protester participating in Occupy Wall Street expressive conduct, the Complaint on its face fails to allege that the police were motivated by Plaintiff's own protected activity when they caused his injury. (Compl. ¶ 34.) See Curley, 268 F.3d at 73.

Accordingly, the Complaint fails to raise a plausible claim for First Amendment retaliation, and that cause of action is dismissed. To the extent Plaintiff moves to amend this claim, his proposed amended complaint does nothing to compensate for the defects in this cause of action; indeed, it does not appear to revise any allegations relating to the officers' motivation or Plaintiff's expressive activity. As such, any amendment of this claim would be futile, and Plaintiff is denied leave to amend his First Amendment retaliation cause of action.[5] See McCarthy, 482 F.3d at 200.

C.    Monell Claim

Municipal defendants such as the City may be sued directly under § 1983 where a municipality's "official policy is responsible for a deprivation of rights protected by the

---

[5] Though Defendant's motion did not specifically challenge Plaintiff's third cause of action for failure to intervene, that claim necessarily contemplates an underlying constitutional violation. Thus, given this Court's determination that Plaintiff's only surviving constitutional claim is his excessive force cause of action, Plaintiff's failure to intervene claim similarly only survives to the extent it is based on the alleged use of excessive force.

Constitution." Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 690 (1978). The Supreme Court has made clear, though, that such liability cannot arise "for an injury inflicted solely by [the municipality's] employees or agents"; rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694. In this vein, courts "have consistently refused to hold municipalities liable under a theory of respondeat superior," limiting such liability to injuries arising out of policies that a municipality either expressly enacted or that are "so widespread as to have the force of law." Bd. of the Cnty. Comms. of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 403-04 (1997).

Case law has delineated four municipal actions that may give rise to Monell liability: (1) an unconstitutional policy enacted by the municipality, id. at 404-05; (2) a deliberate unconstitutional act by a municipal official with policymaking authority, id. at 405; (3) an unconstitutional practice or custom that is "so persistent and widespread as to practically have the force of law," Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011); or (4) failure to train municipal employees to avoid violating constitutional rights, id. at 1360. Once one of

these four circumstances is established, a plaintiff seeking to hold a municipality liable must further demonstrate "a direct causal link between the municipal action and the deprivation of [plaintiff's] federal rights." Brown, 520 U.S. at 404. Throughout this analysis, courts must be mindful of the "rigorous standards of culpability and causation [that] must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Id. at 405. Where a plaintiff alleges a custom or practice, rather than an explicit policy, caused his injury, that "practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." Sorlucco v. N.Y. City Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992).

Here, the Court has already concluded that Plaintiff's Complaint raises a colorable Fourth Amendment claim, which establishes the Monell requirement that a constitutional violation be shown. Accordingly, Plaintiff's Monell claim now turns on whether the Complaint plausibly alleges an unconstitutional municipal policy, action, custom, or failure to train that caused the violation of Plaintiff's Fourth Amendment rights.[6] In attempting to meet this bar, Plaintiff articulates

---

[6] Plaintiff has not alleged that any senior officers or municipal officials with policymaking authority were directly involved in the incident giving rise to his injuries. As such, the second possible scenario – direct action by a policymaking official – is not considered in the Court's analysis.

six different theories in his Complaint and proposed amended complaint. The Court addresses each in turn.

First, Plaintiff alleges that the City "has a policy and practice of targeting participants in Occupy Wall Street activities for wrongful arrest without cause, and the application of excessive force against them." (Compl. ¶ 120.) To the extent that this alleged policy concerns wrongful arrest, it may be disposed of quickly, as nothing in the Complaint or the proposed amended complaint suggests that Plaintiff was ever arrested or even threatened with arrest. To the contrary, the Complaint notes that "Plaintiff was not arrested by the police," and "[a]t no point did any officer attempt to arrest the Plaintiff." (Compl. ¶¶ 39-40.) Accordingly, even if a policy or practice of wrongful arrests exists, Plaintiff cannot establish "a direct causal link" between that alleged policy and his injuries. Brown, 520 U.S. at 404.

