IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x

ROBERT PLUMA,

<em>Plaintiff,</em>

- against -

THE CITY OF NEW YORK, a municipal entity, NEW
YORK CITY POLICE SERGEANT CARL SORECO, NEW
YORK CITY POLICE OFFICER MEGHAN O'LEARY,
NEW YORK CITY POLICE OFFICER CHRISTOPHER
VEGA, MEMBER OF SERVICE DUNLOP, POLICE
OFFICER RAMON HERNANDEZ, POLICE OFFICER
ANTHONY PONS, POLICE OFFICER RICHARD
MCGUIRE, POLICE OFFICER ANTHONY BARBIERI,
SERGEANT DANIEL O'GRADY, SERGEANT
BENJAMIN BELLINGERI, MEMBER OF SERVICE
VINCENT SETTEDUCATO, MEMBER OF SERVICE
COREY WHITE, POLICE OFFICER DANA PALOMO,
CAPTAIN JOHN DUFFY, CAPTAIN FALCON, "JOHN
DOE SECOND PEPPER SPRAY OFFICER", JOHN DOE
BALDING SENIOR OFFICER, and JOHN DOE P.O. VEGA
SUPERVISORS 1-4,

<em>Defendants.</em>

Index No. 13-cv-2017
(TPG)

SECOND
AMENDED
COMPLAINT

[JURY TRIAL
DEMANDED]

-------------------------------------------------------------------------------x

Plaintiff ROBERT PLUMA, by his attorneys, STECKLOW COHEN &

THOMPSON, complaining of the defendants, respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

1.      Plaintiff ROBERT PLUMA brings this action for compensatory damages,

punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988

for violations of his civil rights, as said rights are secured by said statutes and the

Constitutions of the State of New York and the United States.

2.      The Plaintiff ROBERT PLUMA was peaceably assembled at Zuccotti

Park on the evening of December 31, 2011, intending to welcome in the New Year with

his girlfriend, and with other citizens who believed in the goals of the Occupy Wall Street

movement. An overwhelming force of New York City Police officers was present. These

officers initiated physical confrontations with other individuals at Zuccotti Park. The

police officers needlessly escalated these confrontations into violence. In so doing,

multiple police officers used metal fencing as a weapon to push the crowd. The same or

other police officers deployed pepper spray across a group of civilians of which Mr.

Pluma was a part. The Plaintiff was injured when he was blinded by the pepper spray,

and was pushed by the force the police applied to the group.  He fell, breaking his

dominant hand in a way that required surgery and rehabilitation.

## II. JURISDICTION

3.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the

Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is

conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4), and the

aforementioned statutory and constitutional provisions.

4.     Plaintiff ROBERT PLUMA further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally-based claims and causes of action.

### III. VENUE

5.     Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

### IV. JURY DEMAND

6.     Plaintiff ROBERT PLUMA respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

### V.    COMPLIANCE WITH GEN. MUN. LAW § 50-1

7.     A notice of claim was made and served upon the City of New York in compliance with section fifty-e of the New York General Municipal Law, and at least thirty days have elapsed since the service of such notice, and adjustment or payment thereof has been neglected or refused, and this action or special proceeding is commenced within one year and ninety days after the happening of the events upon which the claim is based.

### VI.   THE PARTIES

8.     Plaintiff ROBERT PLUMA ("the Plaintiff") is a resident of the State of New York.

9.     Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

10.     Defendant THE CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

11.     That at all times hereinafter mentioned, Defendant POLICE SERGEANT CARL SORECO ("Defendant SERGEANT SORECO") was a duly sworn police sergeant of the New York City Police Department, and was acting under the supervision of said department and according to his official duties.

12.     That at all times hereinafter mentioned, Defendant POLICE OFFICER MEGHAN O'LEARY ("Defendant POLICE OFFICER O'LEARY") was a duly sworn police officer of the New York City Police Department, and was acting under the supervision of said department and according to her official duties.

13.     That at all times hereinafter mentioned, Defendant POLICE OFFICER CHRISTOPHER VEGA ("Defendant POLICE OFFICER VEGA") was a duly sworn police officer of the New York City Police Department, and was acting under the supervision of said department and according to his official duties.

