UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
ROBERT PLUMA,                       :
                                    :
               Plaintiff,           :      13 Civ. 2017 (LAP)
                                    :
     -against-                      :      OPINION
                                    :
THE CITY OF NEW YORK, a municipal   :
entity; NEW YORK CITY POLICE        :
SERGEANT CARL SORECO; NEW YORK CITY :
POLICE OFFICER MEGHAN O'LEARY; NEW  :
YORK CITY POLICE OFFICER CHRISTOPHER:
VEGA; MEMBER OF SERVICE DUNLOP;     :
POLICE OFFICER RAMON HERNANDEZ;     :
POLICE OFFICER ANTHONY PONS; POLICE :
OFFICER RICHARD McGUIRE; POLICE     :
OFFICER ANTHONY BARBIERI; SERGEANT  :
DANIEL O'GRADY; SERGEANT BENJAMIN   :
BELLINGERI; MEMBER OF SERVICE       :
VINCENT SETTEDUCATO; MEMBER OF      :
SERVICE COREY WHITE; POLICE OFFICER :
DANA PALOMO; CAPTAIN JOHN DUFFY;    :
CAPTAIN FALCON; "JOHN DOE SECOND    :
PEPPER SPRAY OFFICER"; "JOHN DOE    :
BALDING SENIOR OFFICER"; and JOHN   :
DOE P.O. VEGA SUPERVISORS 1-4,      :
                                    :
               Defendants.          :
------------------------------------x

LORETTA A. PRESKA, Chief United States District Judge:

     Plaintiff has filed a Second Amended Complaint [dkt. no.
54] alleging violations of the Fourth and Fourteenth Amendments,
as well as violations of New York State law and the New York
State Constitution, all against the City of New York and several
police officers named and unnamed.  Plaintiff's allegations
arise out of an incident involving a group of Occupy Wall Street

demonstrators and members of the New York Police Department.
(Second Amended Complaint at ¶ 2.) Defendants subsequently
filed a Motion to Dismiss [dkt. no. 64] pursuant to Rules 12(c),
12(b)(1), and 12(f) of the Federal Rules of Civil Procedure as
well as a Supplemental Motion to Dismiss [dkt. no. 84] pursuant
to the same Rules.

I.    BACKGROUND

      A.    FACTUAL

      The Second Amended Complaint asserts the following:
Plaintiff Robert Pluma is a resident of the State of New York.
(Second Amended Complaint at ¶ 8.) On the evening of December
31, 2011, Plaintiff gathered along with a peaceful assembly of
Occupy Wall Street demonstrators in Zuccotti Park in New York
City. (Id. at ¶ 2.) Defendant police officers provoked a
confrontation with the demonstrators, escalated this
confrontation into violence, used metal fencing as a weapon
against demonstrators, and deployed pepper spray across a group
of demonstrators in which Plaintiff stood. (Id.) The pepper
spray temporarily blinded Plaintiff and caused him to vomit.
(Id. at ¶¶ 53-55.) He fell to the ground because Defendant
police officers and others pushed a metal fence against the
crowd in which he stood. (Id.) Plaintiff sustained multiple
spiral fracture injuries to his dominant hand as a result of
this fall to the ground, which required surgery and months of

physical therapy.  (Id. at ¶¶ 59-61.)  The lingering effects of Plaintiff's injuries prevented him from performing basic tasks, interfered with his job, and caused him severe pain, discomfort, frustration, anger, fear, and anxiety.  (Id. at ¶¶ 62-66.)  When Plaintiff later lost his job, his injuries made it difficult to find another.  (Id. at ¶ 68.)

Video recordings contradict Plaintiff's factual allegations.  The recordings establish that, prior to the incident of which Plaintiff complains, there were demonstrators, police, and onlookers gathered in and around Zuccotti Park.  A crowd began to coalesce at the south side of the park, on a sidewalk bordering Cedar Street between Trinity Place and Broadway.  (See dkt. no. 65, Memorandum in Support of Motion to Dismiss, ("MTD Memo") Ex. F at 15:04-20:11; Ex. G at 00:00-00:15; Ex. K at 00:20-00:30.)  There was a rough line of metal barricades arranged from east to west along this sidewalk.  (Ex. F at 19:35-20:11; Ex. G at 00:00-00:15; Ex. K at 0:24-1:00.) There was also a mix of demonstrators, police, and onlookers standing on either side of this barricade line.  (Id.)  This mix of people included members of all groups (demonstrators, police, and onlookers) standing in the park, on the sidewalk, and in Cedar Street itself.  (Id.)  Police personnel were mostly standing on the south side of the barricade line.  (Id.)