Moreover, although Plaintiff describes this policy and practice as involving excessive force, he points to no specific policy authorizing such tactics, and the overwhelming majority of examples he offers to support the allegation of a practice or custom describe wrongful arrests with no use of force involved at all. The only hint of force within this supposed pattern is a conclusory allegation that one individual "was violently arrested without warning" on January 1, 2012. (Compl. ¶ 127.)

This single example, which is utterly lacking in specificity, cannot suffice to allege a plausible pattern or custom of excessive force so pervasive that it "practically ha[s] the force of law." Connick, 131 S. Ct. at 1359. As such, Plaintiff's first Monell theory cannot survive the City's motion to dismiss.

Second, Plaintiff alleges that the City "has a policy and practice of arresting individuals selected at random from within groups engaging in peaceful protest, for the purpose of frightening and deterring the remainder of those protesting." (Compl. ¶ 120.) Because Plaintiff has not alleged that he was arrested or that he was frightened or deterred from protesting by any arrests in his presence, this theory also fails to establish the causation requirement of a Monell claim and must be dismissed. See Brown, 520 U.S. at 404.

Third, Plaintiff alleges that the City "has a policy and practice of unlawful use of 'trap and detain'/'trap and arrest' tactics, creating unjustified risk of injury." (Compl. ¶ 120.) The Complaint describes this tactic as confining individuals "in a space by means of barriers" and then decreasing the size of the space "to pen in and control the people trapped." (Id. ¶¶ 148-49.) Again, to the extent that Plaintiff's allegations seeking to establish this practice focus on wrongful arrests, such a theory cannot support a Monell claim where Plaintiff has

not alleged that he was ever arrested. See Brown, 520 U.S. at 404. To the extent that this theory alleges a practice of trapping demonstrators in a manner that involves the use of excessive force, the causal link of such a custom to Plaintiff's injury is tenuous at best. Nothing in the Complaint suggests that Plaintiff was trapped or held by the police in a confined area. Although the park was surrounded by barriers, one of which officers allegedly pushed into a group that included Plaintiff, there remained entry and exit points to the park elsewhere, which Plaintiff does not allege were ever closed. (See Compl. ¶¶ 18, 19, 46.))

Even if such a causal link could be supported on these allegations, however, the Complaint does not point to a specific policy endorsing such tactics and fails to allege a pattern or custom of trapping involving excessive force sufficient to articulate a Monell claim. The Complaint points to only one instance of trap and arrest that featured excessive force, which involved a NYPD Deputy Inspector pepper-spraying a number of individuals who were "corralled within plastic netting" without justification. (Compl. ¶ 154.) This single instance, without more, by no means establishes a pervasive pattern or custom that was "so manifest as to imply the constructive acquiescence of senior policy-making officials." Sorlucco, 971 F.2d at 871. Plaintiff's attempt to bolster this theory by characterizing

26

this alleged practice as a "trap and push" technique in his proposed amended complaint is inadequate, as the three new examples offered again did not involve excessive force and are insufficiently widespread to satisfy Monell's requirements to establish a custom or practice that imputes culpability to a municipality. (Def. Aff. Ex. C ¶ 179.)

Fourth, Plaintiff's proposed amended complaint alleges that the City "has a policy and practice of using pepper spray against groups of people without probable cause for the use of pepper spray against individuals within the group." (Id. Ex. C ¶ 147.) To support this theory, Plaintiff offers an excerpt from the NYPD Patrol Guide regarding use of pepper spray, which he alleges reflects an unconstitutional municipal policy. Alternatively, Plaintiff offers a Civilian Complaint Review Board ("CCRB") Report of the Pepper Spray Committee, dated October 2000, and the same incident with a NYPD Deputy Inspector discussed above, both of which he claims reveal a practice or custom of deploying pepper spray against groups without individualized probable cause.

With respect to the first argument, on its face, there is nothing unconstitutional about the NYPD Patrol Guide's instructions regarding pepper spray. The document offers detailed instructions concerning the approved use of pepper spray and as a general matter clarifies that it should only be

27

discharged in five specific scenarios: to protect oneself or another from assault, to control a resisting arrestee, to control a fleeing suspect, to control an emotionally disturbed person, or to control a dangerous animal. (See Def. Aff. Ex. B at PG_001331.) It further emphasizes that officers should "[a]void discharging pepper spray indiscriminately over a large area for disorder control," clarifying that "[m]embers who are specifically trained in the use of pepper spray for disorder control may use pepper spray in accordance with their training, and within Department guidelines, and as authorized by supervisors." (Id. Ex. B at PG_001332.)