14.     That at all times hereinafter mentioned, MEMBER OF SERVICE DUNLOP ("Defendant DUNLOP") was a duly sworn member of the New York City Police Department, and was acting under the supervision of said department and according to his/her official duties.

15.     At all times hereinafter mentioned, POLICE OFFICER RAMON HERNANDEZ ("Defendant HERNANDEZ") was a duly sworn member of the New York City Police Department and was acting under the supervision of said department and according to his/her official duties.

16.     At all times hereinafter mentioned, POLICE OFFICER ANTHONY PONS ("Defendant PONS") was a duly sworn member of the New York City Police Department and was acting under the supervision of said department and according to his/her official duties.

17.     At all times hereinafter mentioned, POLICE OFFICER RICHARD MCGUIRE ("Defendant MCGUIRE") (SHIELD NO. 3076 ) was a duly sworn member of the New York City Police Department and was acting under the supervision of said department and according to his/her official duties.

18.     At all times hereinafter mentioned, POLICE OFFICER ANTHONY BARBIERI ("Defendant BARBIERI") was a duly sworn member of the New York City Police Department and was acting under the supervision of said department and according to his/her official duties.

19.     That at all times hereinafter mentioned, SERGEANT DANIEL O'GRADY ("Defendant O'GRADY") was a duly sworn member of the New York City Police Department and was acting under the supervision of said department and according to his/her official duties.

20.     That at all times hereinafter mentioned, SERGEANT BENJAMIN BELLINGERI ("Defendant BELLINGERI") was a duly sworn member of the New York

City Police Department and was acting under the supervision of said department and according to his/her official duties.

21.      At all times hereinafter mentioned, Defendant MEMBER OF SERVICE VINCENT SETTEDUCATO (SHIELD NO. 26690) ("Defendant SETTEDUCATO") was a duly sworn police officer of the New York City Police Department, and was acting under the supervision of said department and according to his official duties.

22.      At all times hereinafter mentioned, Defendant MEMBER OF SERVICE COREY WHITE (SHIELD NO. 29615) ("Defendant WHITE") was a duly sworn police officer of the New York City Police Department, and was acting under the supervision of said department and according to his official duties.

23.      At all times hereinafter mentioned, Defendant POLICE OFFICER DANA PALOMO ("Defendant PALOMO") was a duly sworn police officer of the New York City Police Department, and was acting under the supervision of said department and according to his official duties.

24.      At all times hereinafter mentioned, the Incident Commanders and highest-ranking members of service on the scene of the incident, DEFENDANTS CAPTAIN JOHN DUFFY and CAPTAIN FALCON (individually, "DEFENDANT CAPTAIN DUFFY" and "DEFENDANT CAPTAIN FALCON," collectively, "DEFENDANT INCIDENT COMMANDERS") were duly sworn police officers of the New York City Police Department, and were acting under the supervision of said department and according to their official duties.

25.      At all times hereinafter mentioned, Defendant "JOHN DOE SECOND PEPPER SPRAY OFFICER" was a duly sworn police officer of the New York City

Police Department, and was acting under the supervision of said department and according to his official duties.

26.     At all times hereinafter mentioned, Defendant JOHN DOE BALDING SENIOR OFFICER was a duly sworn police officer of the New York City Police Department, and was acting under the supervision of said department and according to his official duties.

27.     At all times hereinafter mentioned, Defendant JOHN DOE P.O. VEGA SUPERVISORS 1-4 were duly sworn police officers of the New York City Police Department, and was acting under the supervision of said department and according to their official duties.

28.     Plaintiff ROBERT PLUMA will amend this complaint to identify each of the "John Doe" police officers by their true names, as their identities can be established to a reasonable certainty.

29.     All the individual police officers, whether identified by their true names or by "John Doe" names, will be collectively referred to as the "Defendant POLICE OFFICERS."

30.     At all times relevant to this action, the Defendant POLICE OFFICERS were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

31.     Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant THE CITY OF NEW YORK.

## VI. FACTS COMMON TO ALL CLAIMS

32.     On the evening of December 31, 2011, the Plaintiff went to Zuccotti Park with his girlfriend.

33.     The Plaintiff and his girlfriend chose to go to Zuccotti Park to welcome in the New Year with hopeful reflection upon the efforts of Occupy Wall Street to bring greater democracy and a fairer economic system to our country.