Demonstrators and onlookers were mostly standing on the north side.  (Id.)

Demonstrators far outnumbered police.  (Ex. F at 16:23-19:00; Ex. H at 1:21-2:15.)  At times, crowds of demonstrators pushed together to drive groups of police officers from the park while taunting them.  (Ex. F at 16:23-19:00; Ex. H at 1:21-2:15.)  This behavior continued despite numerous warnings by police.  (Ex. F at 16:23-16:45; 16:45-17:03; Ex. H at 1:21-1:55.)  Demonstrators also interfered with police attempts to make at least one arrest.  (Ex. F at 16:23-17:03; Ex. H at 1:21-2:15.)

At least five minutes prior to the incident of which Plaintiff complains, some members of the crowd disconnected barricades and pulled them into the park.  (Ex. F at 15:15-16:00.)  This behavior also continued despite police warnings, with some demonstrators even pulling on barricades while police personnel were attempting to hold them in place or pull them back toward the line.  (Ex. F at 15:34-16:10; Ex. G at 00:00-00:11; Ex. H at 00:06-00:40.)  Protestors also used barricades to push the police on numerous occasions.  (Ex. G at 00:00-00:06; Ex. H at 00:45-1:00; Ex. K at 2:49; 2:57-3:00; 3:09-3:12.)  For instance, a demonstrator grabbed hold of the barricade that later allegedly caused Plaintiff's injury and pushed it into police.  (Ex. K at 2:49, video still K1.)

4

Another demonstrator was recorded attempting to disconnect or otherwise manipulate an adjacent barricade. (Ex. G at 00:00-00:11; Ex. K at 3:09-3:12.) Meanwhile, police attempted to hold barricades in position while the crowd surged around them and people attempted to push, pull, or lift barricades away. (Ex. K at 2:28-3:05, video stills K3, K4.)

Approximately two minutes prior to the incident of which Plaintiff complains, a police officer panned his camera across the crowd of demonstrators directly in front of him. (Ex. K at 1:51-2:14.) The officer filmed Plaintiff standing among these demonstrators, within a few feet of the barricades separating the police from the demonstrators. (Id.) A viewer of the video can determine the filming police officer's position as well as the position of the Plaintiff by reference to the "Joie de Vivre" sculpture, a large red fixture on the southeast corner of the park, which appears frequently within the camera frame. (Ex. F at 18:51-19:04; Ex. K at 00:40-2:14.) Plaintiff himself is distinguishable in the police officer's recording and another video recording by his dark fedora, glasses, dark jacket, light shirt, dark necktie, and the "Canon" brand camera he is holding. (Id.)

Less than one minute prior to the incident of which Plaintiff complains, demonstrators in Plaintiff's immediate vicinity grabbed hold of two sections of barricade. (Ex. G at

00:13-00:25; Ex. K at 3:05-3:45.)  Police officers grabbed hold
of the barricade sections as well.  (Id.)  One of these
barricade sections, with a thick crowd of demonstrators and
police grabbing it on either side, and a larger crowd of
onlookers pressing in toward it with cameras raised, was carried
northward by the crowd, away from Cedar Street, and toward the
recessed ground within the park.  (Ex. G at 00:25-00:45; Ex. K
at 3:35-3:50.)