Plaintiff attempts to argue that by telling officers to avoid deployment in groups without completely prohibiting such actions or detailing the situations in which such deployment is permissible, the policy implicitly condones indiscriminate use of pepper spray in large groups. Such an interpretation would twist the readily apparent meaning and intent of this passage. Read in the context of the full pepper spray guide, it is clear that the policy is tailored to ensure the safe and lawful use of pepper spray. If anything, the instruction to avoid spraying over large groups, which immediately follows a list of the five limited circumstances in which an officer may use pepper spray, appears to be an instruction that even if one of those five circumstances arises, officers should be cognizant of their

28

surroundings and should avoid deployment within large groups. This document is thus far from a policy encouraging the illegal deployment of pepper spray and is in fact an express policy discouraging the kind of behavior that Plaintiff alleges.

With regard to the alleged practice and custom, the Court notes that a decade-old report and single recent incident, without more, are extremely unlikely ever to demonstrate a practice or custom sufficiently widespread to give rise to Monell liability. See Sorlucco, 971 F.2d at 871; Connick, 131 S. Ct. at 1359. This point is reinforced upon examination of the CCRB report, which itself contradicts a number of Plaintiff's allegations. For example, the report makes clear that by October 2000 the NYPD trained its officers "not to use OC [pepper spray] in group settings or for crowd control." (Def. Aff. Ex. A at 6.) Indeed, the pepper spray patrol guide presented in the report's appendix contains the same language discussed above, instructing officers to avoid the use of pepper spray in large crowds or groups. (Id. Ex. A Appx. at 977.)

Plaintiff focuses on the portion of the report describing three cases in which "officers used pepper spray on a large crowd or a group of people" to argue that the NYPD had a widespread practice of such deployment. (Id. Ex. A at 14.) Yet this argument overlooks the fact that the NYPD reported all three cases as "inappropriate pepper spray use," which sparked

investigations into the officers' behavior. (Id. Ex. A at 11.)
Indeed, it appears from the report that these officers were
either disciplined, brought to a hearing, or seriously
investigated. (See id. Ex. A at 12.) The report thus reveals
that, far from allowing such behavior to continue unchecked, the
NYPD expressly condemned deployment of pepper spray on groups.
Ultimately then, these three cases of officers who the NYPD
reported as inappropriately deploying pepper spray before
October 2000 and a single more recent incident involving the
Deputy Inspector do not reflect a sufficiently widespread
pattern of conduct to raise a reasonable inference of municipal
culpability. See Sorlucco, 971 F.2d at 871; Connick, 131 S. Ct.
at 1359.

Fifth, the proposed amended complaint alleges that the City
"fails to train all members of the NYPD in the proper manner to
use pepper spray" against "both groups and individuals." (Def.
Aff. Ex. C ¶ 147.) Plaintiff further alleges that the City "had
substantial advanced notice that its policy and training were
inadequate, resulting from formal reports by the Civilian
Complaint Review Board detailing agency-wide deficiencies in
policy and training." (Id.)

The Supreme Court recently clarified the stringent standard
that a plaintiff must meet to hold a municipality liable for
failure to train. See Connick, 131 S. Ct. at 1359-60. Noting

30

that a "municipality's culpability for a deprivation of rights
is at its most tenuous where a claim turns on a failure to
train," the Court held that to be liable on such a theory a
municipality must act with "deliberate indifference to the
rights of persons with whom [untrained employees] come into
contact." Id. at 1359 (quoting Canton v. Harris, 489 U.S. 378,
388 (1989)) (internal quotation mark omitted). To meet this
standard, a complaint must plausibly allege that the
municipality was "on actual or constructive notice that a
particular omission in [its] training program causes city
employees to violate citizens' constitutional rights" and
nonetheless chose to maintain that training program. Id. at
1360. Such notice generally arises from a "pattern of similar
constitutional violations by untrained employees." Id. "But
showing merely that additional training would have been helpful
in making difficult decisions does not establish municipal
liability." Id. at 1363. Ultimately, the failure to train must
be "the functional equivalent of a decision by the city itself
to violate the Constitution." Cash v. Cnty. of Erie, 654 F.3d
324, 334 (2d Cir. 2011) (quoting Connick, 131 S. C.t at 1360)
(internal quotation mark omitted).