34.     Zuccotti Park is open 24 hours, and the park was open that evening.

35.     At the time the Plaintiff arrived, the police had set up metal barricades that surrounded most or all of the park.

36.     Entry to the park was permitted only through gaps in these barricades, which were guarded by police.

37.     There was an overwhelming police presence at the park; however, the police permitted people to enter the park.

38.     Those entering the park were subjected to search, although such search was probably unlawful under the circumstances.

39.     The Plaintiff and his girlfriend entered the park, and prepared to observe the approaching New Year.

40.     The Plaintiff and others peacefully remained in the park for some time.

41.     The Plaintiff became aware of activity in his vicinity.

42.     The Plaintiff, acting as a citizen journalist, began to film the event.

43.     The Plaintiff, acting as a citizen journalist, planned on publishing the video of the event on various social media outlets.

44.     The Defendant POLICE OFFICERS used a metal barricade as a battering ram against a group of civilians within Zuccotti Park, of which the Plaintiff was a part.

45.     Specifically, they lifted the metal barricade off the ground to above waist height, and pushed the metal into the group, pushing the group of people backwards.

46.     The purpose of the using the metal barricade as battering ram on the group of people was to push the group of people, including the Plaintiff, backwards and to knock them down.

47.     Using the metal barricades, the police did in fact push the group of people backwards and knock some of them down.  One of those knocked down was the Plaintiff.

48.     While the metal barricade was pushing into this group of people, two police officers discharged pepper spray across the group of people.

49.     The two officers that did this were Defendant POLICE OFFICER VEGA and JOHN DOE SECOND PEPPER SPRAY OFFICER.

50.     The police officers targeted the group of people as a whole.

51.     The pepper spray struck the group of people as a whole.

52.     The plaintiff, who was in the group of people, was struck by the pepper spray.

53.     As a result of being struck by the pepper spray and as a result of the use of the metal barricade as a battering ram, the plaintiff was blinded, incapacitated, pushed back and knocked down.

54.     The plaintiff sustained the spiral fracture to his hand when he fell.

55.     As a result of being blinded, incapacitated, pushed back and knocked down, the plaintiff's liberty of movement was restricted. The plaintiff was unable to walk without help.  He was moved a few feet away, where he lay on the ground and vomited from the effects of the police assault.

56.     The plaintiff remained at the scene for a significant period of time before the incapacitating effects of the assault ameliorated sufficiently for the plaintiff to move on his own.

57.     The Plaintiff unsuccessfully sought medical help at the scene.

58.     Unable to find help, the Plaintiff and his girlfriend went to the hospital.

59.     The Plaintiff was found to have multiple spiral fractures of his left hand requiring surgery.

60.     The Plaintiff underwent surgery several days later.

61.     The Plaintiff underwent months of physical therapy.

62.     During his recovery, the Plaintiff was unable to perform basic tasks like tying his own shoelaces.

63.     The Plaintiff, who worked with computers, could not type effectively.

64.     When the Plaintiff attempted to perform the daily tasks of life that required two hands, he felt severe pain and discomfort.

65.     When the Plaintiff attempted to perform the daily tasks of life that required the strength and precision of his dominant hand, he suffered not only pain and discomfort, but also frustration and anger.

66.     The Plaintiff suffered fear and anxiety that his main hand, with its spiral fracture, would never get back to normal.

67.     As a result of his injury, the Plaintiff ceased to participate in Occupy Wall Street events.

68.     When the Plaintiff lost his job, it was hard for him to do the things necessary to find a job, with his broken dominant hand.

69.     To this day, while the function of the Plaintiff's hand has returned to a large extent, the Plaintiff still feels discomfort and limited movement.

70.     Several officers directly participated in lifting and pushing the metal barricade.

71.     Upon information and belief, among the officers involved in carrying out this action were the following defendants: Defendant SERGEANT SORECO, Defendant POLICE OFFICER O'LEARY, Defendant VEGA, MEMBER OF SERVICE DUNLOP, Defendant HERNANDEZ, Defendant MCGUIRE, Defendant BARBIERI, Defendant SETTEDUCATO, Defendant WHITE, Defendant PALOMO, Defendant PONS, and JOHN DOE SECOND PEPPER SPRAY OFFICER, JOHN DOE BALDING SENIOR OFFICER[1] (collectively, "THE BARRICADE OFFICERS").