     With demonstrators and police still grabbing it on either
side, the disputed barricade section moved back and forth amidst
the crowd while people shouted "Push!" "Pull!" and "Fucking
pigs!"  (Ex. G at 00:30-00:45; Ex. J at 00:00-00:16; Ex. K at
3:35-3:50.)  Then the metal barricade, still grasped by people
on both sides, rose up over the heads of the demonstrators,
police, and onlookers.  (Ex. F at 20:30-20:50; Ex. G at 00:45-
00:50; Ex. J at 00:16-00:21; Ex. K at 3:50-3:55.)  Less than
five seconds after the object was lifted over the crowd, there
was a nearly simultaneous exchange of sprayed liquids, first
from police officers on the south side, then from an
unidentified person on the north side.  (Ex. F at 20:30-20:55;
Ex. G at 00:53-00:58; Ex. J at 00:24-00:28; Ex. K at 3:58-4:02.)
As the fluids landed across the crowd in either direction,
police officers, demonstrators, and onlookers stumbled and fell
away coughing, rubbing their eyes, and complaining of the

effects of lachrymatory agents.  (Ex. F at 20:30-20:55; Ex. G at
1:00-1:10; Ex. J at 00:30-00:40; Ex. K at 4:00-4:10.)  The
barricade, now borne aloft by fewer hands, twisted briefly up
into the air before falling to the ground along with several
members of the crowd on both sides.  (Ex. G at 1:00-1:05; Ex. J
at 00:30-00:36; Ex. K at 4:00-4:05.)

     B.   PROCEDURAL

On March 26, 2013, Plaintiff filed his first Complaint
[dkt. no. 1] in this Court, naming as Defendants the City of New
York as well as "New York City Police Officers 'John Does 1-
50.'"  (Complaint at 1.)  Plaintiff's original Complaint alleged
that Defendant City of New York and unnamed Defendant police
officers violated Plaintiff's rights under the First, Fourth,
Fifth, and Fourteenth Amendments to the Constitution, as well as
New York State law and the New York State Constitution.  (Id. at
7-15.)  Plaintiff also included a cause of action for municipal
liability against Defendant City of New York.  (Id. at 15-30.)
On March 31, 2015, this Court issued a Memorandum and Order
[dkt. no. 17], which granted in part and denied in part
Defendant's Motion to Dismiss and Bifurcate [dkt. no. 4]
Plaintiff's original Complaint.  (Memorandum and Order at 34.)
In its Memorandum and Order, this Court dismissed Plaintiff's
First Amendment claim and municipal liability claim but granted

Plaintiff leave to amend his Complaint and proceed with his remaining claims. (Id.)

On April 7, 2015, Plaintiff filed his First Amended Complaint [dkt. no. 29], now naming additional Defendants "Police Sergeant Carl Soreco," "New York City Police Officer Meghan O'Leary," and "New York City Police Officer Christopher Vega," as well as four New York City Police Officers identified by the name "John Doe" and their Shield Numbers: 26990, 29615, 11395, and 3076, plus two "John Doe" New York City Police Officers identified as "Second Pepper Spray Officer" and "Incident Commander." (First Amended Complaint at 3-5.)[1]  At Plaintiff's request, this Court issued electronic summonses [dkt. nos. 32-40] to all of the newly named Defendants on April 8, 2015.

In an Order [dkt. no. 42] dated April 16, 2015, this Court granted Plaintiff leave to file a Second Amended Complaint identifying additional officer defendants. (Order at ¶ 2.) Plaintiff filed his Second Amended Complaint [dkt. no. 54] on June 23, 2015, alleging all of the remaining causes of action from his First Amended Complaint against the previously named

---

[1]  Plaintiff's First Amended Complaint contained all of his previous causes of action, with the exception of the First Amendment claim and municipal liability claim, which this Court had dismissed, and with the omission of the Fifth Amendment claim, which Plaintiff apparently decided to abandon of his own accord. (First Amended Complaint at 2, 20, 23, and 28.)

Defendants and naming as additional Defendants "Member of
Service Dunlop, Police Officer Ramon Hernandez, Police Officer
Anthony Pons, Police Officer Richard McGuire, Police Officer
Anthony Barbieri, Sergeant Daniel O'Grady, Sergeant Benjamin
Bellingeri, Member of Service Vincent Setteducato, Member of
Service Corey White, Police Officer Dana Palomo, Captain John
Duffy, Captain Falcon," as well as "John Doe Second Pepper Spray
Officer," a "John Doe Balding Senior Officer," and four "John
Doe P.O. Vega Supervisors 1-4." (Second Amended Complaint at 3-
7.)