Here, the proposed amended complaint simply does not allege
the kind of deliberate indifference needed to raise a reasonable
inference that the City was culpable in its training or lack

thereof.  In attempting to articulate this theory, Plaintiff
again focuses on instances of inappropriate pepper spray
deployment described in the CCRB report and on the NYPD Deputy
Inspector spraying a group of protesters.  Again, though, this
handful of dissimilar incidents occurring over the course of
more than a decade is too sparse to put the City on notice that
the NYPD's training program produces officers who are likely to
commit constitutional violations through their deployment of
pepper spray.  See Connick, 131 S. Ct. at 1359-60.  Indeed, the
CCRB report noted that officers were already trained regarding
deployment in crowds, and the only training revisions it
suggested proposed offering additional opportunities to practice
aiming because officers often deploy the spray with their non-
dominant hands.  (See Def. Aff. Ex. A at 6, 17.)  The report
articulated no concerns that the training would lead to
problematic deployment in groups.  Thus, these incidents as
raised in the proposed amended complaint cannot meet the high
standard required to allege that the City was on notice that its
training program was so deficient that by failing to alter it,
the City was essentially complicit in the violation of
Plaintiff's constitutional rights.  See Cash, 654 F.3d at 334.

Sixth, the proposed amended complaint alleges that the City
"has a policy and practice of utilizing unsafe methods of crowd
control at Occupy Wall Street Events."  (Def. Aff. Ex. C ¶ 147.)

In support of this theory, Plaintiff points to no explicit policy but rather raises two incidents: one in which NYPD officers trapped and arrested protesters in orange netting in Union Square and one in which officers trapped and arrested hundreds of Occupy protesters on the Brooklyn Bridge. Yet nothing in the proposed amended complaint's description of those events, other than Plaintiff's conclusory statement that those actions were unsafe, suggests that they were dangerous or that any injuries resulted.[7] It can therefore hardly be said that two incidents involving substantially different factual scenarios than that at issue here somehow reveal a widespread pattern or custom of unsafe practices that resulted in Plaintiff's injury. See Connick, 131 S. Ct. at 1359.

Accordingly, none of Plaintiff's six theories of municipal liability raises a plausible Monell claim, and Defendant's motion to dismiss is granted with respect to this cause of action. Because the Court has considered and found insufficient the portions of Plaintiff's proposed amended complaint raising new Monell allegations, it is clear that this proposed amendment would be futile, as it cannot survive a motion to dismiss. See

---

[7] Furthermore, Judge Rakoff recently held that the City was not subject to Monell liability for the Brooklyn Bridge incident. See Garcia v. Bloomberg, 865 F. Supp. 2d 478, 492-93 (S.D.N.Y. 2012), rev'd on other grounds by __ F.3d. __, 2015 WL 737758 (2d Cir. Feb. 23, 2015).

Milanese, 244 F.3d at 110.  As such, Plaintiff may not amend his
complaint with respect to any claims against the City.

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss
[dkt. no. 4] is granted in part and denied in part.
Specifically, with respect to Plaintiff's Second Claim for
Relief, Defendant's motion is denied, and with respect to
Plaintiff's Fourth and Eleventh Claims for Relief, Defendant's
motion is granted.  Accordingly, all municipal liability claims
are dismissed, and the City of New York is no longer a party to
this action.

Plaintiff is granted leave to amend his Complaint within
five days of the date of this Memorandum & Order with respect to
all of his claims except his Fourth and Eleventh Claims for
Relief.  The remaining parties shall appear before the Court for
a conference in Courtroom 12A, or such other courtroom as may be
designated, United States Courthouse, 500 Pearl Street, New
York, NY 10007 on April 15, 2015 at 2:30 PM.

SO ORDERED.


Dated:      New York, New York
            March 31, 2015

                                _____
                                LORETTA A. PRESKA
                                Chief United States District Judge