72.     These officers worked together to push the metal barricade into the crowd.

73.     These acts by these officers, together with the use of pepper spray by Defendant POLICE OFFICER VEGA and JOHN DOE SECOND PEPPER SPRAY OFFICER, caused the plaintiff's injuries.

74.     Several of the BARRICADE OFFICERS are Sergeants or officers of other rank that may issue commands to lower-ranking officers.  Other of the Defendants, including Defendant DUFFY, Defendant FALCON, Defendant O'GRADY, and Defendant BELLINGERI, are Sergeants, Captains, or officers of other rank that may issue commands to lower-ranking officers, and were in the immediate vicinity of the BARRICADE OFFICERS and other Defendant POLICE OFFICERS at the time they

---

[1]     Upon information and belief, JOHN DOE BALDING SENIOR OFFICER is the same as the John/Jane Doe Barricade Officer numbered 5 on Exhibit A.  Video stills showing his face are annexed hereto as Exhibit B.

caused the injury to the plaintiff.  These defendants will be referred to collectively as the "VICINITY COMMANDERS," because they were in the vicinity of the wrongdoing and had the authority to command some or all of those participating in that wrongful conduct, not to do so.

75.     These VICINITY COMMANDERS should have known, both due to common sense and to NYPD training in the proper use of metal barricades, that the conduct of the police occurring in their vicinity was unlawful, and that it was their duty to intervene to stop it.

76.     These VICINITY COMMANDERS had the opportunity to prevent the wrongdoing of the other BARRICADE OFFICERS and the Defendant POLICE OFFICERS, because they were at the location of the wrongdoing before it began, when officers present participated in escalating the situation towards violence, when it began, and during the wrongdoing itself.

77.     Instead, these VICINITY COMMANDERS failed to prevent the wrongful actions of the other Defendant POLICE OFFICERS, and in fact participated in them.

78.     Furthermore, upon information and belief, DEFENDANTS CAPTAIN DUFFY and CAPTAIN FALCON acted, jointly or severally, as the Incident Commander(s) at the time and place of the incident.

79.     As commanders of all personnel at the location, DEFENDANTS CAPTAIN DUFFY and CAPTAIN FALCON had a duty to observe the conduct of the police officers deployed there, including the Defendant POLICE OFFICERS.

80.     DEFENDANTS CAPTAIN DUFFY and CAPTAIN FALCON had the duty to exercise their command authority over the other Defendant POLICE OFFICERS

to control their conduct and ensure that these officers acted reasonably and within Constitutional rules.

81.     DEFENDANTS CAPTAIN DUFFY and CAPTAIN FALCON observed, or should have observed, that the Defendant POLICE OFFICERS at the scene became increasingly undisciplined and aggressive over a significant period of time up to and including the time of the attack.

82.     DEFENDANTS CAPTAIN DUFFY and CAPTAIN FALCON failed to perform their duty to exercise their command authority over the other Defendant POLICE OFFICERS to control their conduct and ensure that these officers acted reasonably and within Constitutional rules.

83.     As a result, the Defendant POLICE OFFICERS engaged in the wrongful conduct described elsewhere herein.

## THE DEFENDANTS FAILED TO ADEQUATELY SUPERVISE DEFENDANT POLICE OFFICER VEGA

84.     Upon information and belief, it was the policy and practice of the NYPD, from the beginning of the occupation of Zuccotti Park by OWS, and up to and including the date of the incident, to assign one person the command of police resources at Zuccotti Park for every platoon (or shift) of every day.

85.     Upon information and belief, this commander would normally be the highest-ranking member of service assigned to the location at that time.

86.     This commander was sometimes referred to as the Incident Commander, as that term is defined within Section 213-11 of the NYPD Patrol Guide, *Policing Special Events/Crowd Control.*

87.     As described within Section 213-11 of the NYPD Patrol Guide, *Policing Special Events/Crowd Control,* the Incident Commander of the OWS event at Zuccotti Park on December 31, 2011 through January 1, 2012, was responsible for the command, control and coordination of all incident operations, and all personnel at that location.

88.     As stated above, upon information and belief, DEFENDANTS CAPTAIN DUFFY and CAPTAIN FALCON acted, jointly or severally, as the Incident Commander(s) at the time and place of the incident.