On August 7, 2015, Defendants filed a Motion to Dismiss
[dkt. no. 64] Plaintiff's Second Amended Complaint. (Notice of
Motion at 1.) In the caption of their Notice of Motion to
Dismiss, Defendants listed all of the Defendant officers named
in Plaintiff's Second Amended Complaint. (Id. at 1.) However,
the text of Defendant's Notice of Motion to Dismiss listed only,
"defendants City of New York, Carl Soreco, Meghan O'Leary, and
Christopher Vega" as movants. (Id.) Nonetheless, in
Defendants' Memorandum of Law in Support of their Motion to
Dismiss [dkt. no. 65], they argued for dismissal of Plaintiff's
claims against all of the officers listed in Plaintiff's Second
Amended Complaint. (See, e.g., Memorandum of Law at 3-11, 17.)

On September 9, 2015, Plaintiff filed his Memorandum of Law
in Opposition [dkt. no. 72] to Defendants' Motion to Dismiss.

9

In his Memorandum, Plaintiff argued, among other things, that the only movants properly before the Court were those listed in the text of the Defendants' Notice of Motion to Dismiss: "City of New York, Carl Soreco, Meghan O'Leary, and Christopher Vega." (Memorandum of Law in Opposition at ¶ I.)  Plaintiff argued that Defendants' counsel "does not represent the other officers in this case" and that the Defense Memorandum's arguments regarding dismissal of claims against the other officers "are not properly before the Court."  (Id.)

On October 15, 2015, at Plaintiff's request, this Court issued an electronic summons [dkt. no. 76] for Member of Service Dunlop, Police Officers Ramon Hernandez, Anthony Pons, Richard McGuire, Anthony Barbieri, Sergeants Daniel O'Grady and Benjamin Bellingeri, Members of Service Vincent Setteducato and Corey White, Police Officer Dana Palomo, and Captains John Duffy and Falcon.  (Summons in a Civil Action at 2.)  On the same date, the attorney who had represented Defendants up to this point filed an additional Notice of Appearance [dkt. no. 77] on behalf of Defendants Anthony Barbieri, Ramon Hernandez, Richard McGuire, Daniel O'Grady, Anthony Pons and Vincent Setteducato. (Notice of Appearance at 1.)  Defense counsel filed another Notice of Appearance [dkt. no. 80] on November 9, 2015, on behalf of Defendants Benjamin Bellingeri, Corey White, Dana

10

Palomo, John Duffy, Captain Falcon and Detective Dunlup. (Notice of Appearance at 1.)

On the same date, this Court issued an Order [dkt. no. 81] granting Defendants leave to file an amended notice of motion on behalf of the additional defendants who had recently joined the pending motion to dismiss and to file an additional memorandum regarding the newly added Defendants. (Order at 1.) Defendants filed their Supplemental Motion to Dismiss [dkt. no. 84] on December 9, 2015, on behalf of all Defendants named in Plaintiff's Second Amended Complaint. (Supplemental Notice of Motion at 1-2.)

Based upon Plaintiff's Response in Opposition [dkt. no. 86] to Defendants' Supplemental Motion to Dismiss, there no longer appears to be any dispute between the parties as to the named Defendants who are the subject of the pending motions before the Court. Accordingly, the Court's decisions herein apply to all Defendants named in Plaintiff's Second Amended Complaint.

II.  STANDARD OF REVIEW

Rule 12(c) permits parties to "move for judgment on the pleadings" after an answer has been filed. Fed. R. Civ. P. 12(c). "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).

In considering such a motion, courts must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (quoting Chambers v. Time Warner Inc., 282 F.3d 147, 152 (2d Cir.2002)) (internal quotation mark omitted); Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50 (2009).  A complaint will only survive a motion to dismiss, however, if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. at 1949 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This "plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully" and requires a "context-specific" consideration of the complaint's factual allegations based upon the court's "judicial experience and common sense." Id. at 1949-50.  In this analysis, complaints that merely offer "labels and conclusions," "naked assertion[s]" devoid of "further factual enhancement," or "a formulaic recitation of the elements of a cause of action will not" survive.  Twombly, 550 U.S. at 555, 557.

In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.  Chambers v. Time Warner, Inc., 282 F.3d 147,

12

153 (2d Cir. 2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999).  Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint "relies heavily upon its terms and effect," thereby rendering the document "integral" to the complaint.  Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir.2006) (quoting Chambers, 282 F.3d at 152-53).  However, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."  Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir.2006).  "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document."  Id.