89.     Upon information and belief, DEFENDANTS CAPTAIN DUFFY and CAPTAIN FALCON were the most senior officers present, and were responsible for the command, control and coordination of all incident operations, and all personnel at that location, including all of the other individual defendants identified herein.

90.     Prior to the point in time when the plaintiff was injured, Defendant POLICE OFFICER VEGA demonstrated that he was not, at that time, fit to perform duty, and presented a risk to civilians (and other officers) at Zuccotti Park.

91.     In an interaction with a civilian who is not a party to this case, and who has no relationship with the plaintiff, Defendant POLICE OFFICER VEGA suffered a slight cut to his hand while carrying out his policing duties.

92.     Upon information and belief, Defendant POLICE OFFICER VEGA blamed one or more of the OWS demonstrators for the injury.

93.     Upon information and belief, the injury influenced Defendant POLICE OFFICER VEGA's mental and emotional state, causing him to become aggressive and violent.

94.     Defendant POLICE OFFICER VEGA responded taking out his anger on someone else – upon information and belief, not the person who allegedly caused Vega's injury.

95.     Defendant POLICE OFFICER VEGA exchanged words with a protestor.

96.     Apparently feeling provoked by what the protestor said, Defendant POLICE OFFICER VEGA lifted one of the metal barricades that the police used to surround the park, and tried to hit that protestor in the face with it.

97.     The protestor narrowly avoided being hit in the face.

98.     By attacking this non-violent protestor with a metal barricade that could have caused serious injury, Defendant POLICE OFFICER VEGA demonstrated that he should not be – at that time – in contact with members of the public.

99.     Upon information and belief, multiple supervising officers observed Defendant POLICE OFFICER VEGA's conduct of lifting the metal barricade to hit the demonstrator in the face.

100.    These four officers are named herein as "JOHN DOE P.O. VEGA SUPERVISORS 1-4."  Annexed hereto as Exhibit C is an image in which JOHN DOE P.O. VEGA SUPERVISORS 1-4 can be seen behind Defendant POLICE OFFICER VEGA.  They are identified by numbers 1 through 4.  Upon information and belief, each of JOHN DOE P.O. VEGA SUPERVISORS 1-4 was of higher rank than Defendant POLICE OFFICER VEGA, and had the power to supervise and give orders to Defendant POLICE OFFICER VEGA.

101.    These supervising officers, and the officers in the chain of command with ultimate authority over the NYPD officers present, DEFENDANTS CAPTAIN DUFFY

and CAPTAIN FALCON, knew or should have known that Defendant POLICE

OFFICER VEGA was acting with unjustified violence, in a manner that presented an

immediate danger to civilians at the scene.

102.    These officers should have removed Defendant POLICE OFFICER

VEGA from policing activities that involved contact with the public on that day, and

should have assigned him to work that did not involve contact with the public.

103.    The failure of these officers to remove Defendant POLICE OFFICER

VEGA from policing activities that involved contact with the public constituted negligent

supervision.

104.    As a result of this negligent supervision, Defendant POLICE OFFICER

VEGA was still present at the scene when he made unjustified and improper use of

pepper spray, causing and contributing to the plaintiff's injury.

105.    As these facts show, upon information and belief, Defendant THE CITY

OF NEW YORK failed to train Defendant POLICE OFFICER VEGA not to use

unnecessary force against civilians while policing a demonstration.

106.    Defendant THE CITY OF NEW YORK failed sufficiently to train

Defendant POLICE OFFICER VEGA to exercise self-control and self-restraint while

policing a demonstration.

107.    Had these supervisory officers properly supervised Defendant POLICE

OFFICER VEGA, he would have been prevented from engaging in the negligent,

reckless, and needlessly violent and aggressive conduct that resulted in the Plaintiff's

injury, as described herein.

108.     In the minutes before the incident in which the plaintiff was injured, other officers at the scene displayed anger and frustration similar to that which Defendant POLICE OFFICER VEGA did.

109.     All supervising officers at the location, including JOHN DOE P.O. VEGA SUPERVISORS 1-4 and DEFENDANTS CAPTAIN DUFFY and CAPTAIN FALCON, should have taken further steps to ensure that other officers at the scene remained calm, used good judgment, and adhered to proper police standards of conduct.