In their Memorandum in Support of the Motion to Dismiss, Defendants ask the Court to consider several video recordings of scenes from Zuccotti Park on December 31, 2011.  (See, e.g., MTD Memo at 2.)  Defendants designate these recordings as Exhibits F, G, H, I, J, and K, and make various references to these recordings.  (See generally, MTD Memo.)

In his Memorandum in Opposition to the Motion to Dismiss ("MTD Opposition Memo") [dkt. no. 72], Plaintiff objects to the Court's consideration of Exhibit I in resolving Defendants' motions to dismiss because Plaintiff did not incorporate Exhibit I into his in Second Amended Complaint and, Plaintiff alleges, Exhibit I does not depict the incident which is the subject of

the Second Amended Complaint.  (MTD Opposition Memo at 2.)

Plaintiff also objects to consideration of the narrative

commentary of the videographer who recorded Exhibit F.  (Id.)

Likewise, Plaintiff objects to consideration of Defense

Counsel's "subjective interpretation" of the video, as described

in the MTD Memo.  (Id. at 2-3.)

The Court may consider Defendants' video evidence in

support of their motions to the extent that this evidence is

incontrovertible; that is, the accuracy of the video is

unchallenged. See Zellner v. Summerlin, 494 F.3d 344, 371 (2d

Cir. 2007) (citing Scott v. Harris, 550 U.S. 372 (2007)).  Here,

Plaintiff challenges the accuracy of Exhibit I, claiming that it

does not depict the incident that is the subject of the subject

of the Second Amended Complaint.  (MTD Opposition Memo at 2.)

Furthermore, Defendants have not established that the Second

Amended Complaint relies heavily upon Exhibit I's terms and

effect, which would render Exhibit I integral to the Second

Amended Complaint. See Mangiafico, 471 F.3d at 398.  Even if

Exhibit I were integral to the Second Amended Complaint, there

is clearly some dispute as to its authenticity or accuracy, at

least as far as whether the video depicts the incident

complained of in the Second Amended Complaint. See Faulkner,

463 F.3d at 134.  Accordingly, this Court will not consider

Exhibit I in ruling upon Defendants' current motions to dismiss.

14

As for the videographer's commentary on Exhibit F and the alleged characterizations made by Defense Counsel in their memoranda, they have no bearing on the Court's decision.

III. DISCUSSION

    A.   Excessive Force and Related Federal Claims

        1.   Seizure

As this Court noted in its previous Memorandum & Order of March 31, 2015 (Memorandum & Order at 3), a "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control." Brower v. Cnty. of Inyo, 489 U.S. 593, 596 (1989). Thus, "the first step in any Fourth Amendment claim (or, as in this case, any section 1983 claim predicated on the Fourth Amendment) is to determine whether there has been a constitutionally cognizable seizure." Medeiros v. O'Connell, 150 F.3d 164, 167 (2d Cir.1998). Such a seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." Brower, 489 U.S. at 597 (emphasis omitted). This test accordingly requires Plaintiff to demonstrate both that his movement was restricted and that he was the intentional object of government restriction. The former contemplates action that "restrains the freedom of a person to walk away," Tennessee v. Garner, 471 U.S. 1, 7 (1985), either "by means of physical force or show of authority," Brendlin v. California, 551 U.S. 249, 254 (2007) (quoting

15

Florida v. Bostick, 501 U.S. 429, 434 (1991)) (internal quotation marks omitted).  The latter meanwhile requires that the governmental agent intended both to take the action that caused restraint and to target Plaintiff specifically. See Medeiros, 150 F.3d at 168-69.

Here, the Second Amended Complaint, like the original Complaint, alleges sufficient facts to raise the reasonable inference that the deployment of pepper spray constituted physical force that temporarily restrained Plaintiff.  The Second Amended Complaint makes clear that upon being struck with the pepper spray, Plaintiff "was blinded, incapacitated, pushed back and knocked down," which constituted a real, if brief, restriction of his movement.  (Second Amended Complaint ¶ 53.) The Second Amended Complaint bolsters this inference by clarifying that Plaintiff was knocked down, "unable to walk without help," and incapacitated to the point of lying on the ground and vomiting "for a significant period of time before the incapacitating effects of the assault ameliorated sufficiently for the plaintiff to move on his own."  (Id. at ¶¶ 55-56.)  None of the video evidence before the Court rebuts these allegations.