110.     Either directly, or indirectly through the chain of command, these officers could have ensured that orders were given, and steps were taken, to enforce proper discipline and good conduct on the officers present, to prevent the incident that injured the plaintiff.

111.     Upon information and belief, these members of the chain of command failed to do so.

### THE CITY OF NEW YORK CAUSED AND/OR FAILED TO PREVENT THE PLAINTIFF'S INJURIES

112.     Metal barricades are not designed to be lifted off the ground and pushed against crowds, and will cause injury if used in this way.

113.     A Rule 30(b)(6) witness, Deputy Inspector Anthony Raganella, commander of the Disorder Control Unit, testifying for the City of New York in another litigation, testified about the proper use of metal barricades.

> Q:     Are metal barricades ever used to push up against the crowd and move them?  …  Are they, in current NYPD practice, used in that fashion?
> A:     Absolutely not.
> Q:     From your answer I take it that the Disorder Control Unit does not teach members of service to use metal barricades to push against crowds and move them.
> A:     No.
> Q:     Why not?
> A:     That's not what they're designed for.

Q:      What are they designed for?
A:      They're designed to be stationary devices on the ground that direct, move, or help congregate crowds of people or like I said, restrict access to a certain area.
Q:      Would using a metal barricade to push a crowd create a risk?
A:      Potentially, yes.
Q:      What kind of risk?
A:      The risk of physical injury, maybe a risk of mental injury.  I don't know.
                          -- May 14, 2014 Deposition of The City of New York,
via 30(b)(6)witness Deputy Inspector Anthony Raganella.

114.    Nevertheless, the City of New York knew, prior to the incident, that NYPD officers – including officers at a policy-making level – used metal barricades as battering rams against groups of peaceful protestors.

115.    On November 17, 2011, a group of police officers including Chief Thomas Purtell used a metal barricade against a group of protestors in exactly the same way as occurred during the incident at issue in this case.  The incident occurred at approximately 9:03 AM in the vicinity of the intersection of Beaver Street and Broad Street in lower Manhattan.  A group of police officers lifted a metal barricade and used into to push into and down on a group of protestors who were standing in the street.  Members of the crowd fell, some of them being potentially crushed under the metal barricade as it pressed forward and down on them.  Although the protestors were possibly committing a violation by being in the street, they were not violent, and had done nothing to provoke the attack by the police.

116.    Chief Purtell, who was then commander of Patrol Borough Manhattan South, personally participated in pushing the barricade into the crowd.  He can be seen pushing the barricade forward into the crowd, leaning forward to use his weight to add to the force pressing the barricade into the crowd.

117.    Chief Purtell was one of only about 30 members of the NYPD who were identified by the agency as a policymaker with "substantial policy discretion," in a list

issued annually pursuant to the requirements of Chapter 68, §2604(b)(12) and

§2604(b)(15) of the New York City Charter.[2]  Also present, although not directly

participating, were at least two other officers of the rank of Chief, and at least one Deputy

Inspector.

118.    Where a member of service of policymaking rank witnesses dangerous

police conduct that violates NYPD training (as well as the officers' oaths to protect the

public), that policymaker and, by extension, the City of New York, knows that there is an

urgent need for further training or other steps to be taken to prevent something similar

from happening again.

119.    Where a member of service of policymaking rank **participates** in

dangerous police conduct that violates NYPD training – as did Chief Purtell -- it can be

presumed that the there is a policy or custom of condoning and even encouraging such

dangerous behavior by the police.

120.    Whether or not the same Chiefs and other executive-level officers who

were present at the November 17, 2011 incident were also present at the scene of the

incident on the night of December 31, 2011, the City of New York had a duty to prevent

another incident involving the dangerous misuse of metal barricades from occurring.

121.    Any officers who were present at both incidents were under a personal

duty to ensure that no such dangerous misuse of metal barricades occurred.

<u>FIRST CLAIM FOR RELIEF</u>

---

[2]      As such, Chief Purtell's acts and/or failures to act could, by themselves, trigger <u>Monell</u>
liability on the part of the City of New York.  *See Haus v. City of New York*, 2011 U.S. Dist.
LEXIS 155735, 36-39 (S.D.N.Y. Aug. 31, 2011) (citing *Amnesty Am. v. Town of W. Hartford*,
361 F.3d 113, 127-29 (2d Cir. 2004), *Allen v. City of New York*, 2007 U.S. Dist. LEXIS 15, 2007
WL 24796, at *19 (S.D.N.Y. Jan. 3, 2007) and *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480,
483, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)).