As this Court has previously ruled [dkt. no. 17 at 4], the temporary restraint described in these allegations satisfies the requirement for an excessive force claim. See California v. Hodari D., 499 U.S. 621, 626 (1991); United States v. Langer,

16

958 F.2d 522, 524 (2d Cir.1992).  The Court of Appeals has
recognized that pepper spray "constitutes a significant degree
of force" with "a variety of incapacitating and painful
effects," which supports the notion that its infliction alone
may constitute a restraint.  Tracy v. Freshwater, 623 F.3d 90,
98 (2d Cir.2010).

        2.    Intent

Turning to the intent requirement, the Second Amended
Complaint offers sufficient factual allegations to raise the
reasonable inference that the police officers intentionally
targeted a group of people, which included Plaintiff, with
pepper spray.  Specifically, the Complaint alleges that "two
police officers discharged pepper spray across [a] group of
people" in which Plaintiff was standing, striking the group of
people as a whole, including Plaintiff.  (Second Amended
Complaint at ¶¶ 48-52.)  Again, none of the video recordings
rebuts these allegations.

As this Court has previously held in its Memorandum & Order
of March 31, 2015 [dkt. no. 17 at 9-10], although the Court of
Appeals has apparently not ruled upon whether the deployment of
pepper spray over an entire group constitutes a seizure of each
affected member, more analogous decisions from other Courts of
Appeal indicate that it does.  Nelson v. City of Davis, 685 F.3d
867, 877 (9th Cir. 2012) (finding that a seizure occurred when

"[a plaintiff] and his fellow students were the undifferentiated objects of shots intentionally fired by the officers . . . aimed towards [the plaintiff] and his group."); Logan v. City of Pullman, 392 F. Supp. 2d 1246, 1260 (E.D. Wash. 2005) (holding that an officer's seizure was limited to those members of a group who were "the deliberate and intended object" of the pepper spray).

3.   Reasonableness

As this Court also noted (Memorandum & Order at 6), a seizure is only a Fourth Amendment violation where it is "objectively unreasonable." Cowan v. Breen, 352 F.3d 756, 762 (2d Cir. 2003). This test "is not capable of precise definition or mechanical application," and "its proper application requires careful attention to the facts and circumstances of each particular case . . . ." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)) (internal quotation mark omitted). In the excessive force context, courts apply this reasonableness standard by considering "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. This assessment must be made objectively "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

18

hindsight" and must recognize "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97.

The Second Amended Complaint alleges sufficient facts to raise a plausible excessive force claim. It alleges that Plaintiff and others in his vicinity were peacefully assembled in Zuccotti Park when a group of police officers attacked them, unprovoked, with a metal barricade and pepper spray, thereby injuring Plaintiff. (See Second Amended Complaint ¶¶ 40-54.)

However, the video evidence clearly contradicts Plaintiff's allegations. In general, the demonstrators vastly outnumbered the police, overwhelming them at times. (MTD Memo Ex. F at 2:15-4:00; 16:23-19:00; Ex. H at 1:21-2:15.) Indeed, just a few minutes before Plaintiff's injury, the demonstrators physically pushed the police out of the park as they tried to make an arrest. (Ex. F at 16:23-19:00; Ex. H at 1:21-2:15.) Members of the crowd also ignored numerous warnings by police and security personnel to get back. (Ex. F at 16:23-16:45; 16:45-17:03; Ex. H at 1:21-1:55.) Protestors responded to these orders by cursing the officers and continuing to push into them while they attempted to make an arrest. (Ex. F at 16:23-17:03; Ex. H at 1:21-2:15.)

It is also beyond dispute that this extremely aggressive
crowd was pulling down barricades around the park.  The
barricades in the center of the park can be seen at Exhibit F at
15:15-16:00.  The demonstrators pulling barricades into the park
while security and police attempted to stop them can be seen in
numerous videos.  (Ex. F at 00:25-4:00; 15:34-16:10; Ex. G at
00:00-00:11; Ex. H at 00:06-00:40.)  Protestors also pushed
police, including with barricades, numerous times before the
incident involving Plaintiff.  (Ex. F at 1:12-1:40; Ex. G at
00:00-00:06; Ex. H at 00:45-1:00; Ex. K at 2:49; 2:57-3:00;
3:09-3:12.)