<u>DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983</u>

122.     Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

123.     All of the aforementioned acts of the Defendant POLICE OFFICERS, their agents, servants and employees, were carried out under the color of state law.

124.     All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth and Fourteenth Amendments to the Constitution of the United States of America, in violation of 42 U.S.C. § 1983.

125.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

126.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

127.     The Defendant POLICE OFFICERS collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

128.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

129.    As a result of the Defendant POLICE OFFICERS ' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

<u>SECOND CLAIM FOR RELIEF</u>

<u>EXCESSIVE FORCE UNDER 42 U.S.C. § 1983</u>

130.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

131.    Plaintiff was subjected to excessive and unjustified force in violation of his rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983 by the Defendant POLICE OFFICERS.

132.    In particular, the Plaintiff was subjected to excessive and unjustified force by the BARRICADE OFFICERS.

133.    As a result of the above constitutionally impermissible conduct by the Defendant POLICE OFFICERS, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

134.    As a result of the Defendant POLICE OFFICERS' impermissible conduct, the Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

<u>THIRD CLAIM FOR RELIEF</u>

<u>FAILURE TO INTERVENE UNDER 42 U.S.C. §1983</u>

135.   Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

136.   The Defendant POLICE OFFICERS had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights.

137.   As alleged above, the Defendant POLICE OFFICERS had an opportunity to intervene on Plaintiff 's behalf to prevent the violation of his constitutional rights.

138.   In particular, DEFENDANTS CAPTAIN FALCON, CAPTAIN JOHN DUFFY, and/or the VICINITY COMMANDERS, by virtue of their presence among or in proximity to the BARRICADE OFFICERS, and their higher rank, had the opportunity to exercise control over the Defendant POLICE OFFICERS and prevent the violation of the Plaintiff's rights.

139.   In particular, Defendant John Doe P.O. Vega Supervisors 1-4 failed to supervise Defendant POLICE OFFICER VEGA, as stated herein.

140.   However, all of the Defendant POLICE OFFICERS had an equal duty to prevent the violations of the Plaintiff's Constitutional rights described herein, and each had an opportunity to do so.

141.   These Defendant POLICE OFFICERS chose not to intervene on the Plaintiff's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

142.   As a result of the aforementioned conduct of the Defendant POLICE OFFICERS, Plaintiff's constitutional rights were violated.

143.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

144.    The Plaintiff demands judgment against the Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

## FOURTH CLAIM FOR RELIEF

### [DELETED]

## FIFTH CLAIM FOR RELIEF

### STATE LAW —— ASSAULT

145.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

146.    The Defendant POLICE OFFICERS s engaged in physical conduct placing the Plaintiff in imminent apprehension of harmful contact.

147.    As a result, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

148.    As a result, the Plaintiff demands judgment against Defendant POLICE OFFICERS in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

## SIXTH CLAIM FOR RELIEF

### STATE LAW —— BATTERY

149.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

150.    The Defendant POLICE OFFICERS, without privilege or consent, intentionally made bodily contact with the Plaintiff which was offensive in nature.

151.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

152.    As a result of Defendant POLICE OFFICERS' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

SEVENTH CLAIM FOR RELIEF

STATE LAW —— NEGLIGENCE

153.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

154.    The Defendant POLICE OFFICERS employed physical force against third parties in the vicinity of the Plaintiff.

155.    The Defendants released gaseous toxins in the vicinity of the Plaintiff.

156.    The Defendant POLICE OFFICERS owed a duty of care not to engage in these activities in the vicinity of the Plaintiff; or, in the alternative, the Defendants had a duty to do so in a manner that would not injure the Plaintiff.

157.    In breach of these duties, the Defendants employed physical force against third parties and released gaseous toxins in a manner that physically injured the Plaintiff.

158.    As a result, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

159.    As a result of Defendant POLICE OFFICERS' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

EIGHTH CLAIM FOR RELIEF

STATE LAW —— RESPONDEAT SUPERIOR

160.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

161.    The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers, officials, and agents of the City of New York.

162.    The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers and officials in the course of their employment by Defendant THE CITY OF NEW YORK and the New York City Police Department, all under the supervision of ranking officers of said department.