More specifically, in the moments before the injury of
which he complains, Plaintiff was not standing in a peaceful
assembly of demonstrators.  He was standing amidst a crowd of
people who were physically struggling against police for control
of a metal barricade.  (Ex. G at 00:30-00:40; Ex. K at 3:45-
3:50.)  The barricade Plaintiff claims caused his injury was
pushed into police by a protester approximately one minute
before it was raised off the ground.  (Ex. K 2:49, video still
K1.)  Another demonstrator who fought over barricades throughout
the evening can be seen manipulating the barricade connected to
the one Plaintiff was injured by moments before the incident.
(Ex. G at 00:00-00:11; Ex. K at 3:09-3:12.)  In fact, police can
be seen attempting to hold that exact barricade in position in

the minutes before as demonstrators surge against it and police. (Ex. K at 2:28-3:05, video stills K3, K4.)   Exhibit G at 00:00-00:17 in the foreground shows demonstrators fighting with police over a barricade, but in the background, at 00:11-00:17, a demonstrator can be seen pushing the barricade the Plaintiff claims the police charged with before detaching it from the adjacent barricade.   (Ex. G at 00:11-00:17, video still G5.)

A video recorded from the demonstrators' side of the upraised barricade confirms the unpredictable and aggressive nature of the crowd. At Exhibit J a demonstrator can be heard asking the other demonstrators to stop pushing because he does not want to be arrested.   (Ex. J at 00:05-00:10.)   Meanwhile other demonstrators call the police "pigs" and urge the crowd to push against the police before they begin throwing objects and sprays.   (Ex. J at 00:00-00:17.)

As is shown in these videos, police officers acted with reasonable restraint while trying to maintain control of this large and dangerous metal object while being buffeted and jostled by the screaming crowd.   (Id.)   Police officers did not deploy lachrymatory agents until the barricade, grasped by people on both sides, rose above the heads of the crowd and threatened the safety of people beneath it.   (Ex. F at 20:30-20:38; Ex. G at 00:50-00:58; Ex. J at 00:16-00:30; Ex. K at 3:50-4:02.)   After police officers and another unidentified

person sprayed the crowd with liquid, a number of people
(including demonstrators, police, and onlookers) fell to the
ground while the barricade remained raised temporarily in the
hands of the few people still holding onto it.  (Id.)  The
released barricade then twisted and fell.  (Id.)

    Based on this evidence, no reasonable fact finder could
conclude "that the officers gratuitously inflicted pain in a
manner that was not a reasonable response to the circumstances."
See Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 124 (2d
Cir. 2004).  The upraised barricade clearly posed an immediate
threat to demonstrators, officers, and onlookers beneath it,
including Plaintiff.  See Graham, 490 U.S. at 396.  It was not
objectively unreasonable for police to attempt to regain
exclusive control of the barricade.  See Cowan, 352 F.3d at 762.
Police attempted to regain control in an objectively reasonable
manner, first by admonishing demonstrators to stop seizing
barricades (Ex. K at 00:40-00:45), then by attempting to pull
barricades away, (Ex. G at 00:13-00:53), and finally by
deploying lachrymatory agents once a barricade rose overhead and
the danger escalated (Ex. F at 20:36-20:38; Ex. G at 00:53-
00:58).

    Defendants' motion is therefore granted with respect to
Plaintiff's second claim for relief, for "Excessive Force Under

22

42 U.S.C. § 1983," due to Plaintiff's failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(c).

Defendants' motion is also granted with respect to Plaintiff's third claim for relief, for "Failure to Intervene Under 42 U.S.C. § 1983," because Plaintiff has not established an underlying constitutional violation upon which to base his failure to intervene claim. See O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988).

Defendants' motion is also granted with respect to Plaintiff's first claim for relief, for "Deprivation of Federal Civil Rights Under 42 U.S.C. § 1983," because Plaintiff has no remaining cognizable federal claims.