163.    As a result, the Defendant THE CITY OF NEW YORK is liable to the Plaintiff for the injuries and other damages caused by its police officers, officials, and agents on a theory of *respondeat superior*.

164.    As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

<u>NINTH CLAIM OF RELIEF</u>

<u>STATE LAW —— NEGLIGENT HIRING, RETENTION
TRAINING AND SUPERVISION</u>

165.     Plaintiff re-alleges each and every allegation contained in the above

paragraphs with the same force and effect as if fully set forth herein.

166.     Defendant The City of New York hired, trained, and supervised the

Defendant POLICE OFFICERS who caused the injuries to the Plaintiff.

167.     Defendant THE CITY OF NEW YORK hired the Defendant POLICE

OFFICERS without regard to their propensity to use excessive or reckless force, or to

unlawfully violate the constitutional rights of citizens.

168.     Defendant THE CITY OF NEW YORK retained the Defendant POLICE

OFFICERS despite knowledge of their use of excessive or reckless force, or repeated

violations of citizens' constitutional rights.

169.     Defendant THE CITY OF NEW YORK failed to train the Defendant

POLICE OFFICERS not to use excessive or reckless force, or to unlawfully violate the

constitutional rights of citizens.

170.     Defendant THE CITY OF NEW YORK failed to supervise the Defendant

POLICE OFFICERS to ensure that they did not to use excessive or reckless force, or to

unlawfully violate the constitutional rights of citizens.

171.     Defendant THE CITY OF NEW YORK and the Defendant POLICE

OFFICERS failed to properly supervise Defendant POLICE OFFICER VEGA on the

night of this incident.

172.     Defendant THE CITY OF NEW YORK and the Defendant POLICE

OFFICERS failed to properly train supervising officers on the proper supervision of

officers when they exhibit aggression and anger during the policing of large demonstrations.

173.     As a result of the above constitutionally impermissible conduct, Plaintiff ROBERT PLUMA was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

174.     As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

TENTH CLAIM FOR RELIEF

VIOLATION OF THE PLAINTIFF'S RIGHTS UNDER THE CONSTITUTION OF THE STATE OF NEW YORK

175.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

176.     As a result of the aforesaid conduct of Defendant THE CITY OF NEW YORK and the Defendant POLICE OFFICERS, the Plaintiff was deprived of rights guaranteed to him by the New York State Constitution, including though not limited to:

A.     The right of the people to freely speak their sentiments on all subjects as described in Article I §8 of the New York State Constitution.

B.     The right of the people to peaceably assemble to petition the government, or any department thereof as described in Article I §9 Subsection 1 of the New York State Constitution.

C.     The right of the people to be free from excessive force under Article I §12 of the New York State Constitution.

177.     The acts complained of were carried out by the Defendant POLICE OFFICERS in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures, and the rules of Defendant THE CITY OF NEW YORK and the NYPD.

178.     The Defendant POLICE OFFICERS and Defendant THE CITY OF NEW YORK, collectively and individually, while acting under color of state law violated the Plaintiff's constitutional rights by engaging in conduct proscribed by the New York State Constitution.

179.     As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, out-of-pocket costs, and other special damages.

180.     As a result of Defendants' impermissible conduct, the Plaintiff demands judgment against Defendants in an amount to be determined at trial, along with punitive damages, together with attorney's fees and costs.

<u>ELEVENTH CLAIM FOR RELIEF</u>

<u>[DELETED]</u>

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

    [a] Invoke pendent party and pendent claim jurisdiction.

    [b] Award appropriate compensatory and punitive damages.

    [c] Empanel a jury.

    [d] Award attorney's fees and costs.

    [e] Award such other and further relief as the Court deems to be in the interest of justice.


DATED:      New York, New York
             June 23, 2015


                Respectfully submitted,


                _____//s//_____
                David A. Thompson [dt3991]
                STECKLOW COHEN & THOMPSON
                ATTORNEYS FOR PLAINTIFF
                217 Centre Street, 6th Floor
                New York, New York 10013
                Phone:      (212) 566-8000
                Fax:        (212) 202-4952
                DTHOMPSON@WYLIELAW.COM