    B.   Assault and Battery under New York State law

To make a claim against Defendants for assault, Plaintiff would have to establish that the use of force of which he complains was "wrongful under all of the circumstances." See Holland v. City of Poughkeepsie, 90 A.D.3d 841, 847 (2d Dep't 2011). Similarly, a battery claim requires proof of an "intentional wrongful physical contact with another person without consent." Girden v. Sandals Intern., 262 F.3d 195, 204 (2d Cir. 2001); Charkhy v. Altman, 678 N.Y.S.2d 40, 41 (1st Dep't 1998). These wrongfulness standards bring the assault and battery analysis within the same "objective reasonableness" analysis used to adjudicate federal excessive force claims under

the Fourth Amendment.  See Lowth v. Town of Cheektowaga, 82 F.3d
563, 573 (2d Cir. 1996) (affirming dismissal of state law
assault and battery claims because Plaintiff failed to show that
use of force was "objectively unreasonable" under a Fourth
Amendment excessive force analysis).

Here, for the reasons stated in Part III.A, supra,
Defendants have established that their use of force in the
incident which precipitated his injury was objectively
reasonable given the circumstances.  Accordingly, Defendants'
Motion is granted with respect to Plaintiff's fifth and sixth
claims for assault and battery.

C.    Negligence

Plaintiff has alleged in this claim that Defendants
breached their duty of care when they "employed physical force
against third parties and released gaseous toxins in a manner
that physically injured the Plaintiff."  (See Second Amended
Complaint at 24.)  With this allegation, Plaintiff is clearly
attempting to make out a claim for negligence based on the same
allegedly intentional conduct underlying his claims for
excessive force, assault, and battery.  (See id. at 21, 23-24.)
As this Court and others within the Circuit have previously
ruled, "when a plaintiff brings excessive force and assault
claims which are premised on a defendant's allegedly intentional
conduct, a negligence claim with respect to the same conduct

24

will not lie." Tatum v. City of New York, 2009 WL 124881, at
*10 (S.D.N.Y. Jan. 20, 2009) (citations omitted); Lalonde v.
Bates, 166 F. Supp. 2d 713, 720 (N.D.N.Y. 2001) (citations
omitted); Oliver v. Cuttler, 968 F. Supp. 83, 92 (E.D.N.Y.
1997).  Accordingly, Defendants' Motion is granted with regard
to Plaintiff's seventh claim for negligence.

    D.   Respondeat Superior

    Plaintiff has also alleged that Defendant police officers
carried out the acts of which he complains "in their capacities
as police officers, officials, and agents of the City of New
York" and that the City is therefore liable for their actions on
a theory of respondeat superior.  (See Second Amended Complaint
at 25.)  Where a plaintiff is unable to establish a cognizable
claim arising from the actions of individual defendants, a
respondeat superior claim against their employer for the
employer's liability for the individuals' actions must be
dismissed.  See Harsco Corp. v. Segui, 91 F.3d 337, 349 (2d Cir.
1996).  Here, for the reasons stated in Parts III.A, III.B, and
III.C, supra, Plaintiff cannot establish wrongful conduct by the
individual defendants.  Accordingly, Defendants' Motion is
granted with respect to Plaintiff's eighth claim under a theory
of respondeat superior.

E.    Abandoned Claims

Plaintiff has alleged that Defendant City of New York hired, retained, failed to train, and failed to properly supervise Defendant police officers despite knowledge of the officers' propensity to use excessive or reckless force or to unlawfully violate the constitutional rights of citizens.  (See Second Amended Complaint at 26-27.)  Plaintiff has also alleged that Defendants violated several of his rights under the Constitution of the State of New York.  (See Second Amended Complaint at 27-28.)  However, Plaintiff has not opposed Defendants' Motion to dismiss these claims.  These claims are therefore deemed abandoned.  See Hanig v. Yorktown Cent. Sch. Dist., 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005).  Defendants' Motion is granted with regard to Plaintiff's ninth and tenth claims, for negligent hiring/retention/training/supervision and New York Constitutional violations.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss [dkt. no. 64] and Supplemental Motion to Dismiss [dkt. no. 84] are hereby GRANTED.  Accordingly, the Clerk of the Court shall mark this action CLOSED and all pending motions DENIED as moot.

SO ORDERED.


Dated:      New York, New York
            March _31_, 2016

                              _Loretta A. Preska_
                              LORETTA A. PRESKA
                              Chief United States District Judge